# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x

CLEANTECH INNOVATIONS, INC.,                             Index No.

                          *Plaintiff*,                   Date of Filing:

            v.                                           Plaintiff has designated
                                                         New York County as the
NASDAQ STOCK MARKET, LLC; MERIT E. JANOW;                place of trial pursuant to
STEPHEN D. BARRETT; DANIEL C. BIGELOW;                   CPLR § 503(1), based upon
MICHAEL J. CURRAN; JOHN A. FRY;                          the residence of some
WILLIAM LYONS; JOHN D. MARKESE;                          Defendants.
DOUGLAS MELAMED; ERIC W. NOLL;
WENDY WHITE; and NASDAQ OMX GROUP, INC.,

                          *Defendants*.

-----------------------------------------------------------------------x

## SUMMONS

To the above named Defendants:

        YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a

copy of your answer, or if the Complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff's attorneys within twenty (20) days after the service of this

summons, exclusive of the day of service (or within thirty (30) days after the service is complete

if this summons is not personally delivered to your within the State of New York); and in case of

your failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the Complaint.

Dated:  December 20, 2011

FENSTERSTOCK & PARTNERS LLP

Blair C. Fensterstock
Thomas A. Brown II
Eugene D. Kublanovsky
Michael T. Phillips II
Kristen M. Madison

100 Broadway
New York, New York 10005
(212) 785-4100

*Counsel for Plaintiff CleanTech
Innovations, Inc.*

Hon. Arlen Specter
Attorney-at-Law
1525 Locust Street, Nineteenth Floor
Philadelphia, PA 19102
(215 735-4200

*Counsel for Plaintiff CleanTech
Innovations, Inc.*

TO:    Office of General Counsel
       The NASDAQ Stock Market, LLC
       805 King Farm Blvd.
       Rockville, MD 20850

       Eric Noll
       The NASDAQ Stock Market, LLC
       805 King Farm Blvd.
       Rockville, MD 20850

       Edward S. Knight, Esq.
       NASDAQ OMX
       One Liberty Plaza
       New York, NY 10006

Stephen D. Barrett
H.C. Wainwright & Co., Inc.
52 Vanderbilt Avenue
New York, NY 10017

Daniel C. Bigelow
Monadnock Capital Management, LP
1900 Market Street
Philadelphia, PA 19103-3527

Michael J. Curran
Centerline Group
625 Madison Avenue
New York, NY 10022

John D. Markese
One Liberty Plaza
New York, NY 10006

Wendy White, Esq.
University of Pennsylvania
133 South 36th Street, Suite 300
Philadelphia, PA 19104

Merit E. Janow
Weatherhead East Asian Institute
Columbia University
420 West 118th Street, MC 3323
New York, NY 10027

A. Douglas Melamed, Esq.
Intel Corporation
2200 Mission College Blvd.
Santa Clara, CA 95054-1549

John A. Fry
Drexel University
3141 Chestnut Street
Philadelphia, PA 19104

William M. Lyons
Morningstar, Inc.
22 West Washington Street
Chicago, IL 60602

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x

CLEANTECH INNOVATIONS, INC.,                          Index No.

                              *Plaintiff*,                    **COMPLAINT**

              v.

NASDAQ STOCK MARKET, LLC; MERIT E. JANOW;
STEPHEN D. BARRETT; DANIEL C. BIGELOW;
MICHAEL J. CURRAN; JOHN A. FRY;
WILLIAM LYONS; JOHN D. MARKESE;
DOUGLAS MELAMED; ERIC W. NOLL;
WENDY WHITE; and NASDAQ OMX GROUP, INC.,

                              *Defendants*.
------------------------------------------------------------------x

Plaintiff CleanTech Innovations, Inc. ("CleanTech") brings this action for injunctive relief against Defendants NASDAQ Stock Market, LLC ("NASDAQ"); NASDAQ's Board of Directors (individually, Merit E. Janow, Stephen D. Barrett, Daniel C. Bigelow, Michael J. Curran, John A. Fry, William Lyons, John D. Markese, A. Douglas Melamed, Eric W. Noll, and Wendy White; collectively, the "Directors"); and NASDAQ's parent company the NASDAQ OMX Group ("OMX"). By and for its Complaint, CleanTech alleges as follows:

## INTRODUCTION

1.     CleanTech is a U.S. publicly-traded company and market leader in China's clean energy industry.  It is a leading designer and manufacturer of wind turbines and other wind energy technologies.  Since December 15, 2010, CleanTech has been listed on the NASDAQ under the stock symbol CTEK.

2.     Having exhausted all available administrative remedies, CleanTech seeks a temporary stay, preliminary injunction, and permanent injunction preventing NASDAQ from delisting it

from the NASDAQ Stock Exchange, pending CleanTech's appeal of NASDAQ's final delisting decision to the Securities Exchange Commission ("SEC").

3.      NASDAQ arbitrarily and capriciously determined to delist CleanTech through a slapdash and sporadic process in contravention of NASDAQ's Stock Market Equity Rules, the Securities Exchange Act of 1934 (the "Act") and the Rules promulgated thereunder by the SEC, and due process under the Constitutions of the United States and State of New York.

4.      NASDAQ has created this emergency.  On December 16, 2011, NASDAQ filed a Form 25 Delisting Notice with the SEC, despite the fact that CleanTech's appeal to the SEC is still pending.  Without judicial intervention, NASDAQ's delisting of CleanTech will be effective 10 days after filing – on December 26, 2011.

5.      Delisting CleanTech prior to the SEC's decision on the merits of CleanTech's appeal will cause the Company irreparable harm – making it difficult for the Company to operate or raise needed capital and pushing the company into insolvency.

6.      Maintaining the status quo, in which CleanTech is suspended from trading on the NASDAQ but is not delisted, would fairly balance the equities and present no harm to NASDAQ or the public markets.  By preserving the status quo, the SEC would have time to hear the merits of CleanTech's appeal and CleanTech would be able to operate effectively in the clean energy marketplace.

## THE PARTIES

7.      Plaintiff CleanTech Innovations, Inc. is a U.S. publicly-traded company headquartered in China.  Its principal place of business is C District, Maoshan Industrial Park, Tieling Economic Development Zone, Tieling City, Liaoning Province, China 112616.

8.     Defendant NASDAQ Stock Market LLC is a Delaware Limited Liability Company with its principal place of business at One Liberty Plaza, 165 Broadway, New York, New York, 10006.   NASDAQ operates as a non-profit entity, with its profits and losses allocated to Defendant NASDAQ OMX Group, Inc.

9.     Defendant NASDAQ OMX Group, Inc. is a Delaware Corporation with its principal place of business at One Liberty Plaza, 165 Broadway, New York, New York, 10006.

10.     Defendant Merit E. Janow is the Chairwoman of the NASDAQ Stock Market LLC Board of Directors. She is a Professor in the Practice of International Economic Law and International Affairs at the School of International and Public Affairs ("SIPA") of Columbia University. Professor Janow is the Director of the Program in International Finance and Economic Policy at SIPA and Co-Director of Columbia's APEC Study Center. In addition, she serves on the faculty of the Weatherhead East Asian Institute and the Center on Japanese Economy and Business at Columbia Business School. Upon information and belief, her address is at the Weatherhead East Asian Institute, 420 West 118th Street, MC 3323, New York, New York 10027.

11.     Defendant Stephen D. Barrett is a member of the NASDAQ Stock Market LLC Board of Directors. Mr. Barrett is the Chief Executive Officer of H.C. Wainwright & Co., Inc., an investment banking firm. He also serves as Managing Partner of Barrett Associates LLC. Previously, he served as Vice President of Merrill Lynch and Co. and as Vice Chairman of NASDAQ OMX BX, Inc. Upon information and belief, his address is at H.C. Wainwright & Co., Inc., 52 Vanderbilt Avenue, New York, New York 10017.

12.     Defendant Daniel C. Bigelow is a member of the NASDAQ Stock Market LLC Board of Directors. He is the President of Monadnock Capital Management LP. Upon information and

belief, his address is at Monadnock Capital Management, LP, 1900 Market Street, Philadelphia, Pennsylvania 19103-3527.

13.     Defendant Michael J. Curran is a member of the NASDAQ Stock Market LLC Board of Directors. He is the Senior Managing Director and Interim Co-Head of the Affordable Housing Group at Centerline Capital Group, Inc. and serves as its Head of Asset Management. Upon information and belief, his address is at Centerline Capital Group, Inc., 625 Madison Avenue, New York, New York 10022.

14.     Defendant John A. Fry is a member of the NASDAQ Stock Market LLC Board of Directors. Since 2010, he has served as the President of Drexel University. He is also a director of Community Health Systems, Delaware Investments, and NASDAQ-OMX. Upon information and belief, his address is at Drexel University, 3141 Chestnut Street, Philadelphia, Pennsylvania 19104.

15.     Defendant William Lyons is a member of the NASDAQ Stock Market LLC Board of Directors. He is the Independent Director in the Technology, Information, and Delivery Services Sector at Morningstar, Inc. Upon information and belief, his address is at Morningstar, Inc., 22 West Washington Street, Chicago, Illinois 60602.

16.     Defendant John D. Markese is a member of the NASDAQ Stock Market LLC Board of Directors. Since 1992, he has served as the President and Chief Executive Officer of the American Association of Individual Investors. He has been a Director of NASDAQ OMX PHLX, Inc. since July 1, 2011 and NASDAQ OMX Group, Inc. since May 1996. Upon information and belief, his address is at the NASDAQ headquarters, One Liberty Plaza, 165 Broadway, New York, New York 10006.

17. Defendant A. Douglas Melamed is a member of the NASDAQ Stock Market LLC Board of Directors. He is the Senior Vice President and General Counsel at Intel Corporation. Upon information and belief, his address is at Intel Corporation, 2200 Mission College Blvd., Santa Clara, California 95054-1549.

18. Defendant Eric W. Noll is a member of the NASDAQ Stock Market LLC Board of Directors. He is the current Chief Executive Officer of the NASDAQ Stock Market LLC and the NASDAQ OMX BX, Inc. As Executive Vice President of Transaction Services of the United States and United Kingdom at NASDAQ OMX Group, Inc., he oversees the trading operations of all United States Transaction Services business and is responsible for NASDAQ OMX Europe. Upon information and belief, his address is at the NASDAQ headquarters, One Liberty Plaza, 165 Broadway, New York, New York 10006.

19. Defendant Wendy White is a member of the NASDAQ Stock Market LLC Board of Directors. She is the Senior Vice President and General Counsel of the University of Pennsylvania and Penn Medicine. Upon information and belief, her address is at the University of Pennsylvania and University of Pennsylvania Health System, 133 South 36th Street, Suite 300, Philadelphia, Pennsylvania 19104.

## JURISDICTION AND VENUE

20. This Court has personal jurisdiction over the Defendants under CPLR §§301 and 302 because they do and transact business in New York, and because many of the material procedures, events, and occurrences giving rise to the claims alleged herein took place in New York.

21.     Venue is proper in this county pursuant to CPLR § 503(a) because one or more of the Defendants, including NASDAQ and OMX, had their headquarters in New York County, New York at all relevant times.

## NASDAQ ARBITRARILY AND CAPRICIOUSLY DETERMINES TO DELIST CLEANTECH

22.     Starting on December 15, 2010, CleanTech has been listed on the NASDAQ, having been approved by NASDAQ Listing Qualifications on December 10, 2010.  Fensterstock Aff.[1] Ex. 5. This listing was approved following a five-month review process which included extensive vetting of, and review of information about, CleanTech's relationship with a successful private investor and corporate advisor (the "Consultant") referenced in an August 2010 article in *Barron's*, the business publication.  Fensterstock Aff. Ex. 2.

23.     Shortly after approving CleanTech's listing on the NASDAQ, NASDAQ Listing Qualifications Staff (the "Staff") began requesting additional information about CleanTech's relationship with the Consultant.   The Staff requested information regarding CleanTech's relationship with the Consultant and any affiliated persons or entities, pursuant to NASDAQ Rules 5205(e) and 5250(a)(1), which empower the Staff to request such information and delist companies if they do not provide that information. Fensterstock Aff. Ex. 2.

24.     On December 13, 2010, CleanTech consummated a $20 million financing which was urgently needed to permit CleanTech to meet mid-December bid deadlines for major wind tower contracts for 2011.  This financing permitted CleanTech to win over $20 million in contracts with major energy producers. Fensterstock Aff. Exs. 2, 4, 6.

25.     CleanTech provided a plethora of information responsive to the Staff's requests, demonstrating that there was no improper relationship or conduct. Fensterstock Aff. Exs. 2, 4.

---

[1]  "Fensterstock Aff." refers to the Affidavit of Blair C. Fensterstock in Support of Plaintiff's Order to Show Cause with a Temporary Restraining Order and its attached Exhibits.

CleanTech made further disclosures in its Form 8-K, filed with the SEC on December 16, 2010. Fensterstock Aff. Ex. 6.

26.     CleanTech filed an S-1 Registration Statement on December 16, 2010 to register investor shares, which was subject to complete SEC scrutiny and review.   The SEC cleared the S-1 without any staff comments.

27.     Despite the fact that CleanTech provided the information and disclosed it in its December 16, 2010 Form 8-K, the Staff argued that CleanTech withheld material information regarding a financing plan involving the Consultant and his affiliate companies, which was consummated in December 2010 (the "December Financing"). Fensterstock Aff. Exs. 2, 7, 9.

28.     Contrary to the theories espoused by the NASDAQ Staff and ultimately ratified by Defendants' determination to delist CleanTech, the December Financing was in no way connected to or conditioned upon CleanTech's being approved for listing on the NASDAQ, and CleanTech promptly, timely, and pursuant to all rules and procedures, disclosed the financing in its December 16, 2010 Form 8-K and S-1 after securing it.   Fensterstock Aff. Ex. 18.

29.     CleanTech further pointed out that it had timely, and pursuant to all proper procedures, informed the Staff of CleanTech's continuing relationship with the Consultant and his affiliate companies during the listing application process, and that the Staff had issued no objection to CleanTech's ties.   That process was thorough, complete, and informed the staff of the Consultant's activities and relationship with CleanTech and included the production of hundreds of pages of e-mails, the forced production of attorney-client information, and extensive interviews. Fensterstock Aff. Exs. 2, 4, 17, 18.

30.     Finally, on January 13, 2011, the Staff notified CleanTech that it had determined to delist CleanTech from NASDAQ, in contravention of NASDAQ's Stock Market Equity Rules, the Act

and the Rules promulgated thereunder by the SEC, and due process under the Constitutions of the United States and State of New York. Fensterstock Aff. Ex. 7.

31.     CleanTech requested a hearing on January 20, 2011, as a result of the Staff's determination.  The NASDAQ Listing Qualification Hearing Panel (the "Hearing Panel") heard oral arguments with respect to the CleanTech's Delisting on February 24, 2011 in Washington D.C. (the "Hearing").  Fensterstock Aff. Ex. 8.

**Michael Emen's Discriminatory Comments to the Hearing Panel**

32.     Representing the Staff at the Hearing was Michael Emen, among others.  Mr. Emen, in putting forth the Staff's position supporting the CleanTech Delisting, spoke at length regarding the NASDAQ's official -- and blatantly discriminatory -- policy against Chinese companies that seek listing on the NASDAQ through a mechanism known as reverse mergers. Fensterstock Aff. Ex. 8.

33.     Mr. Emen did not hide his contempt for such Chinese companies, or the people who promote them.  Indeed, Mr. Emen proudly admitted singling out such companies and their listing applications for special consideration, stating that "[o]ver the past year, we've developed expansive procedures to use in reviewing just this type of company that go well beyond what we do with other applications." Fensterstock Aff. Ex. 8 at 59:15-18.  Mr. Emen's statements clearly indicate that the Staff, rather than apply the same set of procedures for each company that seeks to be listed on the NASDAQ, instead used a different and racially profiling set of procedures for a separate class of companies that had one thing in common:  their management is Chinese, even though they are American companies complying with American securities laws.

34.     The Staff, by its own admission, applied a double standard to companies that sought listing on the NASDAQ based on nothing more than whether the listing applications were from

China-based companies.  In so doing, the NASDAQ applied blatant discriminatory practices and procedures to single out China-based companies for review and delisting. Fensterstock Aff. Ex. 8.

35.     Mr. Emen's bias against China-based companies and reverse mergers are evident in his statements at the Hearing, including the following examples:

a.     "The key regulatory challenge facing us today – NASDAQ – is how to effectively mitigate the regulatory and reputational risks associated with the listing of Chinese reverse merger companies..."  Fensterstock Aff. Ex. 8 at 58:10-14.

b.     "Today, nearly 15 percent of our applications come from China, and the majority of our 180 Chinese listings are the result of reverse mergers."  Fensterstock Aff. Ex. 8 at 58:15-18.

c.     "There's a cottage industry here and in China which is devoted to arranging these reverse merger transactions."  Fensterstock Aff. Ex. 8 at 58:22-59:2.

d.     "Among the promoters the press is focused on are [the Consultant] and his close associate Ming Li, who, through control of firms here and in China, orchestrated the entire process through which CleanTech went public and became listed."  Fensterstock Aff. Ex. 8 at 59:22-60:4.

36.     What is more, Mr. Emen's comments at the Hearing reveal that it was the involvement of the Consultant, rather than any issue regarding CleanTech's alleged untimely disclosure of information, which resulted in the Staff's request that it be delisted.  In fact, when questioned about whether CleanTech could apply in the future for re-listing, Mr. Emen responded "[c]ertainly we'd be looking, among other things, at the company's then relationship with [the Consultant] and his associates in making that decision."  Fensterstock Aff. Ex. 8 at 73:8-11.

37.     Despite the fact that the Consultant was not accused, at any time, of any wrongdoing related to CleanTech, the staff singled out CleanTech's mere association with the Consultant as a reason for delisting, and went so far as to suggest that any future consideration regarding re-listing CleanTech on the NASDAQ was dependent on, as Mr. Emen stated, "the company's then relationship with [the Consultant]."  Fensterstock Aff. Ex. 8 at 73:8-11.

38.     Mr. Emen's comments at the Hearing revealed the true motivation behind the Staff's reason to delist CleanTech: (1) the fact that it was a Chinese company, and (2) its association with the Consultant.  Mr. Emen sought to paint CleanTech in a negative light based solely on its association with the Consultant and his reputation – not CleanTech's.  As Mr. Emen stated at the Hearing, "[i]t doesn't matter whether [the Consultant's] reputation is deserved or not.  What matters is that he is notorious.  We knew of his reputation.  We were concerned about it.  We were entitled to ask about it and we've asked about it through the very end of the approval process."  Fensterstock Aff. Ex. 8 at 61:18-62:2.

39.     Mr. Emen's comments are particularly notable because CleanTech's association with the Consultant was not listed by the Staff as a basis for delisting, yet the Staff devoted tremendous time and effort to the Consultant at the Hearing and, indeed, throughout the initial listing process.

40.     Notably, despite the Staff's stated "concerns" regarding the Consultant, prior to NASDAQ's initial approval of CleanTech's listing on the NASDAQ, the Staff had met with, interviewed, and questioned the Consultant for almost five hours.  All of his career, regulatory history, and the false and misleading articles and blogs about him were explained fully.  The Staff knew full well of his role and relationship with CleanTech, and they nevertheless approved CleanTech's listing.  Mr. Emen and the Staff only subsequently, at the Hearing, sought to leverage the selective negative press and innuendo they could find concerning the Consultant, to

support their delisting case.  Then, they delisted CleanTech based on fabricated and unsupported reasons. Fensterstock Aff. Exs. 2, 4, 17.

41.      It is apparent that the Staff's false allegation that CleanTech failed to timely disclose material information was merely an artifice created to single out a China-based company for delisting based predominately on its association with an individual, who Mr. Emen insinuated had a "notorious reputation," but against whom no allegations of wrongdoing concerning any aspect of the CleanTech listing was ever levied and who has never been accused of any criminal activity. Fensterstock Aff. Ex. 8 at 61:20.

42.      Mr. Emen's comments to the Hearing Panel were a ruse to shift the focus away from the Staff's weak case against CleanTech and its pre-judgment that it would delist CleanTech as a China-based scapegoat.

**The Hearing Panel Determines to Delist CleanTech**

43.      On February 28, 2011, based primarily upon irrational animus against China-based companies and businesspeople, the Hearing Panel wrongfully determined to delist CleanTech from the NASDAQ, in contravention of NASDAQ's Stock Market Equity Rules, the Act and the Rules promulgated thereunder by the SEC, and due process under the Constitutions of the United States and State of New York. Fensterstock Aff. Ex. 9.

44.      On March 2, 2011, NASDAQ suspended CleanTech from trading on the NASDAQ. Fensterstock Aff. Ex. 24.

45.      Since being suspended from trading and threatened with delisting, CleanTech's stock price has fallen from a high of $9.00 to $0.70 – a precipitous decline in market capitalization equal to approximately $200 million. Fensterstock Aff. Ex. 22.

**The Council Sides With CleanTech and Then Reverses Course**

46.     CleanTech appealed to the NASDAQ Listing and Hearing Review Council (the "Council"), the body charged with reviewing Hearing Panel decisions, on February 28, 2011 – the very same day as the Hearing Panel's determination that CleanTech should be delisted. Fensterstock Aff. Exs. 9, 10.

47.     The Council heard new evidence demonstrating that CleanTech's relationship with the Consultant and the December Financing – in which the Consultant's companies played a part - were proper.

48.     On April 27, 2011, Apollo Asia Management L.P. ("Apollo"), an investment fund located at 9 West 57th Street, New York City, with $68 billion under management and a sophisticated shareholder of CleanTech stock, submitted a letter to the NASDAQ Office of Appeals and Review.   Apollo submitted this letter ***not*** "on behalf of [CleanTech] … only to offer the perspective of a sophisticated shareholder on the circumstances that seem to have led to [CleanTech's] Nasdaq delisting."  Fensterstock Aff. Ex. 12, p. 1.

49.     In its letter, Apollo noted that it "[was] well aware of [CleanTech's] affiliation with the [Consultant] and companies with whom the [Consultant] is affiliated.  We are aware of the 2010 Barron's article casting aspersions on [the Consultant] and aware that he may have had regulatory problems in the past.  Although his problems occurred in the distant past, and could be considered by many as minor, we take them seriously.  Nonetheless, we have at no time felt that the affiliation with [the Consultant] has been detrimental to [CleanTech]."  Fensterstock Aff. Ex. 12, p. 2.

50.     In its letter, Apollo also described the circumstances surrounding the December Financing being reviewed by NASDAQ.

"The Council should understand that the benefits to [CleanTech] were considerable, as the financing allowed [CleanTech] to secure business opportunities that would not have otherwise been available to it, and made [CleanTech] more creditworthy by expanding the size and stability of its capital base.   It is also noteworthy that the financing appeared to us to have come together quickly, of necessity, due to contract bid deadlines [CleanTech] was facing.   Apollo is extremely active in financing markets.   Although Apollo was not involved in this [CleanTech] financing, we have had no reason to believe, either before or after the financing, that better terms were available than those obtained."  Fensterstock Aff. Ex. 12, p. 2.

51.     In its letter, Apollo concluded:

"In summary, we are of the opinion that, to our knowledge, [CleanTech] has not done anything that is materially harmful or dangerous to existing or future shareholders.   Nasdaq's decision to delist, however, has negatively impacted the value of [CleanTech] stock, limited the ability of shareholders to exit their investments and jeopardizes [CleanTech's] future.   *We think it is ironic and most unfortunate that the very constituency Nasdaq aims to protect should be so negatively affected by its decision*.   We appreciate that every delisting has potential to harm existing shareholders, and that this criterion alone cannot therefore be the sole reason for overturning a delisting decision.   But when viewed alongside questioned company actions that have not harmed shareholders, and that have in some cases helped shareholders, Nasdaq's decision to delist [CleanTech] seems unduly harsh."  (Emphasis added.)  Fensterstock Aff. Ex. 12, p. 3.

52.     On behalf of CleanTech, on May 5, 2011, Donohoe Advisory Associates LLC ("Donohoe") submitted a letter to the NASDAQ Listing and Hearing Review Council, Office of Appeals and Review.  This letter responded to the inclusion of the Apollo letter into the record before the Council.  Fensterstock Aff. Ex. 13.

53.     In its letter, Donohoe wrote:

"Finally, we think it is important to take note of Apollo's view that [the Consultant] and [his affiliated company] greatly assisted CleanTech and that Apollo and other shareholders benefitted from that assistance.   Moreover, we believe it is significant that Apollo expressed this positive view in spite of its awareness of the *Barron's* article, which was the basis for the Staff's initial focus on the Company's relationship with [the Consultant] . . .  As we indicated in our Appeal Brief, the Staff had to have reached a conclusion that there was no issue with the Company's affiliation with [the Consultant] or it would not have been able to issue the listing approval letter to CleanTech on December 10, 2010.  As

13

noted throughout the Appeal Brief, during the application process CleanTech had provided the Staff with the . . . engagement letter and made numerous representations indicating the expectation that [the Consultant's affiliate] would be participating in future financings as both investor and placement agent.  In that regard, an . . . affiliate even invested in the Company during the middle of the application process.  ***In possession of this knowledge, the Staff then issued an approval letter which did not include any restrictions on CleanTech's relationship or dealings with [the Consultant or his affiliate companies]*** . . . Again, as noted in the Appeal Brief, it was not until the Staff reviewed the December Financing and concluded that it was a "bad deal," that the Staff raised concerns about the Company's relationship with [the Consultant] . . .  As stated herein and throughout the Appeal Brief, we believe the record is abundantly clear that the Staff's subjective analysis of the December Financing was faulty and inherently flawed."  (Emphasis added.)  Fensterstock Aff. Ex. 13, p.2.

54.    On May 19, 2011, the Council issued a decision remanding the delisting dispute to the Hearing Panel for further development of factual issues.   This decision is attached as Fensterstock Aff. Ex. 14.

55.    In its decision to remand to the Hearing Panel, the Council found that the factual record before the Hearing Panel did not justify delisting and was deficient of evidence on two of the Staff's accusations against CleanTech.  First, the Council found that the Hearing Panel was not presented with sufficient evidence to conclude that CleanTech intentionally withheld information about the Consultant, his affiliates, and certain corporate financings.  Second, the Council found the Hearing Panel was not presented with sufficient evidence to conclude that the Company knew that listing approval from NASDAQ was imminent when it failed to disclose that information.  The Council directed the Staff and CleanTech to present more facts to the Hearing Panel on these two issues.  Fensterstock Aff. Ex. 14.

56.    On May 26, 2011, NASDAQ notified CleanTech that it had reopened the record before the Hearing Panel to permit the Staff to respond to an alleged *ex parte* communication. NASDAQ bizarrely alleged that the *ex parte* communication was caused by CleanTech because, when it failed to provide the Staff with a courtesy copy of its April 5, 2011 submission to the

Council, the Staff had no alternative but to contact the Council after the record was closed. CleanTech was permitted to rebut the Staff's response.  The Office of Appeals and Review issued a stay of its May 19 decision.  Fensterstock Aff. Ex. 15.

57.    On June 30, 2011, the Consultant submitted a letter (the "June 30 letter") to the NASDAQ Listing and Hearing Review Council to assist the Council in its understanding of his role and relationship with CleanTech.  Fensterstock Aff. Ex. 17.

58.    In his letter, the Consultant described his open and willing participation in all of the NASDAQ inquiries thus far.  "We met with NASDAQ China Staff in relation to CleanTech on several occasions.  On November 5, 2010, I voluntarily met with seven NASDAQ listing investigations and listing qualifications staff in their Rockville offices for almost five hours in which I answered every question posed to me.  The questions addressed my relationship with CleanTech, the China space generally, issues with other China companies, my history in the securities industry and even the *Barron's* article, which I felt contained vague and irresponsible innuendo."  Fensterstock Aff. Ex. 17, p. 1.

59.    The June 30 letter also described other meetings that he and his associates, including Mr. Ming Li, had with NASDAQ China Staff.  Fensterstock Aff. Ex. 17.

60.    The June 30 letter clarified some of his business practices.

> "We believe that the NASDAQ Staff's criticism of us is based upon a mistaken belief that we are like certain intermediaries, promoters and finders engaged in short-term operations to earn a short-term fee.  Our business is quite different. Anchored by . . . a well-staffed Beijing-based private equity investor conducting painstaking and meticulous due diligence, [we work] for the long-term benefit of our clients and their shareholders.  It is essential and common sense for non-US companies to obtain the type of services that we provide.  It is not realistic to expect a foreign-based company coming to the US market for the first time to have pre-existing relationships with the legal, banking and accounting professionals needed to guide a public company or to have an understanding of US business practices and customs.  Imagine the situation in reverse.  How could a US company with no China experience be expected to enter China without the

guidance of experienced, bilingual local Chinese professionals that understand Chinese business practices, customs and laws?" Fensterstock Aff. Ex. 17, p.3.

61.     The June 30 letter continues:

"The NASDAQ Staff has implied that the involvement of our firm with CleanTech may somehow constitute a public interest concern.  Yet, our firm has no regulatory history, neither have we ever been labeled 'a public interest concern' anywhere in the world, including in the US and in China.  We have unfortunately been attacked by tabloid writers and short-sellers along with hosts of investment banks, consulting firms, corporate issuers, accounting firms and institutional investors associated with the China space.  We are faulted along with certain other advisors in the China space for doing business with China in a highly charged anti-China atmosphere.  In fact, the Staff has admitted that they are now scrutinizing all deals in the China space due to public attention and sentiment in this area." Fensterstock Aff. Ex. 17, p.4.

62.     The June 30 letter further disclosed:  "I have never been sued by the SEC, had to pay a fine to the SEC, been subject to disgorgement, or other penalty or sanction, nor have I ever been convicted of a crime."  Fensterstock Aff. Ex. 17, p. 5.

63.     The June 30 letter also discussed CleanTech's previous financing, filings, and Form 8-Ks, demonstrating that CleanTech's financings and disclosures were entirely within industry standards, and that the December Financing did not distinguish itself from any of the other CleanTech financings that NASDAQ and the SEC approved previously.  Fensterstock Aff. Ex. 17.

64.     The June 30 letter also explained the circumstances surrounding the December Financing:

"In late November 2010, Stifel advised CleanTech's corporate counsel that Stifel would not be able to complete the planned $50 million public offering in 2010 and advised the Company to postpone the offering until the first quarter of 2011. Given the December contract bid deadline, CleanTech, with the assistance of [our Chinese affiliate], contacted several Wall Street firms and Chinese banks, including Barclays Capital, Stifel, Cantor Fitzgerald, Canaccord/Genuity, William Blair, and Bank of Montreal Capital Markets, Bank of China, Shanghai Pudong Development Bank and Tieling Rural Credit Union seeking their input and/or possible participation in obtaining a $20 million bridge financing.  It quickly

became clear from those discussions that CleanTech would not be able to get a bridge financing from any of these banks in a timely fashion.

On November 28, 2010, CleanTech urgently requested that [we] arrange the $20 million financing under the scope of services outlined in the Engagement Letter. The financing negotiations were conducted rapidly between counsel, Orrick Herrington, and the Company's securities counsel, Mr. Robert Newman, from November 30 through the closing of December 13, 2010.

Prior to this financing, [we and our] affiliates owned no voting securities in CleanTech.   Following the financing that voting interest increased to approximately 2.5%.   … CleanTech is not like some other China-based companies experiencing accounting or fraud problems and appearing in the news and should not be punished as if it were one of those companies simply because it is based in China."  Fensterstock Aff. Ex. 17, p. 8.

65.     About the December Financing, the Consultant wrote:

"Further, the financing was not in any way designed to coincide with the NASDAQ listing approval and was not in any way conditioned upon a NASDAQ listing.  The financing would have gone through with or without the NASDAQ listing.  Neither I nor anyone at [my company or our Chinese affiliate] had any role in deciding how or when to disclose the financing to NASDAQ or the SEC, just as we had no role in deciding how or when to disclose the October financing by Strong Growth [the China affiliate of the Consultant's Company] into CleanTech." Fensterstock Aff. Ex. 17, p. 5.

"[T]he financing developed rapidly in response to an urgent need.  There was never any effort to conceal our involvement with CleanTech or any CleanTech financing from NASDAQ and [we] had no role in filing the Form 8-K announcing the transaction.  At all relevant times leading up to the consummation of the December 13, 2010 financing, [we never] discussed with CleanTech whether or when the financing would be disclosed to the NASDAQ."  Fensterstock Aff. Ex. 17, p. 8.

66.     The difficulty in obtaining bridge financing in November and December 2010 was exceptionally difficult, a fact confirmed by Mr. Newman, CleanTech's securities counsel.  "We viewed the [December Financing] opportunity on the terms CleanTech obtained as a major victory given the poor market conditions and inability of CleanTech to attain alternate financing in December of 2010."  Fensterstock Aff. Ex. 18, p.3.

67. At all times, CleanTech was transparent with the Staff – this was evident in CleanTech's rush to disclose the December Financing, just days later in its December 16, 2010 Form 8-K financing. Fensterstock Aff. Exs. 6, 18.

68. Yet, in a stunning reversal, the Council rapidly issued another decision on July 22, 2011, short-circuiting the remand to the Hearing Panel and instead affirming the Hearing Panel's February decision delisting CleanTech. The Counsel held that "[t]he Listing Counsel need not resolve this dispute. The evidence shows that [CleanTech] intentionally withheld documents from Staff concerning the December Financing despite repeated requests for information . . ." Fensterstock Aff. Ex. 20, enclosed within as Ex. A, p. 7.

69. The Council affirmed the Hearing Panel decision in contravention of NASDAQ's Stock Market Equity Rules, the Act and the Rules promulgated thereunder by the SEC, and due process under the Constitutions of the United States and State of New York. *Id.*

70. Reversing its position, the Council suddenly found that CleanTech purposefully withheld information from the Staff and Hearing Panel concerning certain financing involving [the Consultant]. *Id.*

71. This determination was clear legal error and was arbitrary and capricious.

72. This determination was clear legal error because the documents that it newly identified as purposefully withheld were attorney-client privileged documents that, under the law and under the SEC's own policies, are held sacrosanct and are protected from production. Fensterstock Aff. Ex. 18, p. 3.

73. NASDAQ arbitrarily and capriciously pushed for the production of attorney-client privileged documents. These privileged documents are the only documents that CleanTech was alleged to have "purposefully withheld." Instead, as the Wall Street law firm Newman &

Morrison LLP explained in its July 1, 2011 letter, it attempted merely to protect CleanTech's attorney-client privilege while being completely responsive to the NASDAQ inquiries. A true and correct copy of this letter is attached as Fensterstock Aff. Ex. 18.

74.    As Newman & Morrison wrote about the attorney-client privilege that NASDAQ Staff sought to destroy:

> "With respect to [whether CleanTech intentionally withheld information from NASDAQ Staff], there was no point in time during my firm's representation of CleanTech that I, nor any member of our firm, intended to withhold information from the Staff regarding [the Consultant] and his affiliates and/or the [December Financing]. Moreover, to the best of my knowledge, none of CleanTech's officers, directors, or shareholders, [or the Consultant or his affiliates] intended to withhold information from the Staff . . .  It is my understanding that after reviewing the approximately 190 emails generated in connection with the Financing during the period from November 30, 2010, the date of initiation of the financing effort, to December 13, 2010, the date of closing, the Staff has focused on one email from Jason Li to me, dated December 9, 2010, as an indication that CleanTech was fearful of disclosing the planned Financing to NASDAQ. As was evident in my response to Mr. Li, I interpreted this as a request to expedite the completion of the Financing and not worry if completion of the Financing somehow caused a delay in the listing application review process. Accordingly, I responded that I would move forward with the financing as quickly as possible. Had I understood Mr. Li's emails to be expressing a concern that the completion of the Financing could have a negative impact on the listing application, I would have immediately initiated a discussion on that point with Mr. Li. Moreover, I would have contacted the NASDAQ Staff to obtain assurances for CleanTech that it would not negatively affect CleanTech in any way. In my mind, this was a transaction that fully complied with NASDAQ's shareholder approval rules, was on terms considered favorable by all involved, and was essential to the future growth of the Company." Fensterstock Aff. Ex. 18, pp. 1-2.

75.    Further, NASDAQ Staff inaccurately characterized the process between CleanTech and the Staff. As Newman & Morrison wrote:

> "No person from our firm was involved in any of the [NASDAQ Staff Inquiry] conversations from the Staff's Submission. Mr. Uchimoto and I discussed the fact that the Staff was asking CleanTech to waive attorney-client privilege, and I told him I needed time to review the issue and discuss the facts with our client. The Staff has incorrectly implied that we were not cooperating with their request to immediately produce all emails, which would have meant the violation of the attorney-client privilege. We disagree with that characterization. We were very

responsive in providing the emails given the legal research required before releasing attorney-client privileged information, time-zone differences, language barrier and technical issues of combing through the firm's email system to respond to a comprehensive information request by the Staff.  The process took approximately two days and we responded fully on November 24, 2010." Fensterstock Aff. Ex. 18, p. 3.

## The NASDAQ Board of Directors Declines Review

76.    On November 23, 2011, the NASDAQ Board of Directors declined to review the Council's decision pursuant to its power under NASDAQ Rule 5825, rendering the Council's decision final.  Fensterstock Aff. Ex. 19.

77.    Under NASDAQ Rule 5825, any member of the Board of Directors may call for the review of a Council decision.  On information and belief, each of the Board Members were not even informed of the Council's decision with enough information to make a proper decision on whether to review the Council's decision.  This refusal to review the Council's decision was also made in contravention of NASDAQ's Stock Market Equity Rules, the Act and the Rules promulgated thereunder by the SEC, and due process under the Constitutions of the United States and State of New York.

78.    On information and belief, expedited discovery will demonstrate that the Board Members violated the mandated procedure under NASDAQ and SEC Rules, refused to review the Council decision in bad faith, and contravened their duties when they refused review of the Council decision.

79.    Also on November 23, 2011, CleanTech appealed the decision of the Board of Directors to the SEC, as provided by Rule 420 of the SEC Rules of Practice.  Fensterstock Aff. Ex. 20.

80.    On December 9, 2011, NASDAQ sent an email to Dave Donohoe, Financial Advisor to CleanTech, notifying Donohoe Advisory that the NASDAQ Stock Market will issue the attached

press release on December 15, 2011, announcing the filing of NASDAQ's Form 25 Delisting

Notice to go into effect 10 days later.  Fensterstock Aff. Ex. 24.

81.    Also on December 9, 2011, CleanTech submitted a Motion for Reconsideration to the

Board of Directors requesting that they reconsider their decision to decline to review the matter.

Fensterstock Aff. Ex. 21.

82.    On December 12, 2011, NASDAQ Senior Vice President and Corporate Secretary Joan

C. Conley rejected the Motion for Reconsideration, admitting that ***"Nasdaq's rules do not***

***provide a procedure by which the Board of Directors may call a decision for review after the***

***decision becomes the final action of Nasdaq."***  (Emphasis added.)  Fensterstock Aff. Ex. 23.

83.    On December 16, 2011, NASDAQ filed a Form 25 Delisting Notice with the SEC, even

as CleanTech's appeal to the SEC is still pending.  That From 25 reiterated that:

> "On May 26, 2011, the Company was provided notice that the May 19, 2011
> Council decision was stayed to allow the record to be opened so that Staff could
> address an ex-parte communication on the record.  On July 22, 2011, the Council
> issued a decision that affirmed the Panel decision to delist the Company's [sic]
> securities.  On November 23, 2011, the Company was provided notice that the
> Nasdaq Board of Directors declined to call the Council decision for review
> pursuant to Rule 5825(a)."

Without judicial intervention, NASDAQ will delist CleanTech in 10 days – on December 26,

2011. Fensterstock Aff. Ex. 25.

84.    This delisting, were it to become effective on December 26, 2011, would be in

contravention of NASDAQ's Stock Market Equity Rules, the Act and the Rules promulgated

thereunder by the SEC, and due process under the Constitutions of the United States and State of

New York.

85.     If CleanTech is delisted, it faces the distinct possibility of becoming insolvent.  This result would be manifestly unjust and would cause irreparable harm to CleanTech and its shareholders, making it difficult to raise capital or compete in the marketplace.

## CLEANTECH HAS EXHAUSTED ITS ADMINISTRATIVE REMEDIES

86.     CleanTech has exhausted all of the available administrative remedies to prevent the delisting.  NASDAQ filed its Form 25 Delisting Notice with the SEC on December 16, 2011, starting a ten-day countdown clock that will lead to CleanTech's delisting on December 26, 2011. Fensterstock Aff. Ex. 25.

87.     A procedural and due process dead zone now exists.  There is no other process available to stay Nasdaq's decision other than through this Court.  CleanTech submitted its appeal to the SEC on November 23, 2011.  The SEC can overturn NASDAQ's decision to delist CleanTech.  Because of the standard SEC briefing schedule, the appeal of the delisting decision to the SEC will not be resolved until well into 2012.  By this time, the ten-day countdown clock to December 26, 2011 will have rung and CleanTech will be delisted, causing it significant and truly irreparable harm; one which cannot be remedied with money. Fensterstock Aff. Ex. 20.

88.     Because of this procedural and due process dead zone, nothing short of immediate judicial intervention can stop the irreparable harm that NASDAQ's delisting would cause CleanTech.

## NASDAQ MUST BE ENJOINED FROM DELISTING CLEANTECH TO AVOID IRREPARABLE HARM, PRESERVE THE STATUS QUO, AND  PROTECT THE INTERESTS OF THE PARTIES AND SHAREHOLDERS

89.     As a result of NASDAQ's arbitrary, capricious, and racially motivated actions thus far, in addition to NASDAQ's unwarranted and obtrusive invasion of the attorney client privilege, CleanTech has been unduly harmed.  CleanTech has lost an excellent opportunity to bid on the

New Jersey Atlantic City Project which involved the construction of six wind towers for a total contract order of $8,400,000.  The New Jersey Atlantic City Project also involves a follow-up project, which will construct 70 towers, for a total price of just under $100 million.  The first towers will be assembled in New Jersey, using United States employees.  The State of New Jersey would have provided CleanTech, at very low cost and with simple terms, the capital necessary to construct and outfit a manufacturing facility.  As the result of the delisting effort by NASDAQ, CleanTech lost this opportunity. Fensterstock Aff. Ex. 21, enclosed within as Ex. A.

90.    Since being suspended from trading and threatened with delisting, CleanTech's stock price has fallen from a high of $9.00 to $0.70 – a precipitous decline in market capitalization equivalent to approximately $200 million.  Fensterstock Aff. Ex. 22.

91.    When NASDAQ threatened CleanTech with delisting, a $50,000,000 stock offering that CleanTech was preparing with Stifel Financial Corporation was abandoned because Stifel could not sell CleanTech's stock. Fensterstock Aff. Ex. 21, enclosed within as Ex. A.

92.    NASDAQ's efforts have also sabotaged CleanTech's efforts to raise capital through the Toronto Stock Exchange and Hong Kong Stock Exchange. *Id*.

93.    In its April 27, 2011, letter to the NASDAQ Office of Appeals and Review, Apollo  also described the irreparable harm to CleanTech shareholders as a result of NASDAQ's trading suspension and threat to delist CleanTech.  Fensterstock Aff. Ex. 12.

94.    Apollo noted that the delisting decision "disadvantaged existing and future shareholders of [CleanTech] – ironically, the very constituencies it aims to protect."  As proof of such harm, Apollo pointed out that (1) CleanTech stock fell over 50% since the initial delisting decision; (2) the stock's volume also fell, resulting in reduced liquidity; (3) as a public company, CleanTech was required to disclose the delisting decision, which resulted in permanent damage to its

reputation; and (4) the delisting decision impaired CleanTech's ability to obtain financing, which has caused irreparable harm. *Id.*, pp. 1-2.

95.     If CleanTech is delisted, the re-listing process will bring it further financial ruin.  The application costs a $25,000 fee, and NASDAQ gives no indication of how soon the application will be processed.  CleanTech will lose significant time and money.

96.     These types of harms will only be exacerbated should Defendants be permitted to effectuate the delisting while CleanTech's SEC appeal is still pending.

97.     Delisting CleanTech prior to the SEC's decision on the merits of CleanTech's appeal would cause the company irreparable harm – making it difficult for the company to operate or raise needed capital and pushing the company into insolvency.

98.     Maintaining the status quo, in which CleanTech is suspended from trading on the NASDAQ but not delisted, would fairly balance the equities and presents ***no harm to NASDAQ or the public markets***.  By preserving the status quo, the SEC would have time to hear the merits of CleanTech's appeal and CleanTech would be able to operate effectively in the clean energy marketplace.

**FIRST CAUSE OF ACTION (Against All Defendants)**
**TEMPORARY STAY OR PRELIMINARY INJUNCTION**

99.     CleanTech incorporates the preceding allegations of this Complaint in paragraphs 1 through 98 as if fully set forth herein.

100.    Without a stay pending its hearing on the preliminary injunction enjoining NASDAQ from delisting CleanTech, CleanTech will suffer irreparable harm while it simply awaits the SEC's adjudication of its appeal.

101.    A temporary stay and preliminary injunction would preserve the status quo while this Court and the SEC determine the merits of permanent injunctive relief.

102.    Maintaining CleanTech's listing on the NASDAQ pending the SEC's determination of CleanTech's appeal would properly balance the equities.  It is no burden for NASDAQ to maintain CleanTech's listing on the NASDAQ – NASDAQ has already suspended trading in CleanTech on the exchange and that suspension continues.

103.    Having submitted its appeal to the SEC, CleanTech has exhausted all of its administrative remedies.  The SEC may still reverse NASDAQ's decision to delist.  However, no NASDAQ or SEC administrative procedure permits CleanTech to seek an interim stay of the delisting.

<u>SECOND CAUSE OF ACTION (Against All Defendants)</u><br><u>PERMANENT INJUNCTION</u>

104.    CleanTech incorporates the preceding allegations of this Complaint in paragraphs 1 through 103 as if fully set forth herein.

105.    Without a permanent injunction enjoining NASDAQ from delisting CleanTech, CleanTech will suffer irreparable harm while it simply awaits the SEC's adjudication of its appeal.

106.    A permanent injunction would preserve the status quo while the SEC determines the merits of CleanTech's appeal.

107.    Maintaining CleanTech's listing on the NASDAQ pending the SEC's determination of CleanTech's appeal would properly balance the equities.  It is no burden for NASDAQ to keep CleanTech suspended from trading but maintain its listing on the NASDAQ.

108.    Having submitted its appeal to the SEC, CleanTech has exhausted all of its administrative remedies.  The SEC may still reverse NASDAQ's decision to delist.  However, no NASDAQ or SEC administrative procedure permits CleanTech to seek an interim stay of the delisting.

## THIRD CAUSE OF ACTION (Against All Defendants)
## VIOLATION OF SECTION 19(g) OF THE SECURITIES EXCHANGE ACT

109.    CleanTech incorporates the preceding allegations of this Complaint in paragraphs 1 through 108 as if fully set forth herein.

110.    By arbitrarily and capriciously attempting to delist CleanTech from its stock exchange, Defendants have violated Section 19(g) of the Act and the Rules promulgated thereunder by the SEC.  Section 19(g) mandates that stock exchanges like the NASDAQ maintain compliance with their own rules.

111.    NASDAQ's effort to delist CleanTech has been marred by procedural deficiencies, arbitrary and capricious fact findings, and a rush to judgment – all of which have violated NASDAQ Rules.

112.    These violations of NASDAQ Rules have irreparably harmed CleanTech and pushed it to the brink of insolvency.

113.    Only injunctive relief preventing CleanTech's delisting pending the SEC appeal can prevent further violation of these Rules and the Act.

## FOURTH CAUSE OF ACTION (Against All Defendants)
## VIOLATION OF DUE PROCESS UNDER THE U.S. CONST. AMEND. V.

114.    CleanTech incorporates the preceding allegations of this Complaint in paragraphs 1 through 113 as if fully set forth herein.

115.    Defendants, acting in their role as a quasi-governmental and regulatory body, have arbitrarily and capriciously pushed to delist CleanTech from the NASDAQ.  This effort does not afford CleanTech the due process to which it is entitled under the U.S. Constitution when faced with a regulatory action.

116.   NASDAQ Rules maintain a procedural and due process dead zone in which an issuer's appeal to the SEC may still be pending even as NASDAQ files its Form 25 Delisting Notice and effectuates delisting.

117.   By NASDAQ's own admission, "Nasdaq's rules do not provide a procedure by which the Board of Directors may call a decision for review after the decision becomes the final action of Nasdaq." Fensterstock Aff. Ex. 23.

118.   NASDAQ's process has not afforded CleanTech due process to contest the Staff's initial delisting determination.

119.   Because it is possible for NASDAQ to delist CleanTech *and then CleanTech to prevail* in its appeal before the SEC of the NASDAQ action, Defendants have denied CleanTech the due process owed to it under the U.S. Constitution.

**FIFTH CAUSE OF ACTION (Against All Defendants)**
**VIOLATION OF DUE PROCESS UNDER THE N.Y. CONST. ART. I § 6**

120.   CleanTech incorporates the preceding allegations of this Complaint in paragraphs 1 through 119 as if fully set forth herein.

121.   Defendants, acting in their role as a quasi-governmental and regulatory body, have arbitrarily and capriciously pushed to delist CleanTech from the NASDAQ. This effort does not afford CleanTech the due process to which it is entitled under the Constitution of the State of New York when faced with a regulatory action.

122.   NASDAQ Rules maintain a procedural and due process dead zone in which an issuer's appeal to the SEC may still be pending even as NASDAQ files its Form 25 Delisting Notice and effectuates delisting.

123.     By NASDAQ's own admission, "Nasdaq's rules do not provide a procedure by which the Board of Directors may call a decision for review after the decision becomes the final action of Nasdaq." Fensterstock Aff. Ex. 23.

124.     NASDAQ's process has not afforded CleanTech due process to contest the Staff's initial delisting determination.

125.     Because it is possible for NASDAQ to delist CleanTech *and then CleanTech to prevail* in its appeal before the SEC of the NASDAQ action, Defendants have denied CleanTech the due process owed to it under the Constitution of the State of New York.

## PRAYER FOR RELIEF

WHEREFORE, CleanTech prays for judgment against Defendants as follows:

A.     As and for its First Cause of Action, a stay pending its hearing on the preliminary injunction enjoining Defendants from delisting CleanTech from the NASDAQ Capital Market and/or otherwise effectuating the Form 25 Delisting Notice filed with the SEC on December 16, 2011 until such a time as the SEC makes a determination on CleanTech's appeal of NASDAQ's delisting determination;

B.     As and for its Second Cause of Action for a permanent injunction enjoining Defendants from delisting CleanTech from the NASDAQ Capital Market and/or otherwise effectuating the Form 25 Delisting Notice filed with the SEC on December 16, 2011 until such a time as the SEC makes a determination on CleanTech's appeal of NASDAQ's delisting determination;

C.     As and for it Third Cause of Action for violation of Section 19(g) of the Securities Exchange Act for an Order enjoining the effectiveness of that decision and ordering expedited discovery relating to the NASDAQ Board of Directors' decisions not to call for review the

NASDAQ Listing and Hearing Review Council's decision to affirm the Hearing Panel's determination to delist CleanTech;

D.      As and for its Fourth Cause of Action for violation of due process guaranteed under the Fifth Amendment of the U.S. Constitution an Order enjoining the effectiveness of the NASDAQ decision and ordering expedited discovery relating to the NASDAQ Board of Directors' decisions not to call for review the NASDAQ Listing and Hearing Review Council's decision to affirm the Hearing Panel's determination to delist CleanTech;

E.      As and for its Fifth Cause of Action for violation of due process guaranteed under Article I, Section 6 of the Constitution of the State of New York an Order enjoining the effectiveness of the NASDAQ decision and ordering expedited discovery relating to the NASDAQ Board of Directors' decisions not to call for review of the NASDAQ Listing and Hearing Review Council's decision to affirm the Hearing Panel's determination to delist CleanTech; and

F.      For any other and further relief that the Court may deem just and proper.


Dated:  December 19, 2011


                                        FENSTERSTOCK & PARTNERS LLP


                                        _____
                                        Blair C. Fensterstock
                                        Thomas A. Brown II
                                        Eugene D. Kublanovsky
                                        Michael T. Phillips II
                                        Kristen M. Madison

                                        100 Broadway
                                        New York, New York 10005
                                        (212) 785-4100

                                        *Counsel for Plaintiff CleanTech
                                        Innovations, Inc.*

                                        ARLEN SPECTER
                                        Attorney-at-Law
                                        1525 Locust Street, Nineteenth Floor
                                        Philadelphia, PA 19102
                                        (215 735-4200

                                        *Counsel for Plaintiff CleanTech
                                        Innovations, Inc.*