# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------x

CLEANTECH INNOVATIONS, INC.,

                                        Plaintiff,                    Index No. 653524-11

                      — against —

                                                                      **NOTICE OF MOTION**
NASDAQ STOCK MARKET LLC; MERIT E. JANOW;                              **FOR ADMISSION**
STEPHEN D. BARRETT; DANIEL C. BIGELOW;                               *PRO HAC VICE*
MICHAEL J. CURRAN; JOHN A. FRY; WILLIAM
LYONS; JOHN D. MARKESE; A. DOUGLAS MELAMED;
ERIC W. NOLL; WENDY WHITE; and NASDAQ QMX
GROUP, INC.,

                                        Defendants.
------------------------------------------------------------------------x

        PLEASE TAKE NOTICE that upon the annexed affidavit of Blair C. Fensterstock, sworn

to on DECEMBER 20, 2011, and the exhibits annexed thereto, Plaintiff CleanTech Innovations,

Inc. will move before this Court in the Motion Submission Office, Room 130 of the New York

County Courthouse of the Supreme Court, State of New York, at 60 Centre Street, New York, New

York 10007-1474, on DECEMBER 20, 2011 at 9:30 a.m., or as soon thereafter as counsel may be

heard, for an order admitting Arlen Specter, Esq., *pro hac vice*, to act as co-counsel for Plaintiff

CleanTech Innovations, Inc. in the above-captioned action.

Dated: New York, New York
       December 20, 2011

                                        1

FENSTERSTOCK & PARTNERS LLP


By: _____
Blair C. Fensterstock
Thomas A. Brown, II
Eugene D. Kublanovsky
Michael T. Phillips, II

100 Broadway, 8th Floor
New York, NY 10005
(212) 785-4100

*Attorneys for Plaintiff*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------x
CLEANTECH INNOVATIONS, INC.,

                                        Plaintiff,                              Index No. 053524-11

                          — against —                                          **AFFIDAVIT OF
                                                                               BLAIR C.**
NASDAQ STOCK MARKET LLC; MERIT E. JANOW;                                        **FENSTERSTOCK**
STEPHEN D. BARRETT; DANIEL C. BIGELOW;                                          **IN SUPPORT OF**
MICHAEL J. CURRAN; JOHN A. FRY; WILLIAM                                         ***PRO HAC VICE* MOTION**
LYONS; JOHN D. MARKESE; A. DOUGLAS MELAMED;
ERIC W. NOLL; WENDY WHITE; and NASDAQ QMX
GROUP, INC.,

                                        Defendants.
------------------------------------------------------------------------x

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF NEW YORK     )

          BLAIR C. FENSTERSTOCK, being duly sworn, deposes and says:

          1.       I am the Managing Partner of Fensterstock & Partners LLP, attorneys for Plaintiff

CleanTech Innovations, Inc. ("Plaintiff CleanTech").  I have been a member of this Court since

July 8, 1976. I submit this affidavit in support of Plaintiff CleanTech's application to permit Arlen

Specter, to act as co-counsel, *pro hac vice*, for Plaintiff CleanTech in the above-captioned case.

          2.       I apply for the admission *pro hac vice* of Arlen Specter, a member in good standing

of the State Bar of Pennsylvania. The affidavit of Arlen Specter, sworn to on December 9, 2011,

and a certificate attesting to his good standing with the Pennsylvania bar is annexed hereto as

Exhibit A. Mr. Specter has also been admitted to the SUPREME COURT OF THE
UNITED STATES, THE DISTRICT OF COLUMBIA, AND THE STATE OF NEW JERSEY
          3.       A proposed Order is submitted as Exhibit B for the convenience of the Court.

                                                1

WHEREFORE, I apply for the admission of Arlen Specter to the Bar of the Court to act as

co-counsel for Plaintiff CleanTech Innovations, Inc. in the above-captioned action.

_____
BLAIR C. FENSTERSTOCK (BF-2020)

Sworn to before me this
        day of December, 2011

_____
Notary Public

CATHERINE A. HARRISON
Notary Public, State of New York
No. 41-4985444
Qualified in Queens County
Commission Expires August 19, 20_13_

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------x

CLEANTECH INNOVATIONS, INC.,

                      Plaintiff,                              Index No. 653524-11

— against —

NASDAQ STOCK MARKET LLC; MERIT E. JANOW;
STEPHEN D. BARRETT; DANIEL C. BIGELOW;
MICHAEL J. CURRAN; JOHN A. FRY; WILLIAM
LYONS; JOHN D. MARKESE; A. DOUGLAS MELAMED;
ERIC W. NOLL; WENDY WHITE; and NASDAQ QMX
GROUP, INC.,

                      Defendants.
------------------------------------------------------------------------x

**AFFIDAVIT OF
ARLEN SPECTER
IN SUPPORT OF
*PRO HAC VICE* MOTION**

              AFFIDAVIT IN SUPPORT OF *PRO HAC VICE* MOTION

STATE OF PENNSYLVANIA      )
                           ) ss:
COUNTY OF PHILADELPHIA   )

      ARLEN SPECTER, being duly sworn, deposes and says:

      1.      I am a member of the Pennsylvania State Bar, being duly admitted on

April 15, 1957.  I submit this affidavit in support of Plaintiff CleanTech Innovation, Inc.'s

("Plaintiff CleanTech") application to permit me to act as co-counsel, *pro hac vice*, for Plaintiff

CleanTech in the above-captioned action.

      2.      I was admitted to practice law in Pennsylvania in 1957. I have also been admitted

to the bars of the Supreme Court of the United States,  the District of Columbia and the State of

New Jersey. A certificate attesting to my good standing with the Pennsylvania Bar is attached

hereto as Exhibit 1.

      3.      I am familiar with the standards of professional conduct imposed upon members

of the New York Bar and the relevant statutes, rules, and procedures and will abide by them.

WHEREFORE, I apply for the admission to the Bar of this Court to act as co-counsel for Plaintiff CleanTech in the above-captioned action.

ARLEN SPECTER

Sworn to before me this
/ 9ᵗʰ day of December, 2011

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Tracy L. Leonardis, Notary Public
City of Philadelphia, Philadelphia County
My commission expires May 23, 2013



## 𝔖𝔲𝔭𝔯𝔢𝔪𝔢 𝔔𝔬𝔲𝔯𝔱 𝔬𝔣 𝔓𝔢𝔫𝔫𝔰𝔶𝔩𝔳𝔞𝔫𝔦𝔞

# CERTIFICATE OF GOOD STANDING

### *Arlen Specter, Esq.*

### DATE OF ADMISSION

### *April 15, 1957*

The above named attorney was duly admitted to the bar of the Commonwealth of Pennsylvania, and is now a qualified member in good standing.



**Witness my hand and official seal**
**Dated:  December 19, 2011**

John W. Person Jr., Esq.
Deputy Prothonotary

At IAS Part ____ of the Supreme
Court of the State of New York,
Commercial Division, County of
New York, at the courthouse
thereof, 60 Centre Street, New
York, New York, on the ___ day
of _____, 2011

PRESENT:

-----------------------------------------------------------------------x

CLEANTECH INNOVATIONS, INC.,

                                         Plaintiff,                   Index No. 653524-11

                    — against —

NASDAQ STOCK MARKET LLC; MERIT E. JANOW;          **ORDER GRANTING**
STEPHEN D. BARRETT; DANIEL C. BIGELOW;            **ADMISSION**
MICHAEL J. CURRAN; JOHN A. FRY; WILLIAM           ***PRO HAC VICE***
LYONS; JOHN D. MARKESE; A. DOUGLAS MELAMED;
ERIC W. NOLL; WENDY WHITE; and NASDAQ QMX
GROUP, INC.,

                                         Defendants.

-----------------------------------------------------------------------x

　　　　Arlen Specter, Esq., having applied to this Court for admission *pro hac vice* to represent

Plaintiff CleanTech Innovations, Inc. ("Plaintiff CleanTech") in this action, and said applicant

having submitted in support thereof the affidavit of Blair C. Fensterstock, a member of the Bar of

the State of New York and attorney of record herein for Plaintiff CleanTech, sworn to on DECEMBER 20

2011, and exhibits thereto, an affidavit of Mr. Specter dated December 19, 2011 and a Certificate of

Good Standing from the jurisdiction in which he was admitted to the practice of law, and the Court

having reviewed the foregoing submissions and due deliberation having been engaged in, it is now

therefore

1

ORDERED that the motion is granted on consent and Arlen Specter, Esq. is permitted to appear and to participate in this action on behalf of Plaintiff CleanTech and it is further

ORDERED that he shall at all times be associated herein with counsel who is a member in good standing of the Bar of the State of new York and is attorney of record for the party in question; and it is further

ORDERED that, pursuant to Section 520.11 of the Rules of the Court of Appeals and Section 602.2 of the Rules of the Appellate Division, First Department, the attorney hereby admitted *pro hac vice* shall abide by the standards of professional conduct imposed upon members of the New York Bar, including the Rules of the courts governing the conduct of attorneys and the Disciplinary Rules of the Code of Professional responsibility; and it is further

ORDERED that he shall be subject to the jurisdiction of the courts of the State of New York with respect to any acts occurring during the course of his participation in this matter; and its is further

ORDERED that said counsel shall notify the Court immediately of any matter or event in this or any other jurisdiction which affects their standing as a member of the Bar.

_____
J.S.C.

2

MOTION SEQUENCE # 001

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x
CLEANTECH INNOVATIONS, INC.,

                              *Plaintiff,*

                    v.

NASDAQ STOCK MARKET, LLC; MERIT E. JANOW;
STEPHEN D. BARRETT; DANIEL C. BIGELOW;
MICHAEL J. CURRAN; JOHN A. FRY; WILLIAM LYONS;
JOHN D. MARKESE; A. DOUGLAS MELAMED;
ERIC W. NOLL; WENDY WHITE; and
NASDAQ OMX GROUP, INC.,

                              *Defendants.*
-------------------------------------------------------------------x

Index No. 653524 – 11

[~~PROPOSED~~] ORDER TO
SHOW CAUSE

Upon the Affidavit of Arnold Staloff sworn to December 18, 2011, the Affidavit of Blair C. Fensterstock, Esq., sworn to December 19, 2011, and the exhibits attached thereto, the Affidavit of Emergency sworn to by Blair C. Fensterstock, Esq. on December 19, 2011, and Plaintiff's Memorandum of Law, it is hereby

ORDERED, that Defendants show cause at Part 45 of the Supreme Court, to be held in the New York County Supreme Court, 26 Broadway ~~60 Centre Street,~~ New York, New York, on January 6, 2012 at 10:30 o'clock in the forenoon of that day, or as soon thereafter as counsel can be heard, why an order shall not be entered:

(1) Staying NASDAQ's delisting of CleanTech pending the Securities and Exchange Commission's decision on CleanTech's appeal of NASDAQ's delisting decision;

(2) Mandating expedited discovery relating to the NASDAQ Board of Directors' decisions not to call for review of the NASDAQ Listing and Hearing Review Council's decision to affirm the Hearing Panel's determination to delist CleanTech; and

(3) For any other and further relief that the Court may deem just and proper, and it is further

ORDERED that the order of NASDAQ delisting CleanTech is temporarily stayed pending hearing ~~and determination~~ on Plaintiff's Order to Show Cause, and it is further

ORDERED that service of the copy of this Order, together with the supporting papers on which it is made, upon all parties of record be deemed good and sufficient if made by hand or Federal Express on or before 5 p.m. on December 20, 2011, and it is further

ORDERED that opposition papers, if any, shall be served on all parties of record by hand or Federal Express on or before 5 p.m. on ~~December~~ January 3, 2012, and it is further

ORDERED that reply papers, if any, shall be served on all parties of record by hand or Federal Express on or before 5 p.m. on ~~December~~ January 5, 2012.

Dated: December 20, 2011

ENTER:

_____
J.S.C.

ORAL ARGUMENT
DIRECTED
J.S.C.

At IAS Part **45** of the Supreme
Court of the State of New York,
Commercial Division, County of
New York, at the courthouse
thereof, 60 Centre Street, New
York, New York, on the **20** day
of **December**, 2011

P R E S E N T :

-----------------------------------------------------------------------x

CLEANTECH INNOVATIONS, INC.,

                              Plaintiff,                          Index No. **653524-11**

              — against —

NASDAQ STOCK MARKET LLC; MERIT E. JANOW;          **ORDER GRANTING**
STEPHEN D. BARRETT; DANIEL C. BIGELOW;            **ADMISSION**
MICHAEL J. CURRAN; JOHN A. FRY; WILLIAM           *PRO HAC VICE*
LYONS; JOHN D. MARKESE; A. DOUGLAS MELAMED;
ERIC W. NOLL; WENDY WHITE; and NASDAQ QMX
GROUP, INC.,

                              Defendants.

-----------------------------------------------------------------------x

       Arlen Specter, Esq., having applied to this Court for admission *pro hac vice* to represent

Plaintiff CleanTech Innovations, Inc. ("Plaintiff CleanTech") in this action, and said applicant

having submitted in support thereof the affidavit of Blair C. Fensterstock, a member of the Bar of

the State of New York and attorney of record herein for Plaintiff CleanTech, sworn to on *December 7*

2011, and exhibits thereto, an affidavit of Mr. Specter dated *December 19* 2011 and a Certificate of

Good Standing from the jurisdiction in which he was admitted to the practice of law, and the Court

having reviewed the foregoing submissions and due deliberation having been engaged in, it is now

therefore

1

ORDERED that the motion is granted on consent and Arlen Specter, Esq. is permitted to appear and to participate in this action on behalf of Plaintiff CleanTech and it is further

ORDERED that he shall at all times be associated herein with counsel who is a member in good standing of the Bar of the State of new York and is attorney of record for the party in question; and it is further

ORDERED that, pursuant to Section 520.11 of the Rules of the Court of Appeals and Section 602.2 of the Rules of the Appellate Division, First Department, the attorney hereby admitted *pro hac vice* shall abide by the standards of professional conduct imposed upon members of the New York Bar, including the Rules of the courts governing the conduct of attorneys and the Disciplinary Rules of the Code of Professional responsibility; and it is further

ORDERED that he shall be subject to the jurisdiction of the courts of the State of New York with respect to any acts occurring during the course of his participation in this matter; and its is further

ORDERED that said counsel shall notify the Court immediately of any matter or event in this or any other jurisdiction which affects their standing as a member of the Bar.

J.S.C.

2

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840  (3/2011)

| | | For Court Clerk Use Only: |
|---|---|---|
| | | IAS Entry Date |

**Supreme** _____ **COURT, COUNTY OF** ____ **New York** ____

Index No: _65 3524-11_   Date Index Issued: _12/20/11_

| | Judge Assigned |
|---|---|
| | |
| | RJI Date |

**CAPTION:**   Enter the complete case caption.  Do not use et al or et ano.  If more space is required, attach a caption rider sheet.

CLEANTECH INNOVATIONS, INC.,

Plaintiff(s)/Petitioner(s)

-against-

NASDAQ STOCK MARKET, LLC; MERIT E. JANOW; STEPHEN D. BARRETT; DANIEL C. BIGELOW; MICHAEL J. CURRAN; JOHN A. FRY; WILLIAM LYONS; JOHN D. MARKESE; A. DOUGLAS MELAMED; ERIC W. NOLL; WENDY WHITE; and NASDAQ OMX GROUP, INC.,

Defendant(s)/Respondent(s)

## NATURE OF ACTION OR PROCEEDING:   Check ONE box only and specify where indicated.

**MATRIMONIAL**
- ( ) Contested
- ( ) Uncontested
  - **NOTE:**  For all Matrimonial actions where the parties have children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum.**

**TORTS**
- ( ) Asbestos
- ( ) Breast Implant
- ( ) Environmental: _____
  - (specify)
- ( ) Medical, Dental, or Podiatric Malpractice
- ( ) Motor Vehicle
- ( ) Products Liability: _____
  - (specify)
- ( ) Other Negligence: _____
  - (specify)
- ( ) Other Professional Malpractice: _____
  - (specify)
- ( ) Other Tort: _____
  - (specify)

**COMMERCIAL**
- ( ) Business Entity (including corporations, partnerships, LLCs, etc.)
- ( ) Contract
- ( ) Insurance (where insurer is a party, except arbitration)
- ( ) UCC (including sales, negotiable instruments)
- (•) Other Commercial: injunctive relief re: delisting of securities on NASDAQ
  - (specify)
  - **NOTE:**  For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the **COMMERCIAL DIV RJI Addendum.**

**REAL PROPERTY:**   How many properties does the application include? ____
- ( ) Condemnation
- ( ) Foreclosure
- Property Address: _____
  - Street Address   City   State   Zip
  - **NOTE:** For Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the **FORECLOSURE RJI Addendum.**
- ( ) Tax Certiorari - Section: ____ Block: ____ Lot: ____
- ( ) Other Real Property: _____
  - (specify)

**OTHER MATTERS**
- ( ) Certificate of Incorporation/Dissolution    [see **NOTE** under Commercial]
- ( ) Emergency Medical Treatment
- ( ) Habeas Corpus
- ( ) Local Court Appeal
- ( ) Mechanic's Lien
- ( ) Name Change
- ( ) Pistol Permit Revocation Hearing
- ( ) Sale or Finance of Religious/Not-for-Profit Property
- ( ) Other: _____
  - (specify)

**SPECIAL PROCEEDINGS**
- ( ) CPLR Article 75 (Arbitration)   [see **NOTE** under Commercial]
- ( ) CPLR Article 78 (Body or Officer)
- ( ) Election Law
- ( ) MHL Article 9.60 (Kendra's Law)
- ( ) MHL Article 10 (Sex Offender Confinement-Initial)
- ( ) MHL Article 10 (Sex Offender Confinement-Review)
- ( ) MHL Article 81 (Guardianship)
- ( ) Other Mental Hygiene: _____
  - (specify)
- ( ) Other Special Proceeding: _____
  - (specify)

## STATUS OF ACTION OR PROCEEDING:   Answer YES or NO for EVERY question AND enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ( ) | (•) | If yes, date filed: _____ |
| Is this action/proceeding being filed post-judgment? | ( ) | (•) | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION:** Check ONE box only AND enter additional information where indicated.

- ○ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice    Date Issue Joined: _____
- ○ Notice of Motion    Relief Sought: _____    Return Date: _____
- ○ Notice of Petition    Relief Sought: _____    Return Date: _____
- ● Order to Show Cause    Relief Sought: Injuction/Restraining Order    Return Date: _____
- ○ Other Ex Parte Application    Relief Sought: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other  (specify): _____

**RELATED CASES:** List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases. If additional space is required, complete and attach the RJI Addendum. If none, leave blank.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**PARTIES:** If additional space is required, complete and attach the RJI Addendum. For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys: Provide name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. | Issue Joined (Y/N) | Insurance Carrier(s): |
|---|---|---|---|---|
| ☒ | NASDAQ STOCK MARKET, LLC — Last Name; First Name; Primary Role: Defendant; Secondary Role (if any): | Last Name / First Name; Firm Name; One Liberty Plaza, Street Address, New York City, New York State, 10006 Zip; +1 (301) 978-8735 Phone, +1 (301) 978-5055 Fax, e-mail | ○ YES  ● NO |  |
| ☒ | Janow Last Name; Merit First Name; Primary Role: Defendant; Secondary Role (if any): | Last Name / First Name; Firm Name; 420 West 118th Street, Street Address, New York City, New York State, 10027 Zip; Phone, +1 (212) 749-1497 Fax, Mj60@columbia.edu e-mail | ○ YES  ● NO |  |
| ☒ | Barrett Last Name; Stephen First Name; Primary Role: Defendant; Secondary Role (if any): | Last Name / First Name; Firm Name; 52 Vanderbilt Avenue, Street Address, New York City, New York State, 10017 Zip; Phone, Fax, e-mail | ○ YES  ● NO |  |
| ☒ | Bigelow Last Name; Daniel First Name; Primary Role: Defendant; Secondary Role (if any): | Last Name / First Name; Firm Name; 1900 Market Street, Street Address, Philadelphia City, Pennsylvania State, 19103-3527 Zip; Phone, Fax, e-mail | ○ YES  ● NO |  |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.**

Dated: ___12/20/4___

___1121110___
**ATTORNEY REGISTRATION NUMBER**

_(signature)_
**SIGNATURE**

Blair C. Fensterstock
**PRINT OR TYPE NAME**

[ Print Form ]

Print Form

# Request for Judicial Intervention Addendum

UCS-840A (3/2011)

**Supreme** _____ **COURT, COUNTY OF** _____ **New York** _____  **Index No:** _____

For use when additional space is needed to provide party or related case information.

**PARTIES:**  For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties:<br>List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys:<br>Provide name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. | Issue Joined (Y/N) | Insurance Carrier(s): |
|---|---|---|---|---|
| ☒ | Curran   Last Name<br>Michael   First Name<br>Primary Role:<br>Defendant   Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>625 Madison Avenue   New York   New York   10022<br>Street Address   City   State   Zip<br>+1 (212) 317-5700   +1 (212) 751-3550   mccuran@centerline.com<br>Phone   Fax   e-mail | ○ YES<br>◉ NO | |
| ☒ | Fry   Last Name<br>John   First Name<br>Primary Role:<br>Defendant   Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>3141 Chestnut Street   Philadelphia   Pennsylvania   19104<br>Street Address   City   State   Zip<br>+1 (215) 895-1714   jaf@drexel.edu<br>Phone   Fax   e-mail | ○ YES<br>◉ NO | |
| ☒ | Lyons   Last Name<br>William   First Name<br>Primary Role:<br>Defendant   Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>22 West Washington Street   Chicago   Illinois   60602<br>Street Address   City   State   Zip<br>+1 (312) 696-6000<br>Phone   Fax   e-mail | ○ YES<br>◉ NO | |
| ☒ | Markese   Last Name<br>John   First Name<br>Primary Role:<br>Defendant   Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>One Liberty Plaza, 165 Broadway   New York   New York   10006<br>Street Address   City   State   Zip<br>+1 (212) 401-8700   +1 (212) 401-1024<br>Phone   Fax   e-mail | ○ YES<br>◉ NO | |
| ☒ | Melamed   Last Name<br>A. Douglas   First Name<br>Primary Role:<br>Defendant   Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>2200 Mission College Boulevard   Santa Clara   California   95054-1549<br>Street Address   City   State   Zip<br>+1 (408) 765-8080   +1 (408) 765-6016   Gail.k.swarbrick@intel.com<br>Phone   Fax   e-mail | ○ YES<br>◉ NO | |
| ☒ | Noll   Last Name<br>Eric   First Name<br>Primary Role:<br>Defendant   Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>One Liberty Plaza, 165 Broadway   New York   New York   10006<br>Street Address   City   State   Zip<br>+1 (212) 401-1018   Eric.noll@nasdaqomx.com<br>Phone   Fax   e-mail | ○ YES<br>◉ NO | |

**RELATED CASES:**  List any related actions.  For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

| Print Form |
| --- |

## Request for Judicial Intervention Addendum

UCS-840A (3/2011)

**Supreme** _____ COURT, COUNTY OF _____ **New York** _____   Index No: _____

**For use when additional space is needed to provide party or related case information.**

**PARTIES:**   For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys: Provide name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. | Issue Joined (Y/N): | Insurance Carrier(s): |
| --- | --- | --- | --- | --- |
| ☒ | White — Last Name<br>Wendy — First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br>Firm Name<br>33 South 36th Street, Suite 300   Philadelphia   Pennsylvania   19104<br>Street Address          City          State          Zip<br>Phone          +1 (215) 746-5301   Fax          Wendy.white@ogc.upenn.edu   e-mail | ○ YES<br>◉ NO | |
| ☒ | NASDAQ OMX Group, Inc. — Last Name<br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br>Firm Name<br>One Liberty Plaza, 165 Broadway   New York   New York   10006<br>Street Address          City          State          Zip<br>Phone          Fax          e-mail | ○ YES<br>◉ NO | |
| ☐ | Last Name<br>First Name<br>Primary Role:<br>Secondary Role (if any): | Last Name          First Name<br>Firm Name<br>Street Address          City          State          Zip<br>Phone          Fax          e-mail | ○ YES<br>○ NO | |
| ☐ | Last Name<br>First Name<br>Primary Role:<br>Secondary Role (if any): | Last Name          First Name<br>Firm Name<br>Street Address          City          State          Zip<br>Phone          Fax          e-mail | ○ YES<br>○ NO | |
| ☐ | Last Name<br>First Name<br>Primary Role:<br>Secondary Role (if any): | Last Name          First Name<br>Firm Name<br>Street Address          City          State          Zip<br>Phone          Fax          e-mail | ○ YES<br>○ NO | |
| ☐ | Last Name<br>First Name<br>Primary Role:<br>Secondary Role (if any): | Last Name          First Name<br>Firm Name<br>Street Address          City          State          Zip<br>Phone          Fax          e-mail | ○ YES<br>○ NO | |

**RELATED CASES:**   List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |
| | | | | |

Print Form

SUPREME COURT OF THE STATE OF NEW YORK

UCS-840C
3/2011

COUNTY OF <u>New York</u> _____ x

Index No. <u>053524-11</u>

CLEANTECH INNOVATIONS, INC.,

Plaintiff(s)/Petitioner(s)

RJI No. (if any) _____

-against-
NASDAQ STOCK MARKET, LLC; et al.,

Defendant(s)/Respondent(s) _____ x

**COMMERCIAL DIVISION**
Request for Judicial Intervention Addendum

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

[X] Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

[ ] Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

[ ] Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

[ ] Shareholder derivative actions — without consideration of the monetary threshold

[ ] Commercial class actions — without consideration of the monetary threshold

[ ] Business transactions involving or arising out of dealings with commercial banks and other financial institutions

[ ] Internal affairs of business organizations

[ ] Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

[ ] Environmental insurance coverage

[ ] Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

[ ] Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

[ ] Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ <u>No claim for compensatory damages.</u> _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

1) Temporary stay restraining NASDAQ and Defendants from delisting stock.
2) Preliminary Injunction restraining NASDAQ and Defendants from delisting stock.
3) Permanent injunction restraining NASDAQ and Defendants from delisting stock.
4) Violations of Due Process.
5) Expedited discovery of NASDAQ Decision-Making.

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: <u>12/20/2011</u> _____

_____
SIGNATURE

<u>Blair C. Fensterstock</u>
PRINT OR TYPE NAME

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x

CLEANTECH INNOVATIONS, INC.,                         Index No. 653524-11

                         *Plaintiff,*              **[PROPOSED] ORDER TO
SHOW CAUSE**

           v.

NASDAQ STOCK MARKET, LLC; MERIT E. JANOW;
STEPHEN D. BARRETT; DANIEL C. BIGELOW;
MICHAEL J.CURRAN; JOHN A. FRY; WILLIAM LYONS;
JOHN D. MARKESE; A. DOUGLAS MELAMED;
ERIC W. NOLL; WENDY WHITE; and
NASDAQ OMX GROUP, INC.,

                      *Defendants.*
-------------------------------------------------------------------x

      Upon the Affidavit of Arnold Staloff sworn to December __, 2011, the Affidavit of Blair

C. Fensterstock, Esq., sworn to December __, 2011, and the exhibits attached thereto, the

Affidavit of Emergency sworn to by Blair C. Fensterstock, Esq. on December __, 2011, and

Plaintiff's Memorandum of Law, it is hereby

      **ORDERED**, that Defendants show cause at Part ___ of the Supreme Court, to be held in

the New York County Supreme Court, 60 Centre Street, New York, New York, on _____,

at _____ o'clock in the ____ noon of that day, or as soon thereafter as counsel can be heard,

why an order shall not be entered:

      (1) Staying NASDAQ's delisting of CleanTech pending the Securities and Exchange

Commission's decision on CleanTech's appeal of NASDAQ's delisting decision;

      (2) Mandating expedited discovery relating to the NASDAQ Board of Directors'

decisions not to call for review of the NASDAQ Listing and Hearing Review Council's decision

to affirm the Hearing Panel's determination to delist CleanTech; and

(3) For any other and further relief that the Court may deem just and proper, and it is further

**ORDERED** that the order of NASDAQ delisting CleanTech is temporarily stayed pending hearing and determination on Plaintiff's Order to Show Cause, and it is further

**ORDERED** that service of the copy of this Order, together with the supporting papers on which it is made, upon all parties of record be deemed good and sufficient if made by hand or Federal Express on or before 5 p.m. on December ___, 2011, and it is further

**ORDERED** that opposition papers, if any, shall be served on all parties of record by hand or Federal Express on or before 5 p.m. on December ___, 2011, and it is further

**ORDERED** that reply papers, if any, shall be served on all parties of record by hand or Federal Express on or before 5 p.m. on December ___, 2011.

Dated: December ___, 2011

ENTER:

_____
J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------x

CLEANTECH INNOVATIONS, INC.,

                *Plaintiff*,

      v.

NASDAQ STOCK MARKET, LLC; MERIT E. JANOW;
STEPHEN D. BARRETT; DANIEL C. BIGELOW;
MICHAEL J.CURRAN; JOHN A. FRY; WILLIAM
LYONS; JOHN D. MARKESE; A. DOUGLAS
MELAMED; ERIC W. NOLL; WENDY WHITE; and
NASDAQ OMX GROUP, INC.,

                *Defendants*.

-----------------------------------------------------------------------x

Index No. 053524-11

**AFFIDAVIT OF
EMERGENCY OF
BLAIR C.
FENSTERSTOCK**

STATE OF NEW YORK    )
                    ) ss:
COUNTY OF NEW YORK  )

    BLAIR C. FENSTERSTOCK, being duly sworn, deposes and says:

    1.    I am an attorney duly admitted to practice law before the Courts of the State of New York and am the Managing Partner of Fensterstock & Partners LLP, attorneys for Plaintiff CleanTech Innovations, Inc. ("CleanTech") in this dispute with NASDAQ Stock Market, LLC, Merit E. Janow, Stephen D. Barrett, Daniel C. Bigelow, Michael J. Curran, John A. Fry, William Lyons, John D. Markese, A. Douglas Melamed, Eric W. Noll, Wendy White, and NASDAQ OMX Group, Inc. (collectively, "NASDAQ").

    2.    Plaintiff's Motion is made on an emergency basis with utmost urgency. On December 16, 2011, Defendants NASDAQ announced to the market that it will delist the common stock of CleanTech on December 26, 2011, and filed a Form 25 with the Securities and Exchange Commission ("SEC") to initiate the delisting.

1

3. According to NASDAQ Rule 9370, pursuant to §19(d)(2) of the Securities Exchange Act of 1934 (the "Act"), CleanTech has the right to appeal NASDAQ's final determination concerning delisting to the SEC.

4. On November 23, 2011, CleanTech filed an appeal with the SEC requesting that it reverse the NASDAQ's final determination delisting the Company, and is currently awaiting a decision, which is not expected until 2012.

5. In the interim, if the Temporary Restraining Order does not issue, the delisting becomes effective ten days from the day on which the Form 25 is filed – on December 26, 2011. As a result of the delisting, CleanTech's reputation in the marketplace will be tainted, its relationships with investors will be unsalvageable, and it will face further financial harm and potential insolvency. All administrative remedies have been exhausted and there is no process pursuant to which a stay can be issued, other than by this Court.

<u>CLEANTECH HAS EXHAUSTED ALL REMEDIES</u>
<u>BEFORE APPEALING TO THE SEC</u>

6. CleanTech applied to list its common stock on the NASDAQ stock exchange. CleanTech's listing was approved on December 10, 2010, after a full vetting of the Company and its relationship with a successful private investor and corporate advisor. The Company commenced trading under the ticker symbol CTEK on December 15, 2010.

7. On January 13, 2011, the NASDAQ Listing Qualifications Staff (the "Staff") notified the Company that it planned to delist the Company's securities based on its alleged failure to provide the Staff with certain material information.

8. In response to the notification, the Company requested a hearing on January 20, 2011. A hearing was held before the NASDAQ Listing Qualifications Hearing Panel (the "Hearing Panel") on February 24, 2011, in Washington, D.C. On February 28, 2011, the Hearing

2

Panel issued a decision which denied the Company's request for continued listing with NASDAQ.

9.      On February 28, 2011, the Company appealed the NASDAQ Hearing Panel's decision before the NASDAQ Listing and Hearing Review Council (the "Listing Council"). The Listing Council provided the Company with an opportunity to supplement the record prior to the Listing Council's review.

10.     On March 2, 2011 NASDAQ froze trading of the Company's stock indefinitely.

11.     Through a series of letters, from April 27, 2011 to May 5, 2011, sent by the Company and Apollo Capital Management ("Apollo"), an asset management company and a significant shareholder in the Company's securities, the Company demonstrated to the Listing Council that NASDAQ's decision to delist the Company had tarnished the Company's reputation, impaired the Company's ability to attract financing, and curtailed the Company's current and future growth potential, perhaps even survival.

12.     On May 19, 2011, the Listing Council found that the record lacked sufficient details, and remanded the matter to the NASDAQ Hearings Panel for further fact finding and consideration.

13.     On July 22, 2011, the Listing Council issued a decision affirming the Panel's February 28, 2011 decision. On November 23, 2011, NASDAQ informed the Company that the decision was final and appealable.

14.     On November 23, 2011 the Company submitted an application to the SEC for review of the Listing Council's decision.

15.     The SEC has not given a date by which they will issue a decision, although it is not expected until sometime in 2012.

3

<u>IT IS IMPERATIVE THAT NASDAQ'S DELISTING BE
STAYED PENDING THE SEC'S DECISION</u>

16.     Plaintiff's Motion is made on an emergency basis with utmost urgency. NASDAQ
has issued a notice that as of December 26, 2011, the Company will be delisted.

17.     The SEC has yet to issue a decision in the matter, has not set a date by which they
will do so, and likely will not do so until 2012.

18.     By delisting the Company before the SEC issues a decision in the matter,
NASDAQ will cripple the Company, causing significant irreparable harm.

19.     As such, it is imperative that NASDAQ be stayed from delisting the Company
until the SEC issues its decision in the matter.

<u>DENYING THE TEMPORARY RESTRAINING ORDER WILL CAUSE SEVERE
HARM TO PLAINTIFF, WHEREAS GRANTING THE TEMPORARY
RESTRAINING ORDER WILL RESULT IN NO PREJUDICE TO DEFENDANTS</u>

20.     Allowing NASDAQ to proceed with their intended delisting of the Company
would severely prejudice the Company.

21.     If CleanTech wishes to relist with NASDAQ after the delisting becomes effective,
they will be compelled to undergo the same lengthy and costly process they have already
endured.

22.     As a result of the delisting decision, CleanTech may face difficulties in meeting
the liquidity, financial, and qualitative requirements that would be required of the company in
order to relist with NASDAQ.

23.     The delisting becomes effective ten (10) days after the Form 25 is filed—on
December 26, 2011. The Company has no expectation of receiving a decision from the SEC
before 2012.

24.     By granting the Temporary Restraining Order, the Court will stay the delisting of the Company and maintain the *status quo* in the matter. Trading on the Company's stock has not been active since March 2, 2011, and it will remain inactive indefinitely. There will be no injury or harm to the public or the market.

25.     By granting the Temporary Restraining Order, the Court will in no way prejudice Defendants. The Company's stock will not be traded, thereby causing no harm, whether real or potential, to NASDAQ or to the market. The Temporary Restraining Order will merely allow the Company to pursue its appeal to the SEC and to await the decision of the SEC without suffering further harm. In fact, if a Temporary Restraining Order does not issue, not only will the Company be harmed, but so will its shareholders and investors, who will continue to lose value, especially if the Company becomes insolvent.

26.     Accordingly, Plaintiff respectfully requests that the Court issue a Temporary Restraining Order staying the delisting of the Company until such time as the SEC issues a decision on their review of the Listing Council's decision to delist the Company.

27.     Plaintiff has not made any prior application to this Court for the relief requested herein.

                                                        BLAIR C. FENSTERSTOCK

Sworn to before me this
19 day of December, 2011


Notary Public
_____ HARRISON
_____ State of New York
_____ 4985444
_____ Queens County
_____ 19 20 13

5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

CLEANTECH INNOVATIONS, INC.,                      Index No. 053524-11

                          *Plaintiff*

                     v.

NASDAQ STOCK MARKET, LLC; MERIT E. JANOW
STEPHEN D. BARRETT; DANIEL C. BIGELOW;
MICHAEL J. CURRAN; JOHN A. FRY; WILLIAM LYONS;
JOHN D. MARKESE; A. DOUGLAS MELAMED;
ERIC W. NOLL; WENDY WHITE; and
NASDAQ OMX GROUP, INC.,

                          *Defendants.*

------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S ORDER TO SHOW CAUSE
## WITH A TEMPORARY RESTRAINING ORDER

FENSTERSTOCK & PARTNERS LLP
100 BROADWAY
NEW YORK, NEW YORK 10005

ARLEN SPECTER
1525 LOCUST STREET, 19TH FLOOR
PHILADELPHIA, PENNSYLVANIA 19102

COUNSEL FOR PLAINTIFF CLEANTECH INNOVATIONS, INC.

## TABLE OF CONTENTS

                                                                                    **Page**

Table of Authorities...................................................................... iii

INTRODUCTION............................................................................... 1

FACTS............................................................................................ 2

    Background.................................................................................. 2

    NASDAQ Approves CleanTech's Listing................................................ 2

    CleanTech's December 2010 Financing was Promptly Disclosed................... 4

    Notification of Delisting.................................................................. 5

    Impact of the Delisting Decision on CleanTech....................................... 6

    The Initial Hearing and NASDAQ's Discriminatory Stance......................... 7

    CleanTech's Appeal to the Listing Council and Remand to the Panel.............. 9

    CleanTech's Appeal to the SEC and Need for Interim Relief....................... 10

ARGUMENT................................................................................... 11

I.    This Court Should Grant CleanTech's Request for an Order Staying NASDAQ's
    Delisting of CleanTech Pending the SEC's Review of the Delisting Decision......... 11

    A.    A TRO is Necessary to Preserve the *Status Quo* Pending the Completion
        of the SEC's Review of the Delisting Decision........................... 11

    B.    CleanTech Meets the Standard for a TRO and Preliminary Injunction......... 12

        i.    The Balance of Hardships Tips in CleanTech's Favor............... 12

        ii.    CleanTech will be Irreparably Harmed if the Delisting is Not
            Stayed Pending the SEC's Review............................... 13

        iii.    CleanTech is Likely to Succeed on the Merits..................... 14

i

Page

1.    The Delisting Decision Lacked a Sound Basis. . . . . . . . . . . . . . 14

      a.    There is No Proof that Clean Tech Intentionally
         Withheld Any Documents from NASDAQ. . . . . . . . . . . 14

      b.    The Documents were Protected from Disclosure by
         the Attorney-Client Privilege. . . . . . . . . . . . . . . . . . . . . . 16

      c.    The Delisting Decision was Fueled by
         Discriminatory Views Towards Chinese Companies
         and Towards the Entrepreneur. . . . . . . . . . . . . . . . . . . . . 17

2.    The Delisting Decision Deprives CleanTech of Due Process. . . . 19

II.    CleanTech has Not Violated the Exhaustion of Administrative Remedies Rule.. . . . . . 21

    A.    CleanTech has Exhausted its Administrative Remedies. . . . . . . . . . . . . . . . . . . . 21

    B.    Even if CleanTech has Not Exhausted its Administrative Remedies, It is
       Exempt from Doing So. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      i.    CleanTech Will be Irreparably Harmed if It Seeks to Exhaust Any
        Further Administrative Remedies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      ii.    CleanTech Challenges the Delisting Decision as Unconstitutional. . . . . . 22

III.    Expedited Discovery Will Demonstrate That the Directors Wrongfully Denied
    Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*D'Alessio v. New York Stock Exchange, Inc.,*
   258 F.3d 93 (2d Cir. 2001)..................................................... 20

*McLaughlin, Piven, Vogel, Inc. v. National Assn. of Securities Dealers, Inc.,*
   733 F.Supp 694 (S.D.N.Y. 1990)............................................. 20

## STATE CASES

*Aetna Ins. Co. v. Capasso,*
   75 N.Y.2d 860, 552 N.Y.S.2d 918 (1990).................................... 12

*Bankers Trust Corp., v. New York City Dept. of Finance,*
   1 N.Y.3d 315, 805 N.E.2d 92 (2003)........................................ 21

*Chrysler Corp. v. Fedders Corp.,*
   63 A.D.2d 567, 404 N.Y.S.2d 844 (1st Dep't 1978)......................... 11

*Doe v. Novello,*
   39 A.D.3d 1168, 834 N.Y.S.2d 603 (4th Dep't 2007)........................ 21

*First Nat. City Bank v. City of New York Finance Administration,*
   36 N.Y.2d 87, 324 N.E.2d 861 (1975)....................................... 21

*Edgeworth Food Corp. v. Stephenson,*
   53 A.D.2d 588, 385 N.Y.S.2d 64 (1st Dep't 1976).......................... 12

*Golden v. Steam Heat,*
   216 A.D.2d 440, 442, 628 N.Y.S.2d 375 (2d Dep't 1995). .................. 13

*Helfrick v. Dahlstrom Metallic Door Co.,*
   256 N.Y. 199, 176 N.E. 141 (1931)......................................... 20

*Nassau Roofing & Sheet Metal Co. v. Facilities Development Corp.,*
   70 A.D.2d 1021, 1022, 418 N.Y.S.2d 216, 218 (3d Dep't 1979). ............ 12

**Page**

*Nobu Next Door, LLC v. Fine Arts Housing, Inc.,*
  4 N.Y.3d 839, 800 N.Y.S.2d 48 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Priest v. Hennessy,*
  51 N.Y.2d 62, 409 N.E.2d 983 (N.Y. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Segarra v. Ashouin,*
  253 A.D.2d 406, 676 N.Y.S.2d 594 (1st Dep't 1998). . . . . . . . . . . . . . . . . . . . . . . . . 11

*Watergate II Apartments v. Buffalo Sewer Authority,*
  46 N.Y.2d 52, 385 N.E.2d 560 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## RULES AND REGULATIONS

CPLR § 6301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## MISCELLANEOUS

NASDAQ Rule 5100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

NASDAQ Rule 5205(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

NASDAQ Rule 5250(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SEC Enforcement Manual, § 4.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

New York State Constitution, Art. 1, § 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

## INTRODUCTION

Plaintiff CleanTech Innovations, Inc. ("CleanTech") brings this emergency application for a Temporary Restraining Order to stop Defendants at NASDAQ from unlawfully, arbitrarily, and capriciously delisting CleanTech from the NASDAQ Stock Market on December 26, 2011. Because CleanTech has exhausted all of its administrative remedies and awaits the Securities and Exchange Commission's (the "SEC") determination of the merits of its appeal, CleanTech is now in a procedural and due process dead zone as NASDAQ obstinately presses forward with delisting. While in other similar cases, NASDAQ has consented to restraining orders preventing them temporarily from delisting a company, Defendants have thus far stubbornly refused CleanTech this remedy. With nowhere else to turn, and with the countdown to delisting on December 26, 2011 otherwise unstoppable, CleanTech seeks judicial intervention.

Without this relief, the delisting will occur on December 26, 2011, and inflict immediate and irreparable harm upon CleanTech, an event highly likely to render the company insolvent. While CleanTech has exhausted all of its administrative remedies and appealed NASDAQ's decision to the SEC, a standard SEC briefing schedule suggests that the SEC will not decide the merits of the appeal until well into 2012. Unfortunately, since there is no procedure otherwise available to preserve the status quo, CleanTech's only remedy is before this Court.

It is imperative that this Court stay the delisting and preserve the *status quo*, or else CleanTech will almost certainly crumble while waiting for relief from the SEC. This will have a devastating impact on CleanTech, its shareholders, and its creditors. On the other hand, should this Court grant a Temporary Restraining Order pending the injunction hearing, NASDAQ *will suffer no harm if a stay is granted.* Since NASDAQ suspended the trading of

1

CleanTech's stock in March 2011, NASDAQ has no compelling reason to impose the delisting so abruptly. CleanTech needs a stay of the delisting so that it has a chance to survive in the market while it awaits the SEC's ruling. It therefore merely asks this Court to maintain the *status quo* until the SEC's decision is rendered.

Finally, CleanTech is likely to succeed on the merits of its claims because Defendants have engaged in an unlawful, arbitrary, and capricious campaign to delist CleanTech. Defendants have cast aside NASDAQ Rules, the Securities Exchange Act of 1934 (the "Act"), SEC Rules, and due process in their effort to selectively and maliciously delist a Chinese company that has proven itself and worked hard to be listed on NASDAQ. CleanTech should not be delisted when it is likely to prevail on its SEC appeal, and NASDAQ should be enjoined from delisting it.

**FACTS**

<u>**Background**</u>

CleanTech is a market leader in China's clean energy industry. It is a leading designer and manufacturer of wind turbines and other wind products that directly address the air pollution and high energy consumption issues in China. CleanTech's specialty metal products are used in clean solution systems by large-scale industrial companies in a number of heavy industries.

<u>**NASDAQ Approves CleanTech's Listing**</u>

CleanTech has been publicly traded on the NASDAQ Stock Exchange since December 15, 2010, having been approved by NASDAQ Listing Qualifications on December 10, 2010. Fensterstock Aff., Ex. 5. In compliance with NASDAQ's listing procedures, CleanTech filed Form 8-Ks with NASDAQ throughout the application process and after being approved.

2

Fensterstock Aff., Exs. 1, 3. In addition, CleanTech, and those involved with securing funding for CleanTech, were subject to complete and thorough investigatory processes and meetings with NASDAQ Staff. CleanTech produced documents to NASDAQ on November 24, December 3, and December 7, 2010 in cooperation with NASDAQ's requests for additional information regarding the company. Fensterstock Aff., Ex. 20, Ex. A, p. 7.

Throughout this process, a Consultant, founder and president of a consulting company ("Consultant's Company"), was in contact with NASDAQ as a consultant for CleanTech. Fensterstock Aff., Ex. 17. The Consultant helped CleanTech forge business relationships with Chinese companies, acting as an intermediary between the cultural and linguistic differences of China and America. *Id.* This is a role he has mastered in his 20 years of experience in the American and Chinese business worlds. *Id.* He met with NASDAQ staff on multiple occasions related to CleanTech, and submitted to almost five hours of questions at NASDAQ's Rockville, Maryland offices. *Id.* NASDAQ's increased interest in, and distrust of, the Consultant's involvement with CleanTech stemmed primarily from an article regarding Chinese businesses, which was published in *Barron's* on August 28, 2010, and which contained some vaguely critical statements. *Id.*

CleanTech maintained steady contact with the Consultant from September 2010 until CleanTech was listed. CleanTech acted transparently with respect to this contact and disclosed its relationship with the Consultant to NASDAQ throughout. As such, NASDAQ was fully aware of CleanTech's contacts with the Consultant when it approved CleanTech's application for listing on the NASDAQ Stock Exchange. *Id.* NASDAQ approved CleanTech's listing on December 10, 2010, effective December 15, 2010. Fensterstock Aff., Ex. 5.

3

**CleanTech's December 2010 Financing was Promptly Disclosed**

In late 2010, CleanTech sought to secure sufficient financing to bridge CleanTech to the completion of a planned $50 million public offering in the first quarter of 2011. Fensterstock Aff., Ex. 17, p. 5. CleanTech had been working with Stifel Financial Corporation ("Stifel") to carry out the $50 million public offering, but was in need of a surplus to its capital base to secure contract orders for new projects. Fensterstock Aff., Ex. 21, Ex. A. In December 2010, Strong Growth Capital provided a $20 million financing as a bridge loan ("the December Financing"). Fensterstock Aff., Ex. 17, p. 4. Though the NASDAQ staff has criticized the loan, calling the arrangements unfavorable, Strong Growth Capital, Stifel, and Apollo Management ("Apollo"), all firms with vast experience in the industry, all believed that the terms of the financing were extremely favorable. Fensterstock Aff., Ex. 12, p. 2, Ex. 17, p. 4. Without the financing, CleanTech would not have been able to participate in manufacturing bids, and would have been severely handicapped. Fensterstock Aff., Ex. 17, p. 4.

During this time frame, CleanTech's application for listing on the Stock Exchange was pending with NASDAQ. However, CleanTech's December Financing was not contingent upon, scheduled to coincide with, or otherwise connected to its potential listing on NASDAQ. Fensterstock Aff., Ex. 18, p. 3. Instead, the December Financing addressed urgent needs to keep CleanTech running into the key bid season in the Chinese market. *Id.*

Nothing was out of the ordinary about the December Financing. In October 2010, CleanTech entered into a similar arrangement with Strong Growth Capital, an affiliate of Consultant's Company. Fensterstock Aff., Ex. 17, p. 7. And, just as CleanTech would later do with the December Financing, CleanTech promptly and openly disclosed the nature of the

transaction in its Form 8-K filings. Fensterstock Aff. Exs., 15, 16. NASDAQ Staff was fully

aware of these and similar CleanTech transactions and had no issue with them.

**Notification of Delisting**

On January 13, 2011, NASDAQ's Listing Qualifications Staff (the "Staff") notified

CleanTech that it had decided to delist CleanTech's securities, alleging that CleanTech had

failed to comply with NASDAQ Rules 5205(e) and 5250(a)(1). Fensterstock Aff., Ex. 7. Rule

5205(e) allows NASDAQ the authority to request "any information or documentation, public or

non-public, deemed necessary to make a determination regarding a security's initial listing,

including, but not limited to, any material provided to or received from the Commission or

Other Regulatory Authority." Under this rule, a security may be denied listing if the company

does not provide the requested information within a reasonable period of time "or if any

communication to NASDAQ contains a material misrepresentation or omits material

information necessary to make the communication to NASDAQ not misleading."

In particular, the Staff alleged that CleanTech had purposefully withheld a series of

emails involving the Consultant, his affiliates, and the December Financing. Fensterstock Aff.,

Ex. 20, Ex. A, p. 4. The Staff alleged that CleanTech purposefully withheld material

information regarding the December Financing and may have timed the financing to coincide

with CleanTech's imminent listing approval on the NASDAQ. Fensterstock Aff., Ex. 14.   In

addition, the Staff accused CleanTech of dragging its feet in disclosing the December Financing

until after CleanTech's listing was approved, despite the fact that CleanTech promptly disclosed

the transaction in its December 16, 2010 Form 8-K filing with the SEC.

CleanTech continued to cooperate with NASDAQ Staff inquiries, and it produced 190

e-mails concerning the December Financing, some of which were dated prior to CleanTech's

first two productions to NASDAQ. Fensterstock Aff., Ex. 20, Ex. A, p. 2.  As these emails contained correspondence between corporate counsel, these emails were protected by the attorney-client privilege and should not have been called for by NASDAQ Staff.  Nor was the production of these 190 e-mails relevant or intentionally undisclosed. Fensterstock Aff., Ex. 18, p. 3.

The attorney-client privileged documents were ultimately disclosed as a result of a threat on December 2, 2010 by Mr. Michael Emen, the Senior Vice President of NASDAQ Listing Notifications ("Mr. Emen"), together with Gary Sundick ("Mr. Sundick") and Traynham Mitchell and NASDAQ's Chief Listing Compliance Official, in which CleanTech was told that "if every requested e-mail (including those written to and from lawyers) was not produced, [your] listing review would not continue and the application [will] be denied." Fensterstock Aff. Ex. 18, p. 2.  Furthermore, the December Financing was not timed to occur after the company's listing, but was timed to meet an immediate need for cash. There was no connection, condition, or contingency between the December Financing and CleanTech's eventual listing on NASDAQ.  Fensterstock Aff., Ex. 18.  At the time, CleanTech faced extremely poor market conditions, and the December Financing was seen as a victory over adverse conditions and as necessary for the health of the company. Fensterstock Aff., Ex. 18, p. 3.

**Impact of the Delisting Decision on CleanTech**

NASDAQ's delisting decision has had an immediate and profound impact on CleanTech's financial well-being. Unsolicited by CleanTech, Apollo, a global asset management firm which controls $68 billion in assets, sent a letter to NASDAQ explaining the significant adverse affects that would befall shareholders as a result of the CleanTech delisting. Fensterstock Aff., Ex. 12. Among the adverse affects on CleanTech and its shareholders, was

6

the 50% plunge in stock prices, decreased liquidity and volume of stocks, tarnishing of CleanTech's reputation in the marketplace, and impairment of CleanTech's future ability to secure financing and instill trust in its shareholders and business partners. *Id.*

More specifically, CleanTech lost its opportunity to work with Stifel for a $50,000,000 stock offering. Fensterstock Aff., Ex. 21, Ex. A. Stifel was unwilling to complete the offering unless it was listed. *Id.* The delisting decision also impacted CleanTech's ability to secure other investors, as demonstrated by its unsuccessful efforts to raise capital through the Toronto and Hong Kong Stock Exchanges. *Id.* This failure to secure additional financing left CleanTech crippled in its efforts to bid on projects: the New Jersey Atlantic City Project, which totaled $8,400,000, and an associated follow-up project totaling almost $100,000,000. *Id.* Within a year, CleanTech saw a dramatic plunge in its stock price, from a high of $9.00 in November 2010 to $0.70 as of December 2011. Fensterstock Aff., Ex. 22.

Although NASDAQ intended for the delisting decision to act as a protective measure in the interest of the public, the marketplace, and CleanTech's shareholders, it did not have the desired effect. NASDAQ Rule 5100 grants NASDAQ the authority to delist from the NASDAQ Stock Market the securities of a company "in order to maintain the quality of and public confidence in the market, prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade and protect investors and the public interest." Instead of accomplishing these goals, the delisting decision drastically and negatively impacted the very shareholders it was designed to protect. Fensterstock Aff., Ex. 12.

**The Initial Hearing and NASDAQ's Discriminatory Stance**

On January 20, 2011, CleanTech requested a hearing on the delisting from the NASDAQ Hearings Panel ("the Panel"). The hearing took place on February 24, 2011. During

7

the hearing, the Staff revealed a flagrant bias against both Chinese companies and the Consultant. Representing the Staff at the hearing was Mr. Emen. Mr. Emen did not hide his contempt for such Chinese companies, or their promoters. Mr. Emen proudly admitted singling out such companies and their listing applications for special consideration, stating that "[o]ver the past year, we've developed expansive procedures to use in reviewing just this type of company that go well beyond what we do with other applications." Fensterstock Aff., Ex. 8 [59:15-18]. Mr. Emen's statements indicate that the Staff, rather than applying the same set of procedures for each company that seeks to be listed on the NASDAQ, instead used a different set of procedures for a separate class of companies that had one thing in common: they were Chinese. By its own admission, the Staff applied a double standard to companies that sought listing on the NASDAQ based on nothing more than whether the listing applications were from Chinese companies. In so doing, the NASDAQ applied blatantly discriminatory practices and procedures to single out Chinese companies for review and delisting.

Mr. Emen's bias against Chinese companies and reverse mergers are evident in his statements at the hearing, including the following examples:

a.   "The key regulatory challenge facing us today – NASDAQ – is how to effectively mitigate the regulatory and reputational risks associated with the listing of Chinese reverse merger companies..." *Id.* [58:10-14]

b.   "Today, nearly 15 percent of our applications come from China, and the majority of our 180 Chinese listings are the result of reverse mergers." *Id.* [58:15-18]

c.   "There's a cottage industry here and in China which is devoted to arranging these reverse merger transactions." *Id.* [58:22-59:2]

8

  d. "Among the promoters the press is focused on are [the Consultant] and his close associate[] . . . , who, through control of firms here and in China, orchestrated the entire process through which CleanTech went public and became listed." *Id.* [59:22-60:4]

  On February 28, 2011, the Panel issued a decision denying CleanTech's request to remain listed on NASDAQ. Fensterstock Aff., Ex. 9.

**CleanTech's Appeal to the Listing Council and Remand to the Panel**

  The same day, on February 28, 2011, CleanTech appealed the Panel's decision before the NASDAQ Listing and Hearing Review Council (the "Listing Council"). Fensterstock Aff. Ex. 10. CleanTech was provided an opportunity to supplement the record that the Listing Council would review. In the interim, on March 2, 2011, trading on CleanTech's stock was suspended, and has not resumed since that time. On May 19, 2011, the Listing Council concluded that the record did not justify delisting, and remanded the matter for further fact finding and consideration, concluding that the initial review panel had lacked sufficient facts as to whether CleanTech intentionally withheld information from NASDAQ staff concerning the Consultant, his affiliates, and/or the December Financing, and whether CleanTech was aware that the listing approval was imminent. Fensterstock Aff., Ex. 14, p. 4.

  On May 26, 2011, NASDAQ notified CleanTech that it had reopened the record before the Hearing Panel to permit the Staff to respond to an alleged *ex parte* communication. Fensterstock Aff., Ex. 15. There, NASDAQ bizarrely alleged that the *ex parte* communication was caused by CleanTech because, when it failed to provide the Staff with a courtesy copy of its

appeal until well into 2012. Nonetheless, NASDAQ filed a Form 25 Delisting Notice on

December 16, 2011, and the delisting of CleanTech will therefore become effective on

December 26, 2011, unless this Court orders a stay. Fensterstock Aff., Ex. 24.

## ARGUMENT

I.    **This Court Should Grant CleanTech's Request for an Order Staying NASDAQ's Delisting of CleanTech Pending the SEC's Review of the Delisting Decision**

    A.    **A TRO is Necessary to Preserve the *Status Quo* Pending the Completion of the SEC's Review of the Delisting Decision**

A Temporary Restraining Order's ("TRO") purpose is to preserve the *status quo* until

the Court determines whether to grant a preliminary injunction. *See e.g. Segarra v. Ashouin*,

253 A.D.2d 406, 676 N.Y.S.2d 594 (1st Dep't 1998); *Chrysler Corp. v. Fedders Corp.*, 63

A.D.2d 567, 404 N.Y.S.2d 844 (1st Dep't 1978).

This is precisely what is needed here. NASDAQ has made the decision to delist

CleanTech. Fensterstock Aff., Ex. 20, Ex. A. CleanTech has appealed that decision to the SEC

as is the proper next step in such a scenario under the guiding rules of the administrative bodies

at issue. While CleanTech awaits the decision from the SEC, NASDAQ plans to move forward

with the delisting—without waiting for the final determination from the SEC and without regard

for the impact this will have on CleanTech. Fensterstock Aff., Ex. 24. Without this Court's

intervention, the harmful delisting will occur imminently, in a mere 7 days. Therefore, it is

imperative that this Court intervene to preserve the *status quo*. Once CleanTech is delisted,

irreparable harm will befall the Company, its investors, and its creditors – harm that cannot be

undone. This is precisely the scenario against which a TRO is designed to protect.

If delisted, CleanTech faces ruination. Arnold Staloff, Chairman of CleanTech's Audit

Committee, has made clear that the delisting – even now, before its effective date – has severely

11

harmed CleanTech.  In addition to the loss of the Stifel stock offering (*Supra*; Fensterstock Aff., Ex. 21, Ex. A), CleanTech also sought to raise capital through the Toronto Stock Exchange and the Hong Kong Stock Exchange, but did not succeed due to the crushing impact of the delisting decision.  *Id.*

### B.  CleanTech Meets the Standard for a TRO and Preliminary Injunction

A TRO for preliminary injunction may be granted when the movant demonstrates (1) likelihood of success on the merits; (2) irreparable injury absent granting the preliminary injunction; and (3) a balancing of the equities tips in movant's favor. CPLR § 6301; *Nobu Next Door, LLC v. Fine Arts Housing, Inc.,* 4 N.Y.3d 839, 800 N.Y.S.2d 48 (2005); *Aetna Ins. Co. v. Capasso,* 75 N.Y.2d 860, 552 N.Y.S.2d 918 (1990).  In the present case, CleanTech is able to demonstrate a likelihood of success on the merits of its underlying claims, irreparable injury absent the granting of the injunction, and that a balancing of the equities tips in its favor.

### i.     The Balance of Hardships Tips in CleanTech's Favor

The balance of the equities tips in the movant's favor where the harm to the movant caused by denial of the TRO would exceed the harm to the non-movant if the TRO is granted. *Edgeworth Food Corp. v. Stephenson*, 53 A.D.2d 588, 385 N.Y.S.2d 64 (1st Dep't 1976); *Nassau Roofing & Sheet Metal Co. v. Facilities Development Corp.*, 70 A.D.2d 1021, 1022, 418 N.Y.S.2d 216, 218 (3d Dep't 1979).  Here, the balance of equities favors CleanTech, and NASDAQ would suffer no harm by the granting of the stay.

A stay of the delisting will have no negative effect whatsoever on NASDAQ or any entity.  No conceivable loss will be suffered.  CleanTech stock is currently suspended from trading on NASDAQ, so NASDAQ has no interest or purpose in effectuating the delisting immediately.  On the other hand, if the delisting is not stayed, CleanTech will be irreparably

the market. Already on the brink of insolvency, CleanTech is imminently likely to crumble with any further blows. These losses, clearly significant, are not quantifiable.

Moreover, investors are likely to suffer significant losses, as well. According to Apollo the manager of a fund which owns 595,020 shares of CleanTech stocks, "[t]he stock's volume has plummeted, such that [CleanTech] shares are now far less liquid than they were both upon its listing and just prior thereto." Fensterstock Aff., Ex. 12. Future shareholders, warns Apollo, "appear to be faced with considerably greater uncertainties about the financial status of [CleanTech], following the delisting." *Id.* In sum, the delisting decision has "negatively impacted the value of [CleanTech] stock . . ." *Id.*

If CleanTech is delisted, the re-listing process will preclude it from remaining viable. Although NASDAQ does not impose an official waiting period to relist a company's securities, the re-listing process requires a company to go through the entire listing application process. *See* NASDAQ Listing Standards and Fees.[2] For the application, NASDAQ charges a $25,000 fee, and gives no indication of how soon the application will be processed. *Id.* This process will amount to a loss of time and money – the losses of which have already brought CleanTech to the brink of downfall.

###### iii.  CleanTech is Likely to Succeed on the Merits

The SEC's review is likely to result in a favorable outcome for CleanTech because the delisting decision was arbitrary and capricious, and a violation of due process.

####### 1.  The Delisting Decision Lacked a Sound Basis

######## a.  There is No Proof that CleanTech Intentionally Withheld Any Documents from NASDAQ

---

[2] Available at https://listingcenter.nasdaqomx.com/assets/nasdaq_listing_req_fees.pdf.

The delisting decision was based on the Listing Council's belief that CleanTech *intentionally* withheld certain emails from NASDAQ pertaining to the December Financing. However, there is no support for that contention. First, NASDAQ's threat to delist CleanTech if attorney-client privileged material was not provided was an abuse of discretion. Second, CleanTech never withheld any documents.

The Listing Counsel concluded that the withholding was intentional because, *inter alia*, CleanTech knew that the documents pertaining to the December Financing, and the December Financing itself, were likely to be closely scrutinized. *See* Fensterstock Aff., Ex. 20, at Ex. A. However, CleanTech had no intention of hiding these documents from NASDAQ. In fact, the Listing Council itself states that upon filing its Form 8-K regarding the December Financing, CleanTech "then produced 190 emails concerning the December Financing involving [the Consultant]" *Id.* The NASDAQ rules merely indicate that requested materials be provided within "a reasonable time period." *See* NASDAQ Rule 5205(e). The rules give no indication of what constitutes "reasonable" timing. Taking advantage of the broad rule, at no point has the Listing Counsel attempted to explain why CleanTech did not behave reasonably, when NASDAQ gave no indication to CleanTech that a listing decision was imminent. As of the date of the listing approval, CleanTech had not yet produced certain documents to NASDAQ, simply because it thought it had more time to do so. In its final decision, the Listing Counsel concedes this point, indicating that " . . . the Company might not have known how long that review would take." Fensterstock Aff., Ex. 20, at Ex. A. NASDAQ even indicated that although the spirit of its rules may not have been fulfilled, "[t]he timing and the method of these disclosures may have satisfied the letter of our rules." Fensterstock Aff., Ex. 8, at 69:20-22. Despite recognizing this fact, the Listing Counsel arbitrarily rejected CleanTech's argument. CleanTech is likely to

15

succeed on the merits because it intended to provide the documents in question to NASDAQ within a reasonable time, and as NASDAQ itself concedes, the timing and method by which CleanTech produced the documents very well may have fulfilled the requirements of the rules.

Indeed, CleanTech has made no attempt to evade NASDAQ's Rules or Regulations. For instance, the Consultant's involvement with CleanTech was well-known to NASDAQ. In fact, he met with seven NASDAQ listing investigators in November 2010, and answered their questions regarding his involvement with CleanTech. Fensterstock Aff., Ex. 17. His involvement was not hidden; it was well known to NASDAQ.

Further, CleanTech's securities counsel assured NASDAQ at the time that no member of the firm "intended to withhold information from the Staff regarding the Consultant and his affiliates and/or the [December] Financing." Fensterstock Aff., Ex. 18. CleanTech's counsel explained that CleanTech was very responsive in providing the emails NASDAQ sought, in the face of several barriers, including NASDAQ's attempt to force CleanTech to waive its attorney-client privilege, time zone differences, language barriers, and technical issues. *Id.* In short, CleanTech never made any attempt to withhold any information or materials from NASDAQ. A full response was given on November 24, 2010. *Id.*

          **b.**    **The Documents were Protected from Disclosure by the Attorney-Client Privilege**

Many of the documents NASDAQ claims were wrongfully withheld were protected by the attorney-client privilege. The delisting decision failed to consider this issue, even though it indicates that the email documents were sent "to and from . . . corporate counsel." Fensterstock Aff., Ex. 20, Ex. A. The SEC indicates that a party should not be asked "to waive the attorney-client privilege or work product protection without prior approval of the Director or Deputy

Director. *See* SEC Enforcement Manual, § 4.3[3]; *see also Priest v. Hennessy*, 51 N.Y.2d 62, 409 N.E.2d 983 (N.Y. 1980) (The attorney-client privilege exists to ensure that one seeking legal advice will be able to confide fully and freely in his attorney, secure in the knowledge that his confidences will not later be exposed to public view to his embarrassment or legal detriment).

NASDAQ nonetheless demanded that CleanTech disclose privileged emails without any consideration that such a request would force CleanTech to waive its attorney-client privilege. Michael Emen, the Senior Vice President of NASDAQ Listing Notifications, indicated that "if those emails were not produced, the company would not be listed." Fensterstock Aff., Ex. 8 at 63:14-15. No rule gives NASDAQ any authorization to offer a stark ultimatum, forcing a company to waive a sacrosanct, universally recognized privilege in order to be listed on its Stock Exchange. As such, the delisting decision was based on NASDAQ's own improper actions. CleanTech had a right to preserve its privilege *vis-à-vis* the December Financing emails. NASDAQ decided to delist CleanTech based on CleanTech's rightful preservation of that privilege. As such, the delisting decision was improper and CleanTech is likely to succeed on the merits.

**c.**      **The Delisting Decision was Fueled by Discriminatory Views Towards Chinese Companies and Towards the Consultant**

It is evident that the delisting decision centered upon the Staff's discriminatory views towards Chinese companies and the Consultant. Mr. Emen's comments at the Hearing reveal that it was the "Chinese connection," rather than any issue regarding CleanTech's alleged untimely disclosure of information, which resulted in the Staff's request that it be delisted. In fact, when questioned about whether CleanTech could apply in the future for re-listing, Mr.

---

[3] Available at http://www.sec.gov/divisions/enforce/enforcementmanual.pdf.

Emen responded "[c]ertainly we'd be looking, among other things, *at the company's then relationship with [the Consultant] and his associates* in making that decision." Fensterstock Aff. Ex. 8 at 73:8-11.

Despite the fact that the Consultant was not accused, at any time, of any wrongdoing related to CleanTech, the Staff singled out CleanTech's mere association with him as a reason for delisting, and went so far as to suggest that any future consideration regarding re-listing CleanTech on the NASDAQ was dependent on, as Mr. Emen stated, "the company's then relationship with [the Consultant]." *Id.*

Mr. Emen's comments at the hearing revealed the true reason behind the Staff's reason to delist CleanTech: its Chinese connection. Mr. Emen sought to paint CleanTech in a negative light based solely on its Chinese connection – *not CleanTech's*. As Mr. Emen stated at the hearing, "[i]t doesn't matter whether [the Consultant's] reputation is deserved or not. What matters is that he is notorious. We knew of his reputation. We were concerned about it. We were entitled to ask about it and we've asked about it through the very end of the approval process." Fensterstock Aff., Ex. 8, 61:18-62:2.

Mr. Emen's comments are particularly notable because CleanTech's association with the Consultant was not listed by the Staff as a basis for delisting, yet the Staff devoted tremendous time and effort at the hearing and, indeed, throughout the initial listing process, to him.

It is notable that despite the Staff's stated "concerns," prior to their initial approval of CleanTech's listing on the NASDAQ, the Staff had met with, interviewed, and questioned the Consultant for almost five hours. Fensterstock Aff. Ex. 17. The Staff, who spent considerable time demonizing the Consultant at the hearing, knew full well of his role and relationship with CleanTech, *and they nevertheless approved CleanTech's listing*. Mr. Emen and the Staff only

subsequently, at the hearing, sought to leverage the selective negative press they could find concerning the Consultant, to support their case against CleanTech.

Moreover, the Staff's focus on the Chinese connection did not have any legitimate basis. The Consultant enjoys a long history of successfully working with NASDAQ. Fensterstock Aff., Ex. 17. In fact, his company, Consultant's Company has *no history of any regulatory wrongdoing. Id.* In fact, the only potential instances of any remotely questionable activity are (1) an allegation for which he did not admit guilt and which was brought up several years after the fact, and (2) his payment of a fine for providing verbal but not written notification to a brokerage firm. *Id.* He has never been sued by the SEC nor made to pay a fine to the SEC. *Id.* He has never been subject to disgorgement or any other penalty or sanction. Importantly, he *fully disclosed the two incidents referenced above* during his November 5 meeting with NASDAQ. It is apparent that the Staff's allegation that CleanTech failed to timely disclose material information was merely an artifice created to single out a Chinese company for delisting based predominately on its association with the Consultant, who Mr. Emen insinuated had a notorious reputation, but against whom no allegations of wrongdoing concerning any aspect of the CleanTech listing has ever been levied.

Mr. Emen's comments to the Hearing Panel were intended to shift the focus away from the Staff's weak case against CleanTech, and to other easy targets, which they hoped, based on a series of selective articles, blog posts, and insinuations, would tarnish CleanTech and encourage the Hearing Panel to rule in favor of its delisting.

### 2. The Delisting Decision Deprives CleanTech of Due Process

The delisting decision violates procedural due process. Under the New York State Constitution, "[n]o person shall be deprived of life, liberty or property without due process of

19

law" by the government.[4] *See,* New York State Constitution, Art. 1, § 6. At the core of due process are "fair dealing, adequate hearing, impartial decision, and *a procedure to obtain them.*" (emphasis added). *Helfrick v. Dahlstrom Metallic Door Co.,* 256 N.Y. 199, 176 N.E. 141 (1931).

The delisting decision deprives CleanTech of the liberties of being listed, without allowing it adequate process to preserve the status quo while it pursues an appeal to the SEC. Upon filing of a Form 25, the delisting of a company becomes effective after 10 days. As such, CleanTech faces delisting as of December 26. The SEC is currently reviewing CleanTech's appeal, but it is unlikely to render a decision before 2012. As such, the delisting is set to occur before the SEC issues its decision, which may reverse NASDAQ's ruling. The delisting decision therefore leaves CleanTech without any procedure to be heard and obtain relief.

This vacuum of fair process comes into sharp focus with the Board's refusal to review the delisting decision. Fensterstock Aff., Ex. 19. In short, NASDAQ refused to offer CleanTech a procedure to obtain an impartial decision on its delisting. NASDAQ was required to have the opportunity to correct its errors. *See McLaughlin, Piven, Vogel, Inc. v. National Assn. of Securities Dealers, Inc.,* 733 F.Supp 694, 696 (S.D.N.Y.1990). CleanTech gave NASDAQ this opportunity by moving for reconsideration of the delisting decision, and thereby exhausted its available administrative remedies. However, NASDAQ refused to correct its error, leaving CleanTech without any remedy whatsoever short of emergency court intervention. Even though CleanTech was able to appeal to the SEC, the date of delisting will come before

---

[4] As a self-regulating organization, NASDAQ stands in the shoes of the SEC because it performs regulatory functions that would otherwise be performed by the SEC. *D'Alessio v. New York Stock Exchange, Inc.,* 258 F.3d 93, 105 (2d Cir.2001). As a result, it is a quasi-governmental organization. *Id.*

20

the SEC's decision. Once delisted, CleanTech will most likely become insolvent, and a favorable decision by the SEC will be too late.

**II.     CleanTech has Not Violated the Exhaustion of Administrative Remedies Rule**

  **A.   CleanTech has Exhausted its Administrative Remedies**

Ordinarily, a party may not seek injunctive relief without first exhausting its administrative remedies such that the determination is permanent. *Doe v. Novello*, 39 A.D.3d 1168, 834 N.Y.S.2d 603 (4th Dep't 2007). CleanTech has taken every possible route available to it to prevent its delisting. CleanTech has asked NASDAQ to reconsider the delisting decision. However, NASDAQ's refusal to do so led CleanTech to file its appeal with the SEC. The SEC is CleanTech's final administrative hope. Even though the SEC's decision is pending, and therefore the determination sought to be reviewed is not technically final, the present situation is unique in that there is an urgent time constraint at play. Since there is no procedure for a stay before the SEC, CleanTech has no other recourse to prevent it from being delisted pending the SEC's decision and, as such, it is in grave danger of collapse before the SEC may potentially allow it to remain listed.

  **B.   Even if CleanTech has Not Exhausted its Administrative Remedies, It is Exempt from Doing So**

A party seeking judicial relief need not exhaust its administrative remedies where doing so would cause it irreparable harm. *Bankers Trust Corp., v. New York City Dept. of Finance*, 1 N.Y.3d 315, 805 N.E.2d 92 (2003); *Watergate II Apartments v. Buffalo Sewer Authority*, 46 N.Y.2d 52, 385 N.E.2d 560 (1978). In addition, administrative remedies need not be exhausted where an action is challenged as either unconstitutional or wholly beyond its grant of power. *First Nat. City Bank v. City of New York Finance Administration*, 36 N.Y.2d 87, 324 N.E.2d 861 (1975). Here, both exceptions apply.

21

i.    **CleanTech Will be Irreparably Harmed if It Seeks to Exhaust Any Further Administrative Remedies**

CleanTech will be irreparably harmed if it is unable to seek and obtain emergency relief from this Court. Although the SEC is in the process of reviewing CleanTech's appeal of the delisting decision, the timing of the SEC review does not, and cannot, accommodate the emergency situation in which CleanTech has landed. If CleanTech is delisted, insolvency is imminent. News of the delisting has already severely weakened CleanTech's role in the market. For example (*See infra*, Part II(b)(i)), in the wake of news of CleanTech's upcoming delisting going public, CleanTech was precluded from an opportunity to bid on the New Jersey Atlantic City Project, including a follow-up project, which together would have totaled more than $100 million. Fensterstock Aff., Ex. 21, Ex. A. The State of New Jersey was poised to provide the winning bidder with the necessary capital to construct a manufacturing facility. However, CleanTech missed out on the bid because of its perceived weakness due to the delisting. *Id.* The SEC's briefing schedule does not allow for a decision on the appeal before 2012, but CleanTech will be delisted in less than a week. As the mere news of delisting has caused great harm to CleanTech, the impending delisting will likely cause its demise. The SEC cannot speed up the process to provide an answer by December 26. This Court is the only tribunal that can provide relief that accounts for the emergency nature of CleanTech's plight.

ii.   **CleanTech Challenges the Delisting Decision as Unconstitutional**

As argued *infra*, the delisting decision violated the due process clause of the New York State Constitution. NASDAQ deprived CleanTech of the liberties of being a listed company through a decision that was inadequate, sought the disclosure of privileged documents, and was rooted in blatant discrimination instead of reasoned consideration of the facts at hand. As such,

22

CleanTech has made a constitutional challenge to the delisting decision, and is thereby exempt from the requirement of exhausting administrative remedies.

**III.    Expedited Discovery Will Demonstrate That the Directors Wrongfully Denied Review**

This Court should order expedited discovery relating to the decision of the NASDAQ Board of Directors to decline review of the delisting decision despite each individual Director being empowered to do so under NASDAQ Rule 5825.   On information and belief, expedited discovery will demonstrate that the Board Members violated the mandated procedure under NASDAQ and SEC Rules, refused to review the Council decision in bad faith, and contravened their duties when they refused review of the Council decision.   Discovery will further demonstrate that both CleanTech's complaint for injunctive relief and its appeal before the SEC are meritorious.

## CONCLUSION

Based upon the foregoing, it is respectfully requested that this Court grant CleanTech a Temporary Restraining Order pending a preliminary injunction hearing enjoining NASDAQ from delisting it from NASDAQ or the NASDAQ Stock Exchange pending the SEC's appeal decision.

Dated:  December 19, 2011

FENSTERSTOCK & PARTNERS LLP

Blair C. Fensterstock
Thomas A. Brown II
Eugene D. Kublanovsky
Michael T. Phillips II
Kristen Madison

100 Broadway
New York, New York 10005
(212) 785-4100

ARLEN SPECTER
Attorney-at-Law
1525 Locust Street, 19th Floor
Philadelphia, Pennsylvania 19102

*Counsel for Plaintiff CleanTech Innovations, Inc.*

24

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------x

CLEANTECH INNOVATIONS, INC.,

                     *Plaintiff,*

        v.

NASDAQ STOCK MARKET, LLC; MERIT E. JANOW;
STEPHEN D. BARRETT; DANIEL C. BIGELOW;
MICHAEL J.CURRAN; JOHN A. FRY; WILLIAM
LYONS; JOHN D. MARKESE; A. DOUGLAS
MELAMED; ERIC W. NOLL; WENDY WHITE; and
NASDAQ OMX GROUP, INC.,

                     *Defendants.*

------------------------------------------------------------------------x

Index No. 053524 -11

**AFFIDAVIT OF BLAIR C.
FENSTERSTOCK IN
SUPPORT OF
PLAINTIFF'S ORDER
TO SHOW CAUSE
WITH A TEMPORARY
RESTRAINING ORDER**

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss: |
| COUNTY OF NEW YORK | ) |

BLAIR C. FENSTERSTOCK, being duly sworn, deposes and says:

1.    I am an attorney duly admitted to practice law before the Courts of the State of New York and am the Managing Partner of Fensterstock & Partners LLP, attorneys for Plaintiff CleanTech Innovations, Inc. ("CleanTech") in this dispute with NASDAQ Stock Market, LLC, Merit E. Janow, Stephen D. Barrett, Daniel C. Bigelow, Michael J. Curran, John A. Fry, William Lyons, John D. Markese, A. Douglas Melamed, Eric W. Noll, Wendy White, and NASDAQ OMX Group, Inc. (collectively, "NASDAQ").

2.    I submit this Affidavit and the exhibits annexed hereto in support of Plaintiff's Order to Show Cause with a Temporary Restraining Order.

3.      I am familiar with the facts and circumstances of the above-captioned case, and make these statements based upon personal knowledge and upon the files kept in my office.

4.      Attached as Exhibit 1 is a true and correct copy of CleanTech's July 20, 2010 Form 8-K.

5.      Attached as Exhibit 2 is a true and correct copy of an e-mail correspondence between NASDAQ and CleanTech dated August 27, 2010 to September 2, 2010.

6.      Attached as Exhibit 3 is a true and correct copy of CleanTech's October 14, 2010 Form 8-K.

7.      Attached as Exhibit 4 is a true and correct copy of an e-mail to NASDAQ dated November 17, 2010.

8.      Attached as Exhibit 5 is a true and correct copy of a letter of approval dated December 10, 2010, from NASDAQ, approving CleanTech's application to list its common stock on NASDAQ.

9.      Attached as Exhibit 6 is a true and correct copy of CleanTech's form 8-K filed December 16, 2010.

10.     Attached as Exhibit 7 is a true and correct copy of NASDAQ's January 13, 2011 decision to delist CleanTech.

11.     Attached as Exhibit 8 is a true and correct copy of the transcript of the February 24, 2011 hearing before the NASDAQ Listing Qualifications Hearing Panel.

12.     Attached as Exhibit 9 is a true and correct copy of the NASDAQ Listing Qualifications Panel's February 28, 2011 Decision regarding the delisting of CleanTech.

2

13.     Attached as Exhibit 10 is a true and correct copy of CleanTech's submission in support of its appeal to the NASDAQ Listing and Hearing Review Council of the February 28, 2011 decision of the NASDAQ Listing Qualifications Panel.

14.     Attached as Exhibit 11 is a true and correct copy of a March 4, 2011 letter from NASDAQ confirming the receipt of CleanTech's request to review the Listing Panel's February 28, 2011 Decision.

15.     Attached as Exhibit 12 is a true and correct copy of a letter sent, unsolicited, on April 27, 2011 from Apollo Capital Management to NASDAQ regarding the disadvantageous effects of the delisting of CleanTech.

16.     Attached as Exhibit 13 is a true and correct copy of a May 5, 2011 letter to the NASDAQ Listing Council from Donohoe Advisory Associates, LLC.

17.     Attached as Exhibit 14 is a true and correct copy of the NASDAQ Listing Council's May 19, 2011 Decision.

18.     Attached as Exhibit 15 is a true and correct copy of a May 26, 2011 letter from NASDAQ issuing a stay of its May 19, 2011 decision (Exhibit 14) due to an *ex parte* communication.

19.     Attached as Exhibit 16 is a true and correct copy of a June 6, 2011 letter from Buchanan Ingersoll & Rooney PC to the NASDAQ Listing and Hearing Review Council regarding the CleanTech Listing Qualifications Hearings.

20.     Attached as Exhibit 17 is a true and correct copy of a June 30, 2011 letter from New York Global Group to the NASDAQ Listing and Hearing Review Council.

21.     Attached as Exhibit 18 is a true and correct copy of a July 1, 2011 letter from Robert Newman of Newman & Morrison, LLP to the NASDAQ Listing and Hearing Review Council regarding CleanTech.

22.     Attached as Exhibit 19 is a true and correct copy of a letter from NASDAQ to Paula Shaffner of Stradley Ronan Stevens & Young dated November 23, 2011, declining to call for the review of a July 22, 2011 decision by the NASDAQ Listing Council regarding CleanTech.

23.     Attached as Exhibit 20 is a true and correct copy of a November 23, 2011, letter to the United States Securities and Exchange Commission enclosing CleanTech's Application for Review of Final Delisting Action taken by the NASDAQ Stock Market.

24.     Attached as Exhibit 21 is a true and correct copy of CleanTech's December 9, 2011, Motion for Reconsideration, filed with the NASDAQ Stock Market Board of Directors.

25.     Attached as Exhibit 22 is a true and correct copy of line chart from Equity GP displaying CleanTech's stock price history, and demonstrating that CleanTech had a high on 11/03/2010 of $9.00/share prior to delisting, to a low of $0.70 per share after which time trading was suspended.

26.     Attached as Exhibit 23 is a true and correct copy of a December 12, 2011, letter from NASDAQ OMX declining CleanTech's Motion for Reconsideration.

27.     Attached as Exhibit 24 is a true and correct copy of an e-mail dated December 9, 2011, from GMB-NASDAQ-Hearings to Dave Donohoe (advisor for CleanTech) notifying Donohoe Advisory that the NASDAQ Stock Market will issue the attached press release on December 15, 2011 announcing the filing of Form-25 and delisting CleanTech effective 10 days from the filing of Form-25.

4

28.     Attached as Exhibit 25 is a true and correct copy of Form 25 filed by NASDAQ
with the SEC on December 16, 2011.


BLAIR C. FENSTERSTOCK


Sworn to before me this
*19* day of December, 2011

Notary Public

CATHERINE A. HARRISON
Notary Public, State of New York
No. 41-4985444
Qualified in Queens County
Commission Expires August 19, 20*13*

5

1

8-K 1 v191062_8k.htm

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): July 20, 2010

# CLEANTECH INNOVATIONS, INC.
(Exact name of registrant as specified in its charter)

| Nevada | 000-53511 | 98-0516425 |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| C District, Maoshan Industry Park, Tieling Economic Development Zone, Tieling, Liaoning Province, China | 112616 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(86) 0410-6129922**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

- Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
- Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
- Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
- Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 7.01 Regulation FD Disclosure.**

Officers of CleanTech Innovations, Inc. (the "Company") will present information to institutional and strategic investors commencing July 21, 2010. A copy of the presentation materials is being furnished as Exhibit 99.1 hereto.

The information in this Form 8-K (including Exhibit 99.1) shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended or the Exchange Act, except as expressly set forth by specific reference in such a filing.

**Item 9.01 Financial Statements and Exhibits**

**(d) Exhibits.**

| Exhibit No. | Description |
|---|---|
| 99.1 | Slide presentation to be made to institutional and strategic investors commencing July 21, 2010. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CLEANTECH INNOVATIONS, INC.
(Registrant)

Date: July 20, 2010                    By:    /s/ Bei Lu
                                       Name:  Bei Lu
                                       Title: Chief Executive Officer

**2**

## Connolly, James M.

| | |
|---|---|
| **From:** | Connolly, James M. |
| **Sent:** | Thursday, September 02, 2010 2:05 PM |
| **To:** | Michael Wolf |
| **Cc:** | Uchimoto, William W. |

**Subject:** RE: CleanTech_Listing Application

Michael, As we have acknowledged, we received your latest inquiry below. As you recall, Mr. Wey and his firm's consultancy was disclosed to you in the conference call with CleanTech Innovations, Inc.'s (the "Company") independent auditor, Mr. Mohidin, and corporate counsel, Mr. Newman, on August 20, 2010. Mr. Wey, a U.S. citizen, is President of New York Global Group ("NYGG US"), a NY-based firm which he owns. NYGG US has a business relationship with New York Global Group China ("NYGG China"), a Beijing, China-based firm that is owned by three Chinese nationals. NYGG China markets, vets, performs due diligence and advises Chinese company clients on going public transactions in the U.S. as well as on Chinese, Hong Kong, Singapore and London stock exchanges. NYGG US and NYGG China are not affiliated. Both firms work together closely and have co-branded and co-marketed their respective consultant services to highly select Chinese companies such as CleanTech Innovations, Inc. in going public transactions. Mr. Newman disclosed to you that Mr. Wey and his firm's consultancy focuses on the role of introducing clients of NYGG China to experienced U.S. financial and professional service providers in the areas of audit and accounting, investment banking, investment management, legal, insurance, transfer agent and banking assistance. NYGG China is a large China-based advisory firm with extensive business relationships and more than a decade of China experience. NYGG China meets and reviews hundreds of Chinese companies each year based on an extensive fundamental and earnings driven due diligence process. The Company is one of many that have approached NYGG China for introduction to the U.S. and Hong Kong markets. After the Company was introduced to NYGG US by NYGG China, NYGG US recommended the Nasdaq as a listing marketplace over other exchanges. NYGG China pays fixed quarterly fees to NYGG US for consultant services without attribution to any specific client. Mr. Wey is compensated by NYGG US and not by any NYGG China client such as CleanTech Innovations, Inc.

Please feel free to contact Bill Uchimoto or me if you or your staff have any further questions.

Regards, Jim Connolly

*James M. Connolly*
*Stevens & Lee*
*1818 Market Street*
*29th Floor*
*Philadelphia, PA 19103*
*direct dial: 215-751-2877*
*direct fax: 610-371-7759*
*internal: 756-4887*
*jmc@stevenslee.com*

---

**From:** Michael Wolf [mailto:michael.wolf@nasdaqomx.com]
**Sent:** Wednesday, September 01, 2010 5:19 PM
**To:** Connolly, James M.
**Cc:** Uchimoto, William W.
**Subject:** RE: CleanTech_Listing Application

James,

A quick follow up question for you...

10/19/2010

We noticed that the Company's association with Benjamin Wey was mentioned in a recent Barron's article.  Please explain the Company's registration to Mr. Wey.  In your response please include how the Company was introduced to Mr. Wey, what services he provided the Company, and what (if any) consideration was paid to Mr. Wey.

Thanks for your help.

Best,
Michael

**Michael Wolf**
**NASDAQ OMX**
Direct: +1 301 978 8068

**From:** Connolly, James M. [mailto:JMC@stevenslee.com]
**Sent:** Friday, August 27, 2010 3:52 PM
**To:** Michael Wolf
**Cc:** Uchimoto, William W.
**Subject:** CleanTech_Listing Application

Michael, In connection with NASDAQ's review of the listing application of CleanTech Innovations, Inc., please find our additional responses to your August 16, 2010 e-mail (NOBO information) and the information you requested in the conference call with the Company's audit firm, Goldman Kurland & Mohidin LLP (Mr. Ahmed Mohidin) on August 20, 2010.

We have also sent you our response via overnight mail.  Please feel free to contact Bill Uchimoto or me if you or your staff have any further requirements.

Regards, Jim Connolly

*James M. Connolly*
*Stevens & Lee*
*1818 Market Street*
*29th Floor*
*Philadelphia, PA 19103*
*direct dial: 215-751-2877*
*direct fax: 610-371-7759*
*internal: 756-4887*
*jmc@stevenslee.com*

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

10/19/2010

**3**

8-K 1 v199101_8k.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): October 14, 2010**

# CLEANTECH INNOVATIONS, INC.

(Exact name of registrant as specified in its charter)

| Nevada | 000-53511 | 98-0516425 |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| C District, Maoshan Industry Park, Tieling Economic Development Zone, Tieling, Liaoning Province, China | 112616 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(86) 0410-6129922**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

- Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
- Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
- Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
- Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into Material Definitive Agreement**

On October 14, 2010, CleanTech Innovations, Inc. (the "Company") entered into a Short Term Loan Agreement with Strong Growth Capital Ltd. (the "Lender") in the amount of $1.5 million (the "Loan Agreement") for working capital to help meet significantly increased demand for the Company's products. Under the terms of the Loan Agreement, the Company agreed to an annual interest rate of 10% and the principal amount and interest accrued thereon is due and payable in full on March 31, 2011 (the "Maturity Date"). The Lender may also demand payment of outstanding principal and interest at any time if and after the Company completes any capital financing of at least $2 million prior to the Maturity Date.

**Item 2.03 Creation of a Direct Financial Obligation**

The information set forth under Item 1.01 of this Current Report is incorporated herein by reference.

Unassociated Document                                                      Page 3 of 3

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

|                              |                                          |
|------------------------------|------------------------------------------|
|                              | CLEANTECH INNOVATIONS, INC.              |
|                              | (Registrant)                             |
| Date: October 15, 2010       | By:    /s/ Bei Lu                        |
|                              | Name: Bei Lu                             |
|                              | Title:   Chief Executive Officer         |

**4**

**From:** Uchimoto, William W.
**Sent:** Wednesday, November 17, 2010 11:03 AM
**To:** Traynham E. Mitchell Jr. (traynham.mitchell@nasdaqomx.com); gary.sundick@nasdaq.com
**Cc:** Michael J. Wolf (michael.wolf@nasdaqomx.com)
**Subject:** CleanTech Innovations, Inc. Response

Confidential

Tray, in response to Gary Sundick and your request for CleanTech Innovations, Inc.'s
("CleanTech" or the "Company") narrative response to the past, current and anticipated future
services to be provided by NYGG China/Asia and NYGG US to the Company, we hereby provide
the following response on behalf of the Company.

We note that this response supplements information provided to your staff by the
Company's consultant, Mr. Benjamin Wey, in his in person interview with your staff on Friday,
November 5, 2010 in NASDAQ's offices in Rockville, MD.

In providing this response, we have not designated the services provided as being only
provided by NYGG China/Asia or NYGG US, because in most instances there has been close
coordination between both organizations when providing a particular service. For example,
NYGG US may provide the Company with an initial introduction to an investment banking firm,
but NYGG China/Asia may participate in a due diligence visit by the investment banking firm to
the Company's facilities in China. In the future, both NYGG China/Asia and NYGG US will
continue to provide similar services to the Company such as the continued introduction of the
Company to US professionals and the investment banking and investment community as needed.

Our response to your request is provided as follows:

1.  Introductions of law firms, which to date include: Winston & Strawn LLP; Paul, Weiss,
Rifkind, Wharton & Garrison LLP; The Newman Law Firm, PLLC.; Stevens & Lee PC; and
Pillsbury Winthrop Shaw Pittman LLP.

2.  Introductions of registered investment banking firms, which include to date: Barclays
Capital; William Blair & Company, LLC; BMO Capital Markets Corp.; Stifel Nicolaus Weisel; First
Merger Capital, Inc.; Aegis Capital Corporation; Global Hunter Securities LLC; Cantor Fitzgerald
L.P.; Canaccord Genuity, Inc.; and Lazard Capital Markets LLC.

3.  Introduction of the PCAOB registered audit firm: Goldman Kurland Mohidin, LLP.

4.  Introductions of strategic customer relationships, such as China National Grid.

5.  Introduction of potential M&A opportunities in China with a focus on China-based
potential acquisition targets that are involved in industries similar to those of the Company.

6.  The hosting of visitors to the US who represent key relationships to the Company,
such as the visit of local Chinese mayors to New York City, which included a tour of New York
City and the New York Stock Exchange.

7.  Recommendation of the listing marketplace, which currently is NASDAQ, and
introduction to NASDAQ - China staff to the Company, including Mr. Eric Landheer, Head of
NASDAQ – Asia, and Ms. Yeeli Zheng, Head of NASDAQ – China.

8.    Provided assistance in arranging travel and other due diligence logistics for the Company in connection with investment bankers visiting the Company's headquarters and facilities in China.

9.    Introductions of potential institutional investors and bridge lenders, such as: UBS Global Asset Management; Dean Witter; Barclays; Apollo Management; SGC; Goldman Sachs Asset Management through the Sonterra Fund; and provision of short term loan for working capital through NYGG China/Asia affiliate.

10.   Administrative assistance in the Company's non-deal institutional road shows in both the U.S. and in China, in conjunction with Wells Fargo Securities, LLC; Lazard Capital Markets LLC; and William Blair & Company, LLC.

11.   Advice regarding the Company considering an alternative listing on the NYSE (main board) in connection with an ensuing  proposed secondary offering of the Company's securities and meeting the higher listing standards of the NYSE upon close of that offering.

12.   Introduction to the Company of potential market expansion opportunities in the wind-industry both in the US and China.

_____

Based upon the information provided in this correspondence, we believe we have been responsive to the requests made by your Department.  Thank you again for continued prompt attention to the Company's listing application.  Should you have any further questions or require further clarification regarding any matter related to the Company, please do not hesitate to contact me at (215) 751-2876, or James M. Connolly, Esquire at (215) 751-2877.

Once again, we look forward to the listing of CleanTech on the NASDAQ Stock Market.

Bill

**William W. Uchimoto, Esquire**
**Stevens & Lee P.C.**
**1818 Market St., 29th Fl.**
**Philadelphia, PA 19103**
**Office: 215-751-2876**
**Mobile: 215-990-7416**
**Fax: 610-371-7742**
**wwu@stevenslee.com**

**5**

 THE NASDAQ STOCK MARKET
9600 BLACKWELL ROAD
ROCKVILLE, MD 20850

*By Electronic Mail Only*

December 10, 2010

Mr. William W. Uchimoto
Stevens & Lee P.C.
1818 Market Street, 29th Floor
Philadelphia, PA 19103

Re:     Approval letter for Cleantech Innovations, Inc. (the "Company")
        to list on The Nasdaq Capital Market

Dear Mr. Uchimoto:

We are pleased to inform you that Staff has approved the Company's application to list its common stock on Nasdaq. Since our approval is based upon information provided to us by the Company or filed by the Company with the SEC, you should notify us promptly of any material change to such information. We have reserved CAIR as the trading symbol for the Company's common stock.

The balance of the entry fee for the Company's initial inclusion in Nasdaq is estimated to be $70,000. Please pay this amount to The NASDAQ Stock Market LLC and forward it before the listing date per the instructions on the attached Entry Fee Payment Form. Shortly after trading commences, the Company will be billed the applicable annual fee, on a pro-rated basis.

For your information, the Nasdaq Marketplace Rules detail the continued listing requirements and applicable fees for Nasdaq issuers. The Nasdaq Regulatory Requirements guide provides important information on your filing obligations and other regulatory responsibilities of a public company. Both can be found under the "Corporate/Listing" heading at www.nasdaq.com.

Should you have questions regarding Nasdaq's continued listing requirements, please call Rachel Scherr, your issuer compliance analyst, at 301.978.8072 or call me at 301.978.8068 for initial listing requirements.

Sincerely,

Michael J. Wolf
Lead Analyst
Nasdaq Listing Qualifications

**6**



# CLEANTECH INNOVATIONS, INC.

## FORM 8-K
(Current report filing)

Filed 12/16/10 for the Period Ending 12/13/10

| | |
|---|---|
| Telephone | (86) 0410-6129922 |
| CIK | 0001382219 |
| Symbol | CTEK |
| SIC Code | 3490 - Miscellaneous Fabricated Metal Products |
| Industry | Non-Metallic Mining |
| Sector | Basic Materials |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2011, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): December 13, 2010

# CLEANTECH INNOVATIONS, INC.
(Exact name of registrant as specified in its charter)

| Nevada | 000-53511 | 98-0516425 |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| C District, Maoshan Industry Park, Tieling Economic Development Zone, Tieling, Liaoning Province, China | 112616 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(86) 0410-6129922**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement**

On December 13, 2010, CleanTech Innovations, Inc. (the "Company") completed a closing of US $20,000,000 in a combination of equity and debt offerings through accredited institutional investors. In a private placement of equity (the "Offering"), the Company sold 2,500,000 Units (as defined below) at an offering price of $4.00 per Unit for $10,000,000. The "Units" sold consist of one share of our common stock, par value $.00001 per share (the "Common Stock"), and a warrant to purchase, in the aggregate, 1,687,500 shares of Common Stock at an exercise price of $4.00 per share (the "Warrants"). The Warrants are immediately exercisable and expire on the fifth anniversary of their issuance. The purchasers of the Units received registration rights pursuant to a Registration Rights Agreement requiring the Company to file a registration statement within 14 days of the closing of the Offering for the registration of the shares of Common Stock issued in the Offering and the shares of Common Stock issuable upon exercise of the Warrants. The foregoing descriptions are not complete and are qualified in their entirety by reference to the full text of the forms of the Warrant and Registration Rights Agreement attached hereto as Exhibits 4.5 and 4.6, respectively.

The purchasers of the Units have entered into share lockup agreements with the Company, pursuant to which they have agreed not to sell any of their shares of Common Stock for a period of three months from the date we file a registration statement registering the shares of Common Stock issued in the Offering and shares of Common Stock that may be issued upon exercise of the Warrants.

Concurrently with the foregoing Offering, on December 13, 2010, the Company entered into a long-term loan agreement pursuant to a Loan Agreement (the "Loan Agreement") with NYGG (Asia), Ltd. (the "Lender") in the amount of $10,000,000. Under the terms of the Loan Agreement, we agreed to an annual interest rate of 10% payable quarterly beginning on completion of the debt financing. The principal amount and any unpaid interest accrued thereon is due on March 1, 2012 (the "Maturity Date"). The Lender may demand payment of the outstanding principal and interest at any time (i) if our quarterly interest payments are late for more than 5 days from any interest payment due date; (ii) if and after we complete any financing of at least $10,000,000 in one or a series of transactions, excluding the current equity Offering, prior to the Maturity Date; or (iii) in the event of a change of control or upon material organic changes to the Company. The terms of any subsequent financing or material change to the Company is subject to Lender's consent. The loan is evidenced by the Loan Agreement and a 10% Promissory Note (the "Note") in the amount of $10,000,000. The foregoing descriptions of the Loan Agreement and Note are qualified in their entirety by reference to the full text of those documents attached hereto as Exhibits 10.15 and 10.16, respectively.

We issued the securities in the Offering and the Note pursuant to exemptions from registration under Regulation S promulgated under the Securities Act of 1933, as amended (the "Securities Act"). The securities issued in the Offering have not been registered under the Securities Act, or any state securities laws, and unless so registered, may not be sold in the United States except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws.

For its assistance in the Offering, we paid a one-time fee of $1,000,000 to a placement agent and warrants to purchase 300,000 shares of Common Stock under the same terms as the Warrants issued in the Offering. We also paid the placement agent a one-time fee of $100,000 for its assistance in arranging the loan.

We will use the net proceeds of the financing to retire short-term debt obligations, provide necessary growth capital in time to fund the manufacturing of significant wind tower supply contracts already received, participate in new wind tower contract bids and fulfill a significant amount of new wind tower contracts we anticipate receiving in December 2010 and early 2011 from some of China's largest state-owned utilities.

The Newman Law Firm, PLLC, New York, New York, acted as corporate and securities counsel for the Company in connection with this Offering. Orrick, Herrington & Sutcliffe LLP, New York, New York, acted as counsel for the placement agent in connection with this Offering.

**Item 2.03 Creation of a Direct Financial Obligation**

The information set forth under Item 1.01 of this Current Report is incorporated herein by reference.

**Item 3.02 Unregistered Sales of Equity Securities**

The information set forth under Item 1.01 of this Current Report is incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits**

(d) Exhibits

| Exhibit No. | Description |
| --- | --- |
| 4.5 | Form of Warrant |
| 4.6 | Form of Registration Rights Agreement |
| 10.15 | Loan Agreement between NYGG (Asia), Ltd. and CleanTech Innovations, Inc., dated December 13, 2010 |
| 10.16 | 10% Promissory Note, dated December 13, 2010 |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

CLEANTECH INNOVATIONS, INC.

(Registrant)

Date: December 16, 2010

By: /s/ Bei Lu

Name: Bei Lu

Title: Chief Executive Officer

THESE SECURITIES AND THE COMMON STOCK THAT THE HOLDER SHALL RECEIVE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED, HYPOTHECATED, ASSIGNED OR TRANSFERRED EXCEPT (i) IN ACCORDANCE WITH REGULATION S (RULES 901 THROUGH 905), (ii) PURSUANT TO A REGISTRATION STATEMENT UNDER THE SECURITIES ACT THAT HAS BECOME EFFECTIVE AND IS CURRENT WITH RESPECT TO THESE SECURITIES, OR (iii) PURSUANT TO A SPECIFIC EXEMPTION FROM REGISTRATION AVAILABLE UNDER THE SECURITIES ACT BUT ONLY UPON A HOLDER HEREOF FIRST HAVING OBTAINED THE WRITTEN OPINION OF COUNSEL REASONABLY ACCEPTABLE TO THE COMPANY THAT THE PROPOSED DISPOSITION IS CONSISTENT WITH ALL APPLICABLE PROVISIONS OF THE SECURITIES ACT AS WELL AS ANY APPLICABLE "BLUE SKY" OR SIMILAR SECURITIES LAW. ANY HEDGING TRANSACTION INVOLVING THESE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT.

Warrant Holder: _____

Dated: _____, 2010

For the Purchase of _____ Shares of Common Stock

No. SA-____

## WARRANT FOR THE PURCHASE OF
## SHARES OF COMMON STOCK OF

### CLEANTECH INNOVATIONS, INC.

### Expiring Five Years from the Date Hereof

FOR VALUE RECEIVED, CleanTech Innovations, Inc. ("Company"), hereby certifies that the Warrant Holder specified above, or its, his or her registered assigns ("Registered Holder"), is entitled, subject to the terms set forth below, to purchase from the Company on or before the fifth anniversary of the date hereof, that number of shares of Common Stock, $.00001 par value, of the Company ("Common Stock") set forth above, at a purchase price equal to $4.00 per share (as may be adjusted as provided below) upon the terms and conditions set forth herein. The number of shares of Common Stock purchasable upon exercise of this Warrant, and the purchase price per share, each as adjusted from time to time pursuant to the provisions of this Warrant, are hereinafter referred to as the "Warrant Shares" and the "Exercise Price," respectively.

1.    Registration of Transfers and Exchanges .

(i)    The Company shall register the transfer of any portion of this Warrant in the Warrant Register, upon surrender of this Warrant, with the Form of Assignment attached hereto duly completed and signed, to the Transfer Agent or to the Company. Upon any such registration or transfer, a new warrant to purchase Common Stock, in substantially the form of this Warrant (any such new warrant, a "New Warrant"), evidencing the portion of this Warrant so transferred shall be issued to the transferee and a New Warrant evidencing the remaining portion of this Warrant not so transferred, if any, shall be issued to the transferring Holder. The acceptance of the New Warrant by the transferee thereof shall be deemed the acceptance of such transferee of all of the rights and obligations of a holder of a Warrant.

(ii)    This Warrant is exchangeable, upon the surrender hereof by the Holder to the office of the Company for one or more New Warrants, evidencing in the aggregate the right to purchase the number of Warrant Shares that may then be purchased hereunder. Any such New Warrant will be dated the date of such exchange.

2.    Exercise .

(i)    Procedure for Exercise . Subject to the conditions and terms set forth herein, this Warrant may be exercised by the Registered Holder ("Conversion Right"), in whole or in part, by the surrender of this Warrant (with the Notice of Exercise Form attached hereto as Exhibit 1 duly executed by such Registered Holder) at the principal office of the Company, or at such other office or agency as the Company may designate, accompanied by payment in full, in lawful money of the United States, of an amount equal to the then applicable Exercise Price multiplied by the number of Warrant Shares then being purchased upon such exercise.

(ii)    Exercise of Conversion Right . Subject to the terms and conditions set forth herein, the Conversion Right may be exercised by the Holder on any business day by delivering to the Company the Warrant with a duly executed Notice of Exercise Form attached hereto as Exhibit 1 with the conversion section completed by specifying the total number of shares of Common Stock the Registered Holder will purchase pursuant to such conversion.

(iii)    Procedure for Cashless Exercise . If the Common Stock is registered under Section 12 of the Securities Exchange Act of 1934, as amended, the Registered Holder may elect to pay all or part of the Exercise Price by surrendering shares of Common Stock to the Company, including by allowing the Company to deduct from the number of Warrant Shares deliverable upon exercise of this Warrant, such number of such shares that have an aggregate Fair Market Value (defined below), determined as of the average of the Last Sale Price (defined below) of the Common Stock for the 20 consecutive trading days immediately preceding the date of exercise of this Warrant, equal to the aggregate Exercise Price. (By way of example, if the Registered Holder exercises 50,000 warrants at an exercise price of $10.00 and the 20-day average price is $15.00, then Warrant Shares deliverable on exercise: 50,000; Aggregate Exercise Price: $500,000; Number of shares deliverable to Company on Cashless Exercise: $500,000/$15 or 33,334; Net Warrant Shares delivered to Registered Holder on Cashless Exercise: 50,000 - 33,334 = 16,666 shares.) In the event that the Warrant Holder elects to utilize the "cashless exercise" procedure contained in this Section 2(iii), this Warrant is exercisable upon surrender of this Warrant to the Company together with a duly completed Notice of Exercise in the form attached hereto and surrender of that number of shares of Common Stock equal to the aggregate Exercise Price determined in accordance with this Section 2(iii)(a) or (b). "Fair Market Value" per share of Common Stock on any relevant date shall be determined in accordance with the following provisions:

2

(a)    If the Common Stock is at the time traded on the OTC Bulletin Board or other electronic quotation service, then the Fair Market Value shall be the average of the last sale price per share of the Common Stock for the 20 consecutive trading days preceding the date of exercise of this Warrant; or

(b)    If the Common Stock is at the time listed on any Exchange (as defined below), the Fair Market Value shall be the average of the last sale price per share of the Common Stock for the 20 consecutive trading days preceding the date of exercise of this Warrant on the Exchange determined to be the primary market for the Common Stock. "Exchange" shall mean any of the NASDAQ markets, the New York Stock Exchange, NYSE Amex Equities or any organization or association defined as a national exchange by the Securities and Exchange Commission.

"Last Sale Price" shall mean (X) if the Common Stock is listed on an Exchange or quoted on the NASDAQ markets or the OTC Bulletin Board, the last sale price of the Common Stock in the principal trading market for the Common Stock as reported by the Exchange, NASDAQ or the OTC Bulletin Board, as the case may be; (Y) if the Common Stock is not listed on an Exchange or quoted on the NASDAQ markets or the OTC Bulletin Board, but is traded in the over-the-counter market, the closing bid price for the Common Stock on the last trading day preceding the date in question for which such quotations are reported by the Pink Sheets, LLC or similar publisher of such quotations; and (Z) if the fair market value of the Common Stock cannot be determined pursuant to clause (X) or (Y) above, such price as the Board of Directors of the Company shall in good faith determine at their sole discretion.

(iv)    Date of Exercise .  Each exercise of this Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which this Warrant shall have been surrendered to the Company.  At such time, the person or persons in whose name or names any certificates for Warrant Shares shall be issuable upon such exercise shall be deemed to have become the holder or holders of record of the Warrant Shares represented by such certificates.

(v)    Issuance of Certificate .  As soon as practicable after the exercise of the purchase right represented by this Warrant, the Company at its expense will cause to be issued in the name of, and delivered to, the Registered Holder, or, subject to the terms and conditions hereof, to such other individual or entity as such Holder (upon payment by such Holder of any applicable transfer taxes) may direct:

(a)    a certificate or certificates for the number of full shares of Warrant Shares to which such Registered Holder shall be entitled upon such exercise plus, in lieu of any fractional share to which such Registered Holder would otherwise be entitled, cash in an amount determined pursuant to Section 4 hereof, and

(b)    in case such exercise is in part only, a new warrant or warrants (dated the date hereof) of like tenor, stating on the face or faces thereof the number of shares currently stated on the face of this Warrant minus the number of such shares purchased by the Registered Holder upon such exercise as provided in subsection 2(i) above.

3

(vi)    <u>Exercise of Warrant</u> . The Warrant may be exercised in whole or from time to time in part on or prior to the fifth anniversary of the date hereof, as first set forth above.

3.    <u>Adjustments</u> .

(i)    <u>Split, Subdivision or Combination of Shares</u> . If, at any time while this Warrant remains outstanding and unexpired, the outstanding shares of the Company's Common Stock shall be subdivided or split into a greater number of shares, or a dividend in Common Stock shall be paid in respect of Common Stock, the Exercise Price in effect immediately prior to such subdivision or at the record date of such dividend shall, simultaneously with the effectiveness of such subdivision or split or immediately after the record date of such dividend (as the case may be), be decreased proportionately. If the outstanding shares of Common Stock shall be combined or reverse-split into a smaller number of shares, the Exercise Price in effect immediately prior to such combination or reverse split shall, simultaneously with the effectiveness of such combination or reverse split, be increased proportionately. When any adjustment is required to be made in the Exercise Price, the number of shares of Warrant Shares purchasable upon the exercise of this Warrant shall be changed to the number determined by dividing (i) an amount equal to the number of shares issuable upon the exercise of this Warrant immediately prior to such adjustment, multiplied by the Exercise Price in effect immediately prior to such adjustment, by (ii) the Exercise Price in effect immediately after such adjustment.

(ii)    <u>Reclassification, Reorganization, Consolidation or Merger</u> . In the case of any reclassification of the Common Stock (other than a change in par value or a subdivision or combination as provided for in subsection 3(i) above), or any reorganization, consolidation or merger of the Company with or into another corporation (other than a merger or reorganization with respect to which the Company is the continuing corporation and which does not result in any reclassification of the Common Stock), or a transfer of all or substantially all of the assets of the Company, or the payment of a liquidating distribution then, as part of any such reorganization, reclassification, consolidation, merger, sale or liquidating distribution, lawful provision shall be made so that the Registered Holder of this Warrant shall have the right thereafter to receive upon the exercise hereof, the kind and amount of shares of stock or other securities or property which such Registered Holder would have been entitled to receive if, immediately prior to any such reorganization, reclassification, consolidation, merger, sale or liquidating distribution, as the case may be, such Registered Holder had held the number of shares of Common Stock that were then purchasable upon the exercise of this Warrant. In any such case, appropriate adjustment (as reasonably determined by the Board of Directors of the Company) shall be made in the application of the provisions set forth herein with respect to the rights and interests thereafter of the Registered Holder of this Warrant such that the provisions set forth in this Section 3 (including provisions with respect to the Exercise Price) shall thereafter be applicable, as nearly as is reasonably practicable, in relation to any shares of stock or other securities or property thereafter deliverable upon the exercise of this Warrant.

4

(iii)    Price Adjustment . No adjustment in the per share Exercise Price shall be required unless such adjustment would require an increase or decrease in the Exercise Price of at least $0.01; provided, however, that any adjustments that by reason of this paragraph are not required to be made shall be carried forward and taken into account in any subsequent adjustment.  All calculations under this Section 3 shall be made to the nearest cent, with $0.005 being rounded down to the nearest cent, or to the nearest 1/100th of a share, as the case may be.

(iv)    No Impairment . The Company will not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Section 3 and in the taking of all such actions as may be necessary or appropriate in order to protect against impairment of the rights of the Registered Holder of this Warrant to adjustments in the Exercise Price.

(v)    Notice of Adjustment . Upon any adjustment of the Exercise Price or extension of the Warrant exercise period, the Company shall forthwith give written notice thereto to the Registered Holder of this Warrant describing the event requiring the adjustment, stating the adjusted Exercise Price and the adjusted number of shares purchasable upon the exercise hereof resulting from such event, and setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.

4.    Fractional Shares . The Company shall not be required to issue fractions of shares of Common Stock upon exercise.  If any fractions of a share would, but for this Section 4, be issuable upon any exercise, in lieu of such fractional share the Company shall round up or down to the nearest whole number.

5.    Limitation on Sales . Each holder of this Warrant acknowledges that this Warrant and the Warrant Shares, as of the date of original issuance of this Warrant, have not been registered under the Securities Act of 1933, as amended (the "Act"), and agrees not to sell, pledge, distribute, offer for sale, transfer or otherwise dispose of this Warrant or any Warrant Shares issued upon its exercise in the absence of (i) an effective registration statement under the Act as to this Warrant or such Warrant Shares or (ii) an opinion of counsel, reasonably acceptable to the Company and its counsel, that such registration and qualification are not required.  The Warrant Shares issued upon exercise thereof shall be imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED, HYPOTHECATED, ASSIGNED OR TRANSFERRED EXCEPT (i) IN ACCORDANCE WITH REGULATION S (RULES 901 THROUGH 905, AND PRELIMINARY NOTES), (ii) PURSUANT TO A REGISTRATION STATEMENT UNDER THE SECURITIES ACT THAT HAS BECOME EFFECTIVE AND IS CURRENT WITH RESPECT TO THESE SECURITIES, OR (iii) PURSUANT TO A SPECIFIC EXEMPTION FROM REGISTRATION AVAILABLE UNDER THE SECURITIES ACT BUT ONLY UPON A HOLDER HEREOF FIRST HAVING OBTAINED THE WRITTEN OPINION OF COUNSEL REASONABLY ACCEPTABLE TO THE COMPANY THAT THE PROPOSED DISPOSITION IS CONSISTENT WITH ALL APPLICABLE PROVISIONS OF THE SECURITIES ACT AS WELL AS ANY APPLICABLE "BLUE SKY" OR SIMILAR SECURITIES LAW. ANY HEDGING TRANSACTION INVOLVING THESE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT."

5

6.      Notices of Record Date .  In case: (i) the Company shall take a record of the holders of its Common Stock (or other stock or securities at the time deliverable upon the exercise of this Warrant) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of any class or any other securities, or to receive any other right, or (ii) of any capital reorganization of the Company, any reclassification of the capital stock of the Company, any consolidation or merger of the Company with or into another corporation (other than a consolidation or merger in which the Company is the surviving entity), or any transfer of all or substantially all of the assets of the Company, or (iii) of the voluntary or involuntary dissolution, liquidation or winding-up of the Company, then, and in each such case, the Company will mail or cause to be mailed to the Registered Holder of this Warrant a notice specifying, as the case may be, (i) the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is to take place, and the time, if any is to be fixed, as of which the holders of record of Common Stock (or such other stock or securities at the time deliverable upon the exercise of this Warrant) shall be entitled to exchange their shares of Common Stock (or such other stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up.  Such notice shall be mailed at least ten (10) days prior to the record date or effective date for the event specified in such notice, provided that the failure to mail such notice shall not affect the legality or validity of any such action.

7.      Reservation of Stock .  The Company will at all times reserve and keep available, solely for issuance and delivery upon the exercise of this Warrant, such shares of Common Stock and other stock, securities and property, as from time to time shall be issuable upon the exercise of this Warrant.  So long as this Warrant remains outstanding, the Company shall maintain the listing of the shares of Common Stock to be issued upon exercise on each national securities exchange on which Common Stock is listed (on the Nasdaq Over-The-Counter service if the Common Stock is then quoted on such service/bulletin board).

8.      Replacement of Warrants .  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) upon delivery of an indemnity agreement (with surety if reasonably required) in an amount reasonably satisfactory to the Company, or (in the case of mutilation) upon surrender and cancellation of this Warrant, the Company will issue, in lieu thereof, a new Warrant of like tenor.

6

9.    Transfers, etc .

    (i)    Warrant Register . The Company will maintain a register containing the names and addresses of the Registered Holders of this Warrant. Any Registered Holder may change its, his or her address as shown on the warrant register by written notice to the Company requesting such change.

    (ii)    Registered Holder . Until any transfer of this Warrant is made in the warrant register, the Company may treat the Registered Holder of this Warrant as the absolute owner hereof for all purposes; provided, however, that if and when this Warrant is properly assigned in blank, the Company may (but shall not be obligated to) treat the bearer hereof as the absolute owner hereof for all purposes, notwithstanding any notice to the contrary.

    10.    No Rights as Stockholder . Until the exercise of this Warrant, the Registered Holder of this Warrant shall not have or exercise any rights by virtue hereof as a stockholder of the Company.

    11.    Successors . The rights and obligations of the parties to this Warrant will inure to the benefit of and be binding upon the Company and any transferees of Warrant Holder.

    12.    Change or Waiver . Any term of this Warrant may be changed or waived only by an instrument in writing signed by the party against which enforcement of the change or waiver is sought.

    13.    Headings . The headings in this Warrant are for purposes of reference only and shall not limit or otherwise affect the meaning of any provision of this Warrant.

    14.    Governing Law . This Warrant shall be governed by and construed in accordance with the laws of the state of New York, without giving effect to principles of conflicts of laws.

    15.    Jurisdiction and Venue . The Company (i) agrees that any legal suit, action or proceeding arising out of or relating to this Warrant shall be instituted exclusively in any state court located in New York, New York or in the United States District Court for the Southern District of New York, (ii) waives any objection to the venue of any such suit, action or proceeding and the right to assert that such forum is not a convenient forum for such suit, action or proceeding, and (iii) irrevocably consents to the jurisdiction of any state court located in New York, New York and the United States District Court for the Southern District of New York in any such suit, action or proceeding, and the Company further agrees to accept and acknowledge service or any and all process which may be served in any such suit, action or proceeding in any state court located in New York, New York or in the United States District Court for the Southern District of New York and agrees that service of process upon it mailed by certified mail to its address shall be deemed in every respect effective service of process upon it in any suit, action or proceeding.

    16.    Mailing of Notices, etc . All notices and other communications under this Warrant (except payment) shall be in writing and shall be sufficiently given if sent to the Registered Holder or the Company, as the case may be, by hand delivery, private overnight courier, with acknowledgment of receipt, or by registered or certified mail, return receipt requested postage prepaid, as follows:

7

Registered Holder:

>To Registered Holder's address as provided on the Subscription Agreement or otherwise in the Company's Records.

The Company:

>To the Company's Principal Executive Offices
>Attention: Chief Executive Officer
>
>(with a copy, which shall not constitute notice to):
>
>The Newman Law Firm, PLLC
>44 Wall Street, 20 th Floor
>New York, NY  10005

or to such other address as any of them, by notice to the others may designate from time to time.  Time shall be counted to, or from, as the case may be, the date of delivery in person or by overnight courier or five (5) business days after mailing.

IN WITNESS WHEREOF, the Company has caused this Warrant to be executed by its duly authorized officers as of the date first above written.

**CLEANTECH INNOVATIONS, INC.**

By:     _____
Name:   Bei Lu
Title:  Chief Executive Officer

8

EXHIBIT 1

<u>NOTICE OF EXERCISE</u>

Date: _____

TO:      CleanTech Innovations, Inc.
C District, Maoshan Industry Park,
Tieling Economic Development Zone,
Tieling, Liaoning, China
Attn: Ms. Bei Lu, Chief Executive Officer

(Check one)

☐      1.      The undersigned hereby elects to purchase _____ shares of the Common Stock of CleanTech Innovations, Inc. pursuant to terms of the attached Warrant, and tenders herewith payment of $_____ (at the rate of $_____ per share of Common Stock) in payment of the Exercise Price(s) pursuant thereto, together with all applicable transfer taxes, if any.

☐      1.      The undersigned hereby elects to surrender shares of Common Stock or Warrant Shares pursuant to the cashless exercise procedure provided for in Section 2(i ii ) of the Warrant , and indicates below the number of shares of Common Stock or Warrant Shares to be surrendered and provides the calculation (pursuant to Section 2(i ii )(a) or (b) of the Warrant) for the number of shares to be surrendered:

      Number of Shares to be Surrendered: _____

      Calculation Pursuant to Section 2(iii): _____

    2.      Please issue a certificate or certificates representing said shares of the Common Stock in the name of the undersigned, or the undersigned's designee, and delivered to the undersigned, or the undersigned's designee, at the address specified below.

    3.      The undersigned is not a U.S. person and the attached Warrant is not being exercised on behalf of a U.S. person.

    4.      The undersigned agrees that the terms and conditions of the Subscription Agreement between the Company and the Undersign apply to the shares of Common Stock issuable upon the exercise of this Warrant.

[Signature Page Follows]

_____

Signature of Registered Holder

_____

Print Name:

**Notice:  The signature to this form must correspond with the name as written upon the face of the within Warrant in every particular without alteration or enlargement or any change whatsoever.**

### INSTRUCTIONS FOR REGISTRATION OF SECURITIES

Name: _____

(Print in Block Letters)

Address: _____

_____

2

EXHIBIT 2

[To be completed and signed only upon transfer of Warrant]

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____ the right represented by the within Warrant to purchase _____ shares of Common Stock of CleanTech Innovations, Inc. to which the within Warrant relates and appoints _____ attorney to transfer said right on the books of CleanTech Innovations, Inc. with full power of substitution in the premises.

Dated:

_____, _____

_____

(Signature must conform in all respects to name
of holder as specified on the face of the Warrant)

_____

Address of Transferee

_____

_____

In the presence of:

_____

_____

## CLEANTECH INNOVATIONS, INC.

### REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT (the "Agreement"), dated as of _____, 2010, is made by and between CleanTech Innovations, Inc., a Nevada corporation (the "Company"), and the undersigned investor (the "Investor").

WHEREAS, in connection with that certain Subscription Agreement by and among the Company and the Investor (the "Subscription Agreement"), the Company desires to sell to the Investor, and the Investor desires to purchase from the Company units (the "Units") consisting of (a) shares of the Company's common stock, $.00001 par value per share (the "Common Stock"); and (b) Warrants to purchase additional shares of Common Stock (the "Warrants") equal to 67.5% of the Common Stock initially purchased; and

WHEREAS, to induce the Investor to purchase the Common Stock and Warrants, the Company has agreed to register the shares of Common Stock purchased and the Common Stock underlying the Warrants pursuant to the terms of this Agreement.

NOW, THEREFORE, the Company and the Investor hereby covenant and agree as follows:

1. <u>Certain Definitions</u> . As used in this Agreement, the following terms shall have the following respective meanings:

"Closing" shall mean the closing of the sale of the Units.

"Commission" shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

"Effectiveness Date" shall mean that date which is one hundred eighty (180) days following the Final Closing Date.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Filing Date" shall mean that date which is fourteen (14) days following the Final Closing Date.

"Final Closing Date" shall mean the date hereof.

"Offering" shall refer to the Company's proposal to sell Units for $4.00 per Unit, with each Unit consisting of (i) one share of Common Stock of the Company and (ii) a five (5) year Warrant to purchase 67.5% of one share of Common Stock of the Company with an exercise price of $4.00 per share.

"Register," "registered" and "registration" each shall refer to a registration effected by preparing and filing a Registration Statement or statements or similar documents in compliance with the Securities Act and the declaration or ordering of effectiveness of such Registration Statement or document by the Commission.

"Registrable Securities" shall mean the shares of Common Stock issued pursuant to the Subscription Agreement or upon the exercise of the Warrants delivered as part of the Offering; provided , however , that shares of Common Stock which are Registrable Securities shall cease to be Registrable Securities (i) upon any sale pursuant to a Registration Statement or Regulation S under the Securities Act or (ii) at such time as they become eligible for sale pursuant to Regulation S under the Securities Act or another similar exemption under the Securities Act; provided, further, that the maximum amount of Registrable Securities at any one time shall be limited by Rule 415.

"Regulation S" shall mean Regulation S, as amended, as promulgated by the Securities and Exchange Commission under the Securities Act.

"Securities Act" shall mean the Securities Act of 1933, as amended.

Capitalized terms used but not defined herein shall have the meanings set forth in the Subscription Agreement or the Warrants.

2.     Automatic Registration .

(a)     On or prior to the Filing Date, the Company shall prepare and file with the Commission the Registration Statement covering the resale of all of the Registrable Securities for an offering to be made on a continuous basis pursuant to Rule 415. The Registration Statement required hereunder shall be on Form S-1 or Form S-3, as applicable. Subject to the terms of this Agreement, the Company shall use its commercially reasonable efforts to cause the Registration Statement to be declared effective under the Securities Act as promptly as possible after the filing thereof, but in any event not later than the Effectiveness Date, and shall use its commercially reasonable efforts to keep the Registration Statement continuously effective under the Securities Act until the date when all Registrable Securities covered by the Registration Statement have been sold or may be sold pursuant to Regulation S as determined by counsel to the Company pursuant to a written opinion letter to such effect, addressed and acceptable to the Company's transfer agent and the Investor (the "Effectiveness Period"). The maximum amount of Registrable Securities at any one time shall be limited by Rule 415 as required by the Commission. In the event that there is a limitation by the Commission on the number of Registrable Securities that may be registered at one time, the Company shall use its reasonable best efforts to file an additional Registration Statement covering such ineligible securities within 30 days of the date such securities become eligible and to make such Registration Statement be declared effective by the Commission as soon as practicably possible.

2

(b)      If: (i) a Registration Statement is not filed on or prior to the Filing Date, or (ii) the Company fails to file with the Commission a request for acceleration in accordance with Rule 461 promulgated under the Securities Act, within 5 trading days of the date that the Company is notified (orally or in writing, whichever is earlier) by the Commission that a Registration Statement will not be "reviewed," or is not subject to further review, or (iii) a Registration Statement filed or required to be filed hereunder is not declared effective by the Commission on or before the Effectiveness Date as a result of the failure of the Company to meet its obligations with respect to such filing as provided for herein, or (iv) after a Registration Statement is first declared effective by the Commission, it ceases for any reason to remain continuously effective as to the Registrable Securities held by the Investor, or the Investor is not permitted to utilize the Prospectus therein to resell such Registrable Securities, for in any such case 20 consecutive trading days but no more than an aggregate of 30 trading days during any 12-month period (which need not be consecutive trading days) during which the Investor is not permitted to sell such Registrable Securities under Regulation S (any such failure or breach being referred to as an "Event," and for purposes of clause (i) or (iii) the date on which such Event occurs, or for purposes of clause (ii) the date on which such 5 trading day period is exceeded, or for purposes of clause (iv) the date on which such 20- or 30-day period, as applicable, is exceeded being referred to as "Event Date"), then: (A) on the first Event Date to occur the Company shall pay to such Investor an amount, at the election of the Company, in cash or in Common Stock, as liquidated damages and not as a penalty, equal to 1.0% of the aggregate purchase price paid by such Investor pursuant to the Subscription Agreement for any Registrable Securities then held by such Investor for which such Inv estor has not received liquidated damages pursuant to Section 2(c) below ; and (B) on each anniversary of such Event Date (if the applicable Event, or any subsequent Event, shall not have been cured by such date) until all Event (s) are cured, the Company shall pay to such Investor an amount, as determined by the Company, in cash or in Common Stock, as liquidated damages and not as a penalty, equal to 1.0% of the aggregate purchase price paid by such Investor pursuant to the Subscription Agreement for any Registrable Securities then held by such Investor for which such Inv estor has not received liquidated damages pursuant to Section 2(c) below . In determining the number of shares of Common Stock payable to the Investor, the 20-day average closing price of the Common Stock ending on the Event Date shall be used. If the Company fails to pay any liquidated damages pursuant to this Section 2(b) in full within seven days after the date payable, the Company will pay interest thereon at a rate of 10% per annum (or such lesser maximum amount that is permitted to be (in cash or Common Stock, at the option of the Investor) paid by applicable law) to the Investor, accruing daily from the date such liquidated damages are due until such amounts, plus all such interest thereon, are paid in full.  The liquidated damages pursuant to the terms hereof shall apply on a daily pro-rata basis for any portion of a year prior to the cure of an Event.

(c)      Notwithstanding any other provision of this Section 2, if the Commission determines that the number of securities that the Company may register on the Registration Statement pursuant to Rule 415 is limited such that the shares so registered thereunder shall exclude any Registrable Securities held by the Investor, then the Company shall promptly so advise the Investor and the Company shall use commercially reasonable efforts to effect the registration of any Registrable Securities not so included on the Registration Statement as a result thereof as soon as is legally possible to do so.  In such event, the Company shall pay to such Investor liquidated damages as set forth in Section 2(b) hereof with respect to any Registrable Securities then held by the Investor that were not registered by the Effectiveness Date.

3

(d)        The parties acknowledge and agree that (i) the maximum amount of damages that the Company shall be obligated to pay the Investor for any and all breaches of this Section 2 is the amount of liquidated damages set forth in Section 2(b) or 2(c), and (ii) such liquidated damages shall be the sole remedy available to Investor for any breach of this Agreement, provided that nothing in this Section 2(d) shall preclude Investor from seeking injunctive relief, including specific performance of its rights under this Section 2.

3.        <u>Registration Procedures</u> .  If and whenever the Company is required by the provisions of Section 2 hereof to use its commercially reasonable efforts to affect the registration of any Registrable Securities under the Securities Act, the Company will, as expeditiously as possible:

(a)        prepare and file with the Commission the Registration Statement with respect to such securities and use its reasonable best efforts to cause such Registration Statement to become effective in an expeditious manner;

(b)        prepare and file with the Commission such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be necessary to keep such Registration Statement continuously effective during the Effectiveness Period and comply with the provisions of the Securities Act with respect to the disposition of all Registrable Securities covered by such Registration Statement in accordance with the intended method of disposition set forth in such Registration Statement for such period;

(c)        furnish to each seller of Registrable Securities and to each underwriter such number of copies of the Registration Statement and the prospectus included therein (including each preliminary prospectus) as such persons reasonably may request in order to facilitate the intended disposition of the Registrable Securities covered by such Registration Statement;

(d)        use its commercially reasonable efforts (i) to register or qualify the Registrable Securities covered by such Registration Statement under the securities or "Blue Sky" laws of such jurisdictions as the sellers of Registrable Securities or, in the case of an underwritten public offering, the managing underwriter, reasonably shall request, (ii) to prepare and file in those jurisdictions such amendments (including post-effective amendments) and supplements, and take such other actions, as may be necessary to maintain such registration and qualification in effect at all times for the period of distribution contemplated thereby and (iii) to take such further action as may be necessary or advisable to enable the disposition of the Registrable Securities in such jurisdictions, provided, that the Company shall not for any such purpose be required to qualify generally to transact business as a foreign corporation in any jurisdiction where it is not so qualified or to consent to general service of process in any such jurisdiction;

(e)        use its commercially reasonable efforts to list the Registrable Securities covered by such Registration Statement with any securities exchange on which the Common Stock of the Company is then listed;

4

(f)        immediately notify each seller of Registrable Securities and each underwriter under such Registration Statement, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the happening of any event of which the Company has knowledge as a result of which the prospectus contained in such Registration Statement, as then in effect, includes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing and promptly amend or supplement such Registration Statement to correct any such untrue statement or omission;

(g)        promptly notify each seller of Registrable Securities of the issuance by the Commission of any stop order suspending the effectiveness of the Registration Statement or the initiation of any proceedings for that purpose and make every reasonable effort to prevent the issuance of any stop order and, if any stop order is issued, to obtain the lifting thereof at the earliest possible time;

(h)        if the offering is an underwritten offering, enter into a written agreement with the managing underwriter selected in the manner herein provided in such form and containing such provisions as are usual and customary in the securities business for such an arrangement between such underwriter and companies of the Company's size and investment stature, including, without limitation, customary indemnification and contribution provisions;

(i)        if the offering is an underwritten offering, at the request of any seller of Registrable Securities, use its commercially reasonable efforts to furnish to such seller on the date that Registrable Securities are delivered to the underwriters for sale pursuant to such registration: (1) a copy of an opinion, dated such date, of counsel representing the Company for the purposes of such registration, addressed to the Investors (or a reliance letter addressed to the Investors), stating that such Registration Statement has become effective under the Securities Act and that (A) to the knowledge of such counsel, no stop order suspending the effectiveness thereof has been issued and no proceedings for that purpose have been instituted or are pending or contemplated under the Securities Act, (B) the Registration Statement, the related prospectus and each amendment or supplement thereof comply as to form in all material respects with the requirements of the Securities Act (except that such counsel need not express any opinion as to financial statements or other financial or statistical information contained therein) and (C) to such other effects as reasonably may be requested by counsel for the Investors and customarily given in an underwritten public offering; and (2) a copy of a letter dated such date from the independent public accountants retained by the Company, addressed to the Investors (or a reliance letter addressed to the Investors), stating that they are independent registered public accountants within the meaning of the Securities Act and that, in the opinion of such accountants, the financial statements of the Company included in the Registration Statement or the prospectus, or any amendment or supplement thereof, comply as to form in all material respects with the applicable accounting requirements of the Securities Act, and such letter shall additionally cover such other financial matters (including information as to the period ending no more than five business days prior to the date of such letter) with respect to such registration as such underwriters reasonably may request;

5

(j)        take all actions reasonably necessary to facilitate the timely preparation and delivery of certificates (not bearing any legend restricting the sale or transfer of such securities) representing the Registrable Securities to be sold pursuant to the Registration Statement and to enable such certificates to be in such denominations and registered in such names as the Investor or any underwriters may reasonably request; and

(k)        take all other reasonable actions necessary to expedite and facilitate the registration of the Registrable Securities pursuant to the Registration Statement.

4.        Obligations of Investor .

(a)        The Investor shall furnish to the Company such information regarding such Investor, the number of Registrable Securities owned and proposed to be sold by it, the intended method of disposition of such securities and any other information as shall be required to effect the registration of the Registrable Securities, and cooperate with the Company in preparing the Registration Statement and in complying with the requirements of the Securities Act; and

(b)        Concurrently with the execution of the Subscription Agreement, the Company and the Investor have entered into a lock-up letter agreement (the "Lock-Up Letter Agreement") regarding the Registrable Securities. Pursuant to the Lock-Up Letter Agreement, and notwithstanding the effectiveness of any Registration Statement registering the Registrable Securities, the Investor has agreed that it shall not offer for sale, sell, pledge or otherwise dispose of any shares of Common Stock or securities convertible into or exercisable or exchangeable for Common Stock in any manner contrary to the Lock-Up Letter Agreement for a period of 90 days commencing on the date the Company files the Registration Statement registering the Registrable Securities. The undersigned understands that the Company is relying upon such Lock-Up Letter Agreement in connection with the purchase of the Units by the Investor in the Offering.

5.        Expenses .

(a)        All expenses incurred by the Company in complying with Sections 2 and 3 including, without limitation, all registration and filing fees (including the fees of the Securities and Exchange Commission and any other regulatory body with which the Company is required to file), printing expenses, fees and disbursements of counsel and independent public accountants for the Company, fees and expenses (including counsel fees) incurred in connection with complying with state securities or "Blue Sky" laws, and fees of transfer agents and registrars are called "Registration Expenses." All underwriting discounts and selling commissions applicable to the sale of Registrable Securities are called "Selling Expenses."

(b)        The Company will pay all Registration Expenses in connection with any Registration Statement filed hereunder, and the Selling Expenses in connection with each such Registration Statement shall be borne by the participating sellers in proportion to the number of Registrable Securities sold by each or as they may otherwise agree.

6

6.      Indemnification and Contribution .

(a)      In the event of a registration of any of the Registrable Securities under the Securities Act pursuant to the terms of this Agreement, the Company will indemnify and hold harmless and pay and reimburse, each seller of such Registrable Securities thereunder, each underwriter of such Registrable Securities thereunder and each other person, if any, who controls such seller or underwriter within the meaning of the Securities Act, against any losses, claims, damages or liabilities, joint or several, to which such seller, underwriter or controlling person may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any Registration Statement under which such Registrable Securities were registered under the Securities Act pursuant hereto or any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation or alleged violation of the Securities Act or any state securities or "Blue Sky" laws and will reimburse each such seller, each such underwriter and each such controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, that the Company will not be liable in any such case if and to the extent that any such loss, claim, damage or liability arises out of or is based upon the Company's reliance on an untrue statement or alleged untrue statement or omission or alleged omission so made in conformity with information furnished by any such seller, any such underwriter or any such controlling person in writing specifically for use in such Registration Statement or prospectus.

(b)      In the event of a registration of any of the Registrable Securities under the Securities Act pursuant hereto, each seller of such Registrable Securities thereunder, severally and not jointly, will indemnify and hold harmless the Company, each person, if any, who controls the Company within the meaning of the Securities Act, each officer of the Company who signs the Registration Statement, each director of the Company, each underwriter and each person who controls any underwriter within the meaning of the Securities Act, against all losses, claims, damages or liabilities, joint or several, to which the Company or such officer, director, underwriter or controlling person may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon reliance on any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement under which such Registrable Securities were registered under the Securities Act pursuant hereto or, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and each such officer, director, underwriter, and controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided that such seller will be liable hereunder in any such case if and only to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with information pertaining to such seller, as such, furnished in writing to the Company by such seller specifically for use in such Registration Statement or prospectus; and provided, further, that the liability of each seller hereunder shall be limited to the proceeds received by such seller from the sale of Registrable Securities covered by such Registration Statement. Notwithstanding the foregoing, the indemnity provided in this Section 6(b) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or expense if such settlement is effected without the consent of such indemnified party and provided further, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage or liability (or action in respect thereof) arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission in such Registration Statement, which untrue statement or alleged untrue statement or omission or alleged omission is completely corrected in an amendment or supplement to the Registration Statement and the undersigned indemnitees thereafter fail to deliver or cause to be delivered such Registration Statement as so amended or supplemented prior to or concurrently with the sale of the Registrable Securities to the person asserting such loss, claim, damage or liability (or actions in respect thereof) or expense after the Company has furnished the undersigned with the same.

7

(c)     Promptly after receipt by an indemnified party hereunder of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party hereunder, notify the indemnifying party in writing thereof, but the omission so to notify the indemnifying party shall not relieve it from any liability which it may have to such indemnified party other than under this Section 6 and shall only relieve it from any liability which it may have to such indemnified party under this Section 6 if and to the extent the indemnifying party is materially prejudiced by such omission.  In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate in and, to the extent it shall wish, to assume and undertake the defense thereof with counsel reasonably satisfactory to such indemnified party, and, after notice from the indemnifying party to such indemnified party of its election so to assume and undertake the defense thereof, the indemnifying party shall not be liable to such indemnified party under this Section 6 for any legal expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation and of liaison with counsel so selected; provided that if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded based upon written advice of its counsel that there may be reasonable defenses available to it that are different from or additional to those available to the indemnifying party or if the interests of the indemnified party reasonably may be deemed to conflict with the interests of the indemnifying party, the indemnified party shall have the right to select a separate counsel and to assume such legal defenses and otherwise to participate in the defense of such action, with the expenses and fees of such separate counsel and other expenses related to such participation to be reimbursed by the indemnifying party as incurred.

8

(d)       In order to provide for just and equitable contribution to joint liability under the Securities Act in any case in which either (1) any holder of Registrable Securities exercising rights under this Agreement, or any controlling person of any such holder, makes a claim for indemnification pursuant to this Section 6 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 6 provides for indemnification in such case, or (2) contribution under the Securities Act may be required on the part of any such selling holder or any such controlling person in circumstances for which indemnification is provided under this Section 6; then, and in each such case, the Company and such holder will contribute to the aggregate losses, claims, damages or liabilities to which they may be subject (after contribution from others) in such proportion so that such holder is responsible for the portion represented by the percentage that the public offering price of its Registrable Securities offered by the Registration Statement bears to the public offering price of all securities offered by such Registration Statement, and the Company is responsible for the remaining portion; provided, that, in any such case, (A) no such holder will be required to contribute any amount in excess of the public offering price of all such Registrable Securities offered by it pursuant to such Registration Statement and (B) no person or entity guilty of fraudulent misrepresentation (within the meaning of Section 12 (f) of the Securities Act) will be entitled to contribution from any person or entity who was not guilty of such fraudulent misrepresentation.

7.       Changes in Capital Stock .  If, and as often as, there is any change in the capital stock of the Company by way of a stock split, stock dividend, combination or reclassification, or through a merger, consolidation, reorganization or recapitalization, or by any other means, appropriate adjustment shall be made in the provisions hereof so that the rights and privileges granted hereby shall continue as so changed.

8.       Representations and Warranties of the Company .  The Company represents and warrants to the Investor as follows:

(a)       The execution, delivery and performance of this Agreement by the Company have been duly authorized by all requisite corporate action and will not violate any provision of law, any order of any court or other agency of government, the Articles of Incorporation or Bylaws of the Company or any provision of any indenture, agreement or other instrument to which it or any or its properties or assets is bound, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the properties or assets of the Company or its subsidiaries.

(b)       This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable in accordance with its terms, subject to any applicable bankruptcy, insolvency or other laws affecting the rights of creditors generally and to general equitable principles and the availability of specific performance.

9.       Rule 144 Requirements .  The Company agrees to:

(a)       make and keep current public information about the Company available, as those terms are understood and defined in Rule 144;

(b)       use its commercially reasonable efforts to file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements); and

9

(c)      furnish to any holder of Registrable Securities upon request (i) a written statement by the Company as to its compliance with the reporting requirements of Rule 144 and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), (ii) a copy of the most recent annual or quarterly report of the Company, and (iii) such other reports and documents of the Company as such holder may reasonably request to avail itself of any similar rule or regulation of the Commission allowing it to sell any such securities without registration.

10.      Termination . All of the Company's obligations to register Registrable Shares under Sections 2 and 3 hereto shall terminate upon the date on which the Investor holds no Registrable Securities or all of the Registrable Securities are eligible for resale under Regulation S.

11.      Miscellaneous .

(a)      All covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto (including without limitation transferees of any Registrable Securities), whether so expressed or not.

(b)      All notices, requests, consents and other communications hereunder shall be in writing and shall be delivered in person, mailed by certified or registered mail, return receipt requested postage prepaid, or sent by telecopier, addressed (i) if to the Company, at CleanTech Innovations, Inc., c/o The Newman Law Firm, PLLC, 44 Wall Street, 20 th Floor, New York, New York 10005 USA, Attn: Robert Newman, Esquire; phone (212) 248-1001; facsimile (212) 202-6055; and (ii) if to any holder of Registrable Securities, to it at such address as may have been furnished to the Company or its counsel in writing by such holder; or, in any case, at such other address or addresses as shall have been furnished, in writing to the Company or its counsel (in the case of a holder of Registrable Securities) or to the holders of Registrable Securities (in the case of the Company) in accordance with the provisions of this paragraph.

(c)      This Agreement shall be governed by and construed under the laws of the State of New York, without giving effect to principles of conflicts of laws. The Company and Investor (i) agree that any legal suit, action or proceeding arising out of or relating to this Agreement shall be instituted exclusively in any state court located in New York, New York or in the United States District Court for the Southern District of New York, (ii) waive any objection which the Company or Investor may have now or hereafter to the venue of any such suit, action or proceeding, and (iii) irrevocably consent to the jurisdiction of any state court located in New York, New York, and the United States District Court for the Southern District of New York in any such suit, action or proceeding. The Company and Investor further agree to accept and acknowledge service of any and all process which may be served in any such suit, action or proceeding in any state court located in New York, New York, or in the United States District Court for the Southern District of New York and agree that service of process upon the Company or Investor mailed by certified mail, return receipt requested, postage prepaid, to, in the case of the Company, the Company's address, and in the case of the Investor, to the Investor's address as set forth on the Company's books and record, shall be deemed in every respect effective service of process upon the Company, in any such suit, action or proceeding. THE PARTIES HERETO AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY.