(d)     In the event of a breach by the Company or by the Investor of any of their obligations under this Agreement, the Investor or the Company, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Company and the Investor agree that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and hereby further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate.

(e)     This Agreement may not be amended or modified without the written consent of the Company and the Investor.

(f)     Failure of any party to exercise any right or remedy under this Agreement or otherwise, or delay by a party in exercising such right or remedy, shall not operate as a waiver thereof. No waiver shall be effective unless and until it is in writing and signed by the party granting the waiver.

(g)     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement, once executed by a party, may be delivered to the other party hereto by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

(h)     If any provision of this Agreement shall be held to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render illegal, invalid or unenforceable any other provision of this Agreement, and this Agreement shall be carried out as if any such illegal, invalid or unenforceable provision were not contained herein.

(i)     This Agreement constitutes the entire contract among the Company and the Investor relative to the subject matter hereof and supersedes in its entirety any and all prior agreements, understandings and discussions with respect thereto.

(j)     The headings of the sections of this Agreement are for convenience and shall not by themselves determine the interpretation of this Agreement.

[Signature Page Follows]

11

**[Signature Page to the Registration Rights Agreement]**

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

COMPANY

**CLEANTECH INNOVATIONS, INC.**

By: _____

Name: Bei Lu

Title:    Chief Executive Officer

**INVESTOR**

**[Company, Partnership or Trust]**

COMPANY NAME: _____

By: _____

Name:

Title:

**[Individual(s)]**

_____

Name:

_____

Name:

12

## LOAN AGREEMENT

**LOAN AGREEMENT** (this "Agreement") dated as of December 13, 2010 by and among CleanTech Innovations, Inc., a Nevada corporation with its principal executive offices located at C District, Maoshan Industry Park, Tieling Economic Development Zone, Tieling, Liaoning Province, China 112616 ("CleanTech"), and its wholly owned subsidiaries, Liaoning Creative Bellows Co., Ltd. ("Creative Bellows") and Liaoning Creative Wind Power Equipment Co., Ltd. ("Wind Power," together with Creative Bellows, the "Subsidiaries"), each such subsidiary organized under the laws of the People's Republic of China (CleanTech, Creative Bellows and Wind Power are collectively referred to herein as the "Company"), and NYGG (Asia), Ltd., a company organized under the laws of the British Virgin Islands with its principal executive offices located at 12 th Floor Ruttonjee House, 11 Duddell Street, Central, Hong Kong ("Lender").

### WITNESSETH

**WHEREAS** , Lender has agreed, subject to the terms and conditions hereof, to loan to the Company the sum of U.S. $10,000,000 (Ten Million Dollars) (the "Loan").

**NOW, THEREFORE** , in consideration of the foregoing premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. The Loan . Simultaneously with the execution of this Agreement by the parties hereto, the Lender will loan to the Company the sum of U.S. Dollars ("USD") 10,000,000. The Loan will be evidenced by a note (the "Note"), dated the date hereof, in the principal amount of the Loan, and will bear simple interest at the rate of 10% per annum, payable quarterly in advance commencing on the date hereof and thereafter every three (3) months from the date hereof on the following dates: March 13, 2011, June 13, 2011, September 13, 2011, and December 13, 2011, unless such date is a banking holiday recognized by JPMorgan Chase & Co. in New York City or a Saturday or Sunday (a "Business Day"), in which case such payment will be due on the next succeeding Business Day. The principal, together with any accrued and unpaid interest thereon, shall be due on the earlier of (i) March 1, 2012, (ii) on demand of the Lender of a full or partial payment at any time after the closing of any financing of USD 10,000,000 or more, or the equivalent in another currency, in one or a series of transactions or (iii) upon acceleration due to a Change of Control or Event of Default (as defined in the Note). The Note will be in the form attached hereto as Exhibit A. At the Lender's option, the principal amount of the note and all interest thereon shall be paid in either USD or Renminbi ("RMB") at an exchange rate of RMB 6.90 to USD 1.00 to the Lender or any designee of Lender as provided to the Company in writing by Lender.

2. Representations and Warranties of the Company . The Company represents and warrants that:

(A) The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada, and the Company and its Subsidiaries are duly qualified to do business and in good standing in such jurisdictions where the conduct of their business makes such qualification necessary. The Company has full power and authority, corporate and otherwise, to enter into and perform this Agreement and the Note. ·

1

(B) The execution, delivery and performance by the Company of this Agreement, and the making, execution and delivery by the Company of the Note (collectively with the Agreement referred to herein as the "Transaction Documents") have been duly authorized by all necessary corporate action and will not violate any provision of law, court order or decree to which the Company or its Subsidiaries are subject to, or the Company's Articles of Incorporation or Bylaws, as amended, or result in the breach of, or constitute a default under, or result in the creation of any lien, charge or encumbrance upon any property or assets of the Company or its Subsidiaries pursuant to any agreement or instrument to which they are a party. The Transaction Documents are a valid and binding obligation of the Company, enforceable in accordance with its terms subject to general principles of equity and bankruptcy and other laws affecting creditors' rights generally.

(C) No governmental permit, consent, approval or authorization is required in connection with (i) the execution, delivery and performance of the Transaction Documents, or (ii) the offer, sale, issuance and delivery of the Note contemplated hereby by the Company; provided , that , all representations made to the Company by the Lender in this Agreement and in any other document or instrument delivered in connection herewith are assumed for purposes of this representation and warranty to be accurate and complete.

(D) The Company has made available to the Lender through the EDGAR system, true and complete copies of the Company's current report on Form 8-K filed July 2, 2010 (the "8-K"), and all other reports filed by the Company pursuant to the 1934 Act since the filing of the 8-K and prior to the date hereof (collectively, the "SEC Filings"). The SEC Filings are the only filings required of the Company pursuant to the 1934 Act for such period. The Company and its Subsidiaries are engaged in all material respects only in the business described in the SEC Filings and the SEC Filings contain a complete and accurate description in all material respects of the business of the Company and its Subsidiaries, taken as a whole.

(E) The SEC Filings complied as to form and content in all material respects with the requirements of the 1934 Act and did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

(F) The net proceeds of the Note hereunder shall be used by the Company for working capital.

(G) Since December 31, 2009, except as identified and described in the SEC Filings, there has not been:

(i) any change in the financial condition of the Company that could reasonably be expected to have a material adverse effect ("Material Adverse Effect") on (x) the assets, liabilities, results of operations, condition (financial or otherwise), business, or prospects of the Company and its Subsidiaries taken as a whole, or (y) the ability of the Company to perform its obligations under the Transaction Documents, individually or in the aggregate; or

2

(ii) any other event or condition of any character that has had or could reasonably be expected to have a Material Adverse Effect.

3. <u>Representations and Warranties by the Lender</u> . As an inducement to the Company to enter into this Agreement and issue the Note, Lender represents and warrants, as follows:

(A) Lender is a validly existing company, limited partnership or limited liability company and has all requisite corporate, partnership or limited liability company power and authority to enter into the Transaction Documents.

(B) The execution, delivery and performance by Lender of the Transaction Documents to which Lender is a party have been duly authorized and will each constitute the valid and legally binding obligation of Lender, enforceable against Lender in accordance with their respective terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability, relating to or affecting creditors' rights generally.

(C) Lender acknowledges that it has been advised that the Note has not been registered under the provisions of the Act.

(D) Lender acknowledges it has reviewed and received copies of all SEC Filings. Lender specifically disclaims receipt of any other information and material, whether oral or in writing, from the Company or anyone acting for or on behalf of the Company, and reliance upon any such unauthorized oral or written information and material is specifically disclaimed.

4. <u>Covenants.</u> Upon an Event of Default or a Change of Control of the Company (as defined in the Note), the entire outstanding principal amount of the Note, and interest due thereon, shall become immediately due and payable in accordance with the terms of the Note.

5. <u>Negative Covenants.</u> Without the prior written consent of the Lender, from the date hereof until the date the Note is repaid in full, the Company and its Subsidiaries shall be prohibited from:

(A) Selling, leasing, encumbering, pledging or otherwise disposing of their respective assets, except in the ordinary course of business;

(B) Dissolving, liquidating, or winding up their respective businesses;

(C) Conducting their respective businesses other than in their ordinary and usual course;

(D) Paying any dividend or make any other distributions of cash or property;

(E) Merging or consolidating with another entity;

(F) Issuing any new stock or redeeming any existing stock;

(G) Incurring indebtedness for borrowed money, including capitalized loan obligations; or

(H) Effecting any fundamental change to the Company's lines of business.

6. Loan Delivery. Lender shall deposit a total of USD 10,000,000, less any applicable wire or transfer fees as follows:

Beneficiary: The Newman Law Firm PLLC IOLA Trust Account
Bank Name: TD Bank, NA
Bank Address: 2 Wall Street, New York, NY 10005
ABA: 026013673
Account Address: 44 Wall Street, New York, NY 10005
Account Number:

Upon the receipt by Lender and Company of the executed Loan Agreement and Note, The Newman Law Firm is hereby authorized by the Lender and the Company to promptly release all funds to the Company as directed by the Company in writing.

7. Miscellaneous .

(A) (i) The Company agrees to indemnify and hold harmless the Lender and its affiliates and their respective directors, officers, employees and agents (each a "Lender Indemnitee") from and against any and all losses, claims, damages, liabilities and expenses (including without limitation reasonable attorney fees and disbursements and other expenses incurred in connection with investigating, preparing or defending any action, claim or proceeding, pending or threatened and the costs of enforcement thereof) (collectively, "Losses") to which any such Lender Indemnitee may become subject as a result of any breach of representation, warranty, covenant or agreement made by or to be performed on the part of the Company under the Transaction Documents, and will reimburse any such Lender Indemnitee for all such amounts as they are incurred by such Lender Indemnitee.

(ii) The Lender agrees to indemnify and hold harmless the Company and its affiliates and their respective directors, officers, employees and agents (each a "Company Indemnitee") from and against any and all Losses to which any such Company Indemnitee may become subject as a result of any breach of representation, warranty, covenant or agreement made by or to be performed on the part of the Lender under the Transaction Documents, and will reimburse any such Company Indemnitee for all such amounts as they are incurred by such Company Indemnitee.

4

(B) This Agreement may not be assigned by a party hereto without the prior written consent of the Company or the Lender, as applicable, provided , however , that Lender may assign its rights and delegate its duties hereunder in whole or in part to an affiliate and may assign in writing any right to the payment of interest and principal to any designee. The provisions of this Agreement shall inure to the benefit of and be binding upon the respective permitted successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

(C) This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may also be executed via facsimile, which shall be deemed an original.

(D) The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(E) Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given as hereinafter described (i) if given by personal delivery, then such notice shall be deemed given upon such delivery, (ii) if given by mail, then such notice shall be deemed given upon the receipt of such notice by the recipient and (iii) if given by an internationally recognized overnight air courier, then such notice shall be deemed given two Business Days after delivery to such carrier. All notices shall be addressed to the party to be notified at the address as follows, or at such other address as such party may designate by ten days advance written notice to the other party:

> If to the Company:
> C District, Maoshan Industry Park,
> Tieling Economic Development Zone,
> Tieling, Liaoning Province, China 112616
> Att: Bei Lu
>
> With a copy to (which copy shall constitute notice):
> The Newman Law Firm, PLLC
> 14 Wall Street, 20 th Floor
> New York, NY 10005
> Attention: Robert Newman
>
> If to the Lender:
> NYGG (Asia), Ltd.
> 12 th Floor Ruttonjee House,
> 11 Duddell Street
> Central, Hong Kong

With a copy to (which copy shall constitute notice):
Orrick, Herrington & Sutcliffe, LLP
51 West 52 nd Street
New York, NY 10019
Attn: George H. Wang Esq.

(F) Amendments and Waivers . Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the Lender, and the Company will pay the reasonable fees and expenses of the Lender incurred in connection with any such amendment.

(G) Severability . Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof but shall be interpreted as if it were written so as to be enforceable to the maximum extent permitted by applicable law, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereby waive any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

(H) Entire Agreement . This Agreement, including the Exhibits and the Disclosure Schedules, and the other Transaction Documents constitute the entire agreement among the parties hereof with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter hereof and thereof.

(I) Further Assurances . The parties shall execute and deliver all such further instruments and documents and take all such other actions as may reasonably be required to carry out the transactions contemplated hereby and to evidence the fulfillment of the agreements herein contained.

(J) Governing Law; Consent to Jurisdiction; Waiver of Jury Trial . This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to the choice of law principles thereof. Each of the parties hereto irrevocably submits to the exclusive jurisdiction of the courts of the State of New York located in New York County and the United States District Court for the Southern District of New York for the purpose of any suit, action, proceeding or judgment relating to or arising out of this Agreement and the transactions contemplated hereby. Service of process in connection with any such suit, action or proceeding may be served on each party hereto anywhere in the world by the same methods as are specified for the giving of notices under this Agreement. Each of the parties hereto irrevocably consents to the jurisdiction of any such court in any such suit, action or proceeding and to the laying of venue in such court. Each party hereto irrevocably waives any objection to the laying of venue of any such suit, action or proceeding brought in such courts and irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. **EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO REQUEST A TRIAL BY JURY IN ANY LITIGATION WITH RESPECT TO THIS AGREEMENT AND REPRESENTS THAT COUNSEL HAS BEEN CONSULTED SPECIFICALLY AS TO THIS WAIVER.**

6

(K) The Company shall pay the reasonable fees and expenses of counsel incurred in connection with the negotiation and consummation of the transactions contemplated hereby.

**IN WITNESS WHEREOF** , the parties hereto have executed this agreement as of the date first above written

**CLEANTECH INNOVATIONS, INC.**

By: /s/ Bei Lu
   Name: Bei Lu
   Title: President and Chief Executive Officer

**LIAONING CREATIVE BELLOWS CO., LTD.**

By: /s/ Bei Lu
   Name: Bei Lu
   Title: President and Chief Executive Officer

**LIAONING CREATIVE WIND POWER EQUIPMENT CO., LTD.**

By: /s/ Bei Lu
   Name: Bei Lu
   Title: President and Chief Executive Officer

7

**LENDER:**

**NYGG (Asia), Ltd.**

By: /s/ Ming Li
      Name:
      Title:

8

## REGULATION S TEMPORARY GLOBAL NOTE DUE 2012

THIS NOTE IS A TEMPORARY GLOBAL NOTE FOR PURPOSES OF REGULATION S UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, THAT IS EXCHANGEABLE FOR A PERMANENT GLOBAL NOTE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH HEREIN.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE " **SECURITIES ACT** "), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS NOTE, REPRESENTS THAT IT HAS OBTAINED THIS NOTE IN A TRANSACTION IN COMPLIANCE WITH THE SECURITIES ACT, ALL OTHER APPLICABLE LAWS OF THE UNITED STATES OR ANY OTHER JURISDICTION. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS NOTE, FURTHER REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS PURCHASE MONEY NOTE (OR ANY INTEREST HEREIN) EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, AND ALL OTHER APPLICABLE LAWS OF ANY JURISDICTION AND ONLY TO A TRANSFEREE THAT IS NOT A U.S. PERSON (AS DEFINED IN REGULATION S OF THE SECURITIES ACT) AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION (AS DEFINED IN REGULATION S OF THE SECURITIES ACT) IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT. PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE AND IS CURRENT OR PURSUANT TO A SPECIFIC EXEMPTION FROM REGISTRATION THAT IS AVAILABLE UNDER THE SECURITIES ACT.

THIS NOTE IS NOT TRANSFERABLE EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED HEREIN. ANY SALE OR TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER OR ANY INTERMEDIARY. THIS NOTE IS NOT EXCHANGEABLE FOR DEFINITIVE SECURITIES UNTIL THE EXPIRATION OF THE 40-DAY DISTRIBUTION COMPLIANCE PERIOD SPECIFIED IN RULE 903(b)(3) AND UNTIL CERTIFICATION OF BENEFICIAL OWNERSHIP OF THE SECURITIES BY A NON-US PERSON OR A U.S. PERSON WHO PURCHASED SECURITIES IN A TRANSACTION THAT DID NOT REQUIRE REGISTRATION UNDER THE SECURITIES ACT. EACH TRANSFEROR OF THIS NOTE AGREES TO PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN TO THE TRANSFEREE.

THE FAILURE TO PROVIDE THE ISSUER, WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, AN INTERNAL REVENUE SERVICE FORM W-8 (OR SUCCESSOR APPLICABLE FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN THE IMPOSITION OF U.S. FEDERAL BACK-UP WITHHOLDING UPON PAYMENTS TO THE HOLDER IN RESPECT OF THIS NOTE.

**CLEANTECH INNOVATIONS, INC.**
Liaoning Creative Bellows Co., Ltd.
Liaoning Creative Wind Power Equipment Co., Ltd.

10% Promissory Note

Issuance Date: December 13, 2010                                                                New York, NY
Principal Amount: U.S. $10,000,000.00

For value received, CleanTech Innovations, Inc., a Nevada corporation (the "Company"), Liaoning Creative Bellows Co., Ltd. and Liaoning Creative Wind Power Equipment Co., Ltd., each such subsidiary organized under the laws of the People's Republic of China., a company organized under the Peoples Republic of China (collectively, jointly and severally, the "Maker"), hereby promises to pay to the order of NYGG (Asia) Ltd., a British Virgin Islands company with an address of 12 th Floor Ruttonjee House, 11 Duddell Street, Central, Hong Kong (together with its successors, representatives, and permitted assigns, and designees the "Holder"), in accordance with the terms hereinafter provided and subject to the terms and conditions of the Loan Agreement by and between the Maker and the Holder, dated the even date hereof (the "Loan Agreement"), the Principal Amount of TEN MILLION U.S. DOLLARS AND ZERO CENTS (U.S.$10,000,000.00), together with interest thereon.

All payments under or pursuant to this Note shall be made in United States Dollars ("USD") or, at the option of the Holder, in Renminbi ("RMB") at an exchange rate of RMB 6.90 to USD 1.00 in immediately available funds to the Holder or the designee of the Holder at the address of the Holder first set forth above or at such other place as the Holder may designate from time to time in writing to the Maker or by wire transfer of funds in USD or RMB, at the option of the Holder, to the Holder's or the Holder's designee's account, as requested by the Holder in writing. The outstanding principal balance of this Note, together with all accrued and unpaid interest, shall be due and payable in full on March 1, 2012 (the "Maturity Date"), or at such earlier time as provided herein.

ARTICLE I
PAYMENT

Section 1.1    Interest. Beginning on the date of this Note (the "Issuance Date"), the outstanding principal balance of this Note shall bear interest at a rate per annum equal to ten percent (10%), payable in USD or RMB at an exchange rate of RMB 6.90 to USD 1.00 at the option of the Holder, and payable first quarterly in advance commencing on the date hereof and thereafter every three (3) months from the date hereof (the "Interest Payment Date") on the following dates: March 13, 2011, June 13, 2011, September 13, 2011, December 13, 2011, and the final payment due on the Maturity Date. Interest shall be computed on the basis of a 365-day year and shall accrue daily commencing on the Issuance Date. Furthermore, upon the occurrence of an Event of Default (as defined in Section 2.1 hereof), the Maker will pay interest to the Holder, payable on demand, on the outstanding principal balance of Note from the date of the Event of Default until such Event of Default is cured at the rate per annum of the lesser of twenty-four percent (24%) accrued daily and the maximum applicable legal rate per annum.

2

Section 1.2     Payment of Principal; Prepayment. The Principal Amount hereof shall be paid in full on the earliest of (i) the Maturity Date, (ii) the due date of any Mandatory Prepayment (as defined below) (such prepayment pursuant to this clause (ii) to be in part if sufficient funds are not available for application pursuant to Section 1.5 hereof) or (iii) upon acceleration of this Note in accordance with the terms hereof. Any amount of principal repaid hereunder may not be re-borrowed. The Maker may prepay all or, subject to Holder preapproval, any portion of the Principal Amount of this Note without premium or penalty; provided , however , any quarterly prepayment of interest shall not be prorated or refunded to Maker if the Principal Amount is paid in full after an interest payment is made.

Section 1.3     Payment on Non-Business Days. Whenever any payment to be made shall be due on a Saturday, Sunday or a holiday recognized by the branch offices of JPMorgan Chase & Co. located in New York City, NY, such payment may be due on the next succeeding day (a "Business Day").

Section 1.4     Use of Proceeds. The Maker shall use the proceeds of this Note only for general working capital and pre-payment of all outstanding principal and interest on the existing $1,500,000 loan, dated October 14, 2010, from Strong Growth Capital, Ltd.

Section 1.5     Mandatory Prepayment. Notwithstanding anything to the contrary contained herein, upon the earliest to occur of (i) Maker's receipt of any financing from any source in excess of $10,000,000 in one or a series of transactions, (ii) any Change of Control of the Maker, (iii) any material negative change of the Maker's business and financial position, as reasonably determined by the Holder, (iv) any change to the shareholdings of any person under a 3-year share lockup agreement entered by certain insiders of the Maker or (v) departure of any senior members of management of the Maker that will negatively impact the business of the Maker, as reasonably determined by the Holder, in each case, the entire outstanding Principal Amount of this Note, and all interest due thereon shall become immediately payable upon demand of the Holder ("Mandatory Prepayment").

ARTICLE II
EVENTS OF DEFAULT; REMEDIES

Section 2.1     Events of Default. Unless waived in writing by the Holder, the occurrence of any of the following events shall be an "Event of Default" under this Note:

(a)     any default in the payment of (1) the Principal Amount hereunder when due, or (2) interest on this Note if five (5) Business Days after the date when the same shall become due and payable (whether on the Maturity Date, Interest Payment Date, the date of any mandatory prepayment, by acceleration or otherwise); or

(b)     the Maker shall fail to observe or perform any other covenant or agreement contained in this Note or the Loan Agreement; or

3

(c)      any material representation or warranty made by the Maker herein or in the Loan Agreement shall prove to have been false or incorrect or inaccurate or breached in a material respect on the date as of which made; or

(d)      the Maker shall (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property or assets, (ii) make a general assignment for the benefit of its creditors, (iii) commence a voluntary case under the United States Bankruptcy Code (as now or hereafter in effect) or under the comparable laws of any jurisdiction (foreign or domestic), (iv) file a petition seeking to take advantage of any bankruptcy, insolvency, moratorium, reorganization or other similar law affecting the enforcement of creditors' rights generally, (v) acquiesce in writing to any petition filed against it in an involuntary case under the United States Bankruptcy Code (as now or hereafter in effect) or under the comparable laws of any jurisdiction (foreign or domestic), (vi) issue a notice of bankruptcy or winding down of its operations or issue a press release regarding same or (vii) take any action under the laws of any jurisdiction (foreign or domestic) analogous to any of the foregoing; or

(e)      a proceeding or case shall be commenced in respect of the Maker, without its application or consent, in any court of competent jurisdiction, seeking (i) the liquidation, reorganization, moratorium, dissolution, winding up, or composition or readjustment of its debts, (ii) the appointment of a trustee, receiver, custodian, liquidator or the like of it or of all or any substantial part of its assets in connection with the liquidation or dissolution of the Maker or (iii) similar relief in respect of it under any law providing for the relief of debtors, and such proceeding or case described in clause (i), (ii) or (iii) shall continue undismissed, or unstayed and in effect, for a period of thirty (30) days or any order for relief shall be entered in an involuntary case under the United States Bankruptcy Code (as now or hereafter in effect) or under the comparable laws of any jurisdiction (foreign or domestic) against the Maker or action under the laws of any jurisdiction (foreign or domestic) analogous to any of the foregoing shall be taken with respect to the Maker and shall continue undismissed, or unstayed and in effect for a period of thirty (30) days.

Section 2.2      Remedies Upon An Event of Default. If an Event of Default shall have occurred and shall be continuing, the Holder of this Note may, at any time, at its option, declare the entire unpaid principal balance of this Note, together with all interest accrued hereon, due and payable, and thereupon, the same shall be accelerated and so due and payable, without presentment, demand, protest or notice, all of which are hereby expressly unconditionally and irrevocably waived by the Maker. The Maker shall pay to the Holder such additional amounts as shall be sufficient to pay the Holder's actual and reasonable costs and expenses of collection, including without limitation, reasonably attorney's fees and expenses. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note, at law or in equity (including, without limitation, a decree of specific performance and/or other injunctive relief), no remedy contained herein shall be deemed a waiver of compliance with the provisions giving rise to such remedy and nothing herein shall limit the Holder's right to pursue actual damages for any failure by the Maker to comply with the terms of this Note.

4

Section 2.3    Definition of Change of Control. For the purposes of this Note, a "Change of Control" means, with respect to the Maker, the occurrence of any of the following events:

(i)    the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 30% or more of the combined voting power of the then outstanding common stock, par value $.00001 per share (the "Common Stock"), of the Company or any subsidiary; provided , however , that for purposes of this Section 2.3(i), the following acquisitions will not constitute a Change of Control: (A) any issuance of Common Stock of the Company directly from the Company that is approved by the Board of Directors of the Company (the "Board of Directors"), (B) any acquisition by the Company of Common Stock of the Company, (C) any acquisition of Common Stock of the Company by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Subsidiary or (D) any acquisition of Common Stock of the Company pursuant to a Business Combination after Maker has complied with Section 1.5 hereof.

(ii)    individuals who, as of the date hereof, constitute the Board of Directors, cease for any reason to constitute at least a majority of the Board of Directors;

(iii)    consummation of a reorganization, merger or consolidation, a sale or other disposition of all or substantially all of the assets of the Company, or other transaction (each, a "Business Combination"); or

(iv)    approval by the stockholders of the Company of a complete liquidation or dissolution of the Company.

ARTICLE III
MISCELLANEOUS

Section 3.1    Notices. Any notice, demand, request, waiver or other communication required or permitted to be given hereunder shall be in writing and shall be effective (a) upon hand delivery, at the address set forth on the signature page hereto (in the case of the Maker) or above (in the case of the Holder) (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received), (b) on the second business day following the date of mailing by an internationally recognized overnight courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur or (c) by email, or other electronic means to the email address listed below. Copies of such notice shall be delivered by any of the foregoing means to Robert Newman, Esq., The Newman Law Firm, PLLC, 44 Wall Street, 20 th Floor, New York, NY 10005, email (Rnewman@nlawglobal.com), and such delivery shall constitute effective notice to the Maker hereunder.

5

Section 3.2       Governing Law; Drafting; Representation. This Note shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any of the conflicts of law principles which would result in the application of the substantive law of another jurisdiction. This Note shall not be interpreted or construed with any presumption against the party causing this Note to be drafted.

Section 3.3       Headings. Article and section headings in this Note are included herein for purposes of convenience of reference only and shall not constitute a part of this Note for any other purpose.

Section 3.4       Binding Effect; Amendments. The obligations of the Maker and the Holder set forth herein shall be binding upon the successors and assigns of each such party. This Note may not be modified or amended in any manner except in writing executed by the Maker and the Holder.

Section 3.5       Consent to Jurisdiction. Each of the Maker and the Holder (i) hereby irrevocably submits to the exclusive jurisdiction of the United States District Court sitting in the Southern District of New York and the courts of the State of New York located in New York county for the purposes of any suit, action or proceeding arising out of or relating to this Note and (ii) hereby waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Each of the Maker and the Holder consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address in effect for notices to it hereunder and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

Section 3.6       Failure or Indulgence Not Waiver. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

Section 3.7       Maker Waivers; Dispute Resolution. Except as otherwise specifically provided herein, the Maker and all others that may become liable for all or any part of the obligations evidenced by this Note, hereby waive presentment, demand, notice of nonpayment, protest and all other demands and notices in connection with the delivery, acceptance, performance and enforcement of this Note, and do hereby consent to any number of renewals of extensions of the time or payment hereof and agree that any such renewals or extensions may be made without notice to any such persons and without affecting their liability herein and do further consent to the release of any person liable hereon, all without affecting the liability of the other persons, firms or Maker liable for the payment of this Note, AND DO HEREBY WAIVE TRIAL BY JURY.

(a)       No delay or omission on the part of the Holder in exercising its rights under this Note, or course of conduct relating hereto, shall operate as a waiver of such rights or any other right of the Holder, nor shall any waiver by the Holder of any such right or rights on any one occasion be deemed a waiver of the same right or rights on any future occasion.

6

(b)      THE MAKER ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS NOTE IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED BY APPLICABLE LAW, HEREBY WAIVES ITS RIGHT TO NOTICE AND HEARING WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH THE HOLDER OR ITS SUCCESSORS OR ASSIGNS MAY DESIRE TO USE.

**IN WITNESS WHEREOF** , the Maker has caused this Note to be duly executed by its duly authorized officer as of the date first above indicated.

CLEANTECH INNOVATIONS, INC.

By: /s/ Bei Lu
      Name: Bei Lu
      Title: President and Chief Executive Officer

LIAONING CREATIVE BELLOWS CO., LTD.

By: /s/ Bei Lu
      Name: Bei Lu
      Title: President and Chief Executive Officer

LIAONING CREATIVE WIND POWER EQUIPMENT CO., LTD

By: /s/ Bei Lu
      Name: Bei Lu
      Title: President and Chief Executive Officer

Address of Makers:
C District, Maoshan Industry Park,
Tieling Economic Development Zone, Tieling,
Liaoning Province, China 112616
Email: beilu@ctiproduct.com

7

# 7

 THE NASDAQ STOCK MARKET
9600 BLACKWELL ROAD
ROCKVILLE, MD 20850

**Gary N. Sundick**
Vice President
Listing Qualifications

January 13, 2011

**Via e-mail to beilu@ctiproduct.com**

Ms. Bei Lu, Chairman and Chief Executive Officer
CleanTech Innovations, Inc.
C District, Maoshan Industry Park
Tieling Economic Development Zone
Tieling, Liaoning Province, China

      Re:    CleanTech Innovations, Inc. (the "Company" or "CTEK")

Dear Ms. Lu:

    Based upon our review of public documents and information provided by the Company, Staff of The NASDAQ Stock Market LLC ("Nasdaq") believes that the continued listing of the Company's securities on Nasdaq is no longer warranted.  As discussed below, the Company failed to provide Staff with material information in violation of its obligations under its Listing Application and the applicable Listing Rules.  Our conclusion is based on Nasdaq's broad discretionary authority contained in Listing Rule 5101[1] to deny continued inclusion of securities in order to maintain the quality of, and the public's confidence in, Nasdaq and the failure of the Company to comply with Listing Rules 5205(e) and 5250(a)(1).[2]

---

[1]    Listing Rule 5101 states, in part, that "Nasdaq, therefore, in addition to applying the enumerated criteria set forth in the Rule 5000 Series, has broad discretionary authority over the initial and continued listing of securities in Nasdaq in order to maintain the quality of and public confidence in its market, to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and to protect investors and the public interest.  Nasdaq may use such discretion to deny initial listing, apply additional or more stringent criteria for the initial or continued listing of particular securities, or suspend or delist particular securities based on any event, condition, or circumstance that exists or occurs that makes initial or continued listing of the securities on Nasdaq inadvisable or unwarranted in the opinion of Nasdaq, even though the securities meet all enumerated criteria for initial or continued listing on Nasdaq."

[2]    Listing Rules 5205(e) and 5250(a)(1) state that a company may be denied initial or continued listing if "any communication to Nasdaq contains a material misrepresentation or omits material information necessary to make the communication to Nasdaq not misleading."

Ms. Bei Lu
January 13, 2011
Page 2


## **Background**

During the Company's application process, Staff repeatedly requested information regarding the Company's involvement with Benjamin Wey, an individual with certain notoriety and a securities-related regulatory history, and certain companies and persons affiliated with him.  Staff made numerous information and document requests, written and verbal, relating to Mr. Wey.  For example, on October 29, 2010, Staff requested the following information:

- For the time period June 1, 2008 through the present, provide all documents, including e-mails and attachments, related to Benjamin Wey (a/k/a/ Wei), Ming Li, New York Global Group, NYGG China [a/k/a, NYGG Asia], and/or any other associated/affiliated persons and/or entities, including shareholders.  For all entities, provide the names of all individuals associated with them.  Please also provide a written narrative describing any and all such relationships;

- For the time period June 1, 2008 through the present, provide all documents, including e-mails and attachments, relating to all consultants, advisers, placement agents, underwriters, broker/dealers, finders, investor relations firms and people, and/or public relations firms and people.  Please also provide a written narrative describing any and all services provided, dates involved, and all compensation paid (in any form);

- Provide all documents, including e-mails and attachments, relating to all loans and/or similar arrangements to or from Benjamin Wey, NYGG, NYGG China, and/or affiliated persons and/or entities;

- Provide a detailed, written narrative describing all due diligence work performed by NYGG and/or NYGG China;

Staff's requests about Mr. Wey and his affiliates were designed to determine his involvement with, and ownership of, the Company, given the concerns noted above.

On November 12th, the Company produced documents pursuant to this request and informed Staff in an accompanying e-mail that "[b]ased upon the information now provided herein, we have been responsive to all requests made . . . on behalf of NASDAQ's Listing Investigations Department."  Subsequently, Staff learned that the Company had not provided certain e-mails because they were also sent or copied to Company's counsel.  Staff thereafter had extensive discussions with CTEK's counsel regarding these e-mails and made clear that the Company's application would be denied if they were not produced.  Based on these discussions, on November 24th and December 3rd, the Company made additional submissions containing e-mails relating to Mr. Wey that were responsive to the original October 29th request.  Staff discussed these e-mails at length with the Company's outside counsel on December 7th, and the Company thereafter provided additional documents pursuant to this discussion.

Ms. Bei Lu
January 13, 2011
Page 3

At this time Nasdaq staff was again assured by Company counsel that all responsive emails had been produced. Following Staff's review of these additional documents, the Company was approved for listing on December 10th; trading began on December 15th.

On December 16th, immediately after trading began on Nasdaq, the Company filed a Form 8-K in which it disclosed two material financing transactions. Specifically, the Company disclosed that on December 13th, it "completed a closing of US $20,000,000 in a combination of equity and debt offerings through accredited institutional investors." The equity portion of the financing was a private placement of 2.5 million units at an offering price of $4.00 per unit for $10 million. Each unit consisted of one share of common stock and one warrant with an exercise price of $4.00 a share.[3] NYGG (Asia) received $1 million and warrants exercisable at $4.00 to purchase 300,000 shares of common stock, worth at least an additional $825,000,[4] for acting as placement agent. Furthermore, out of the 2.5 million units, 625,000 were purchased by certain of Mr. Wey's affiliates. Given the substantial market discount, these units represented nearly $3 million in compensation. The debt portion of the financing was in the form of a long-term loan agreement with NYGG (Asia) in the amount of $10 million with an annual interest rate of 10 percent payable quarterly. NYGG (Asia) received $100,000 for its assistance in arranging the loan. The total compensation to Mr. Wey and his affiliates, for both the debt and equity portions of the financing, was approximately $4.8 million.

However, neither of these material transactions was disclosed to Nasdaq prior to the filing of the Form 8-K on December 16th, despite the fact that: Staff had previously specifically requested any such information with regard to Mr. Wey and Mr. Li or their affiliated entities; the Company's general obligation to update Staff throughout the listing process concerning any new material information; and, the specific question in the Listing Application concerning any bridge financings and private placements by the Company.

## Discussion

On December 21, 2010, upon learning of the Company's financing transactions via the December 16th Form 8-K, Staff immediately contacted the Company's counsel to express concern about the Company's failure to bring the transactions to Staff's attention and to request further documents and information, including a specific chronology. During this conversation, Staff made clear that each of these transactions was required to have been disclosed during the listing process, based upon the Listing Application and Staff's numerous document requests made throughout the listing process. The chronology provided by the Company made clear that as early as November 30th, the Company had preliminary discussions on terms of a potential financing and thereafter sought consulting advice and assistance from NYGG (Asia). Substantial e-mail traffic was provided to Staff showing that these transactions were developed throughout the very period that Staff was considering

---

[3]    The Company's closing stock price on December 13, 2010, was $6.75.

[4]    The warrants were in the money by $2.75 at the time of issuance. Thus, 300,000 warrants were worth $825,000 at that time.

Ms. Bei Lu
January 13, 2011
Page 4

whether to approve the Company's application.   A number of these e-mails were copied to Mr. Wey and were required to have been produced to Staff by the clear terms of Staff's requests and discussions with Company counsel, discussed above.  Had they been timely provided, Staff would have learned of these transactions and had the opportunity to consider whether listing the Company was appropriate. Notwithstanding Staff's clear interest in any transaction, or even any e-mail, between the Company and Mr. Wey, neither pending transaction was disclosed to Staff and the multitude of e-mails about it were not provided.

        The Company's chronology identifies and quotes at length from the following e-mail dated December 8th from Jason Li, CTEK's Corporate Secretary, which speaks for itself:

> We were informed that the 20MM CleanTech financing was revised to 10M equity and 10M debt, I assume we need to re-sign the documents, right? When will receive them?
>
> *We understand that if we close the deal before we get approval from Nasdaq listing, we have to file the 8K, and we may have new problem crop up unexpectedly for list approval*. (emphasis added), but for the best interests of the company, Bei [CleanTech's Chairman] doesn't want to wait, if we cannot get approval from Nasdaq by this Friday, Bei want to close the deal next Monday, and transfer the money to our U.S. account.  It's been a long time, and a lot of effort taken by all of us, You, NYGG, CleanTech, Stevens & Lee, since we submitted the application for the first time (July 16th, if I remember right), Bei has no interest to put Nasdaq listing as a prior first considering the production plan we have in our hand and working capitals we need for the next year.
>
> We wish for every luck for Nasdaq approval, but if we have no choice, we would put our production operating as our major concerns. We'll have a further discussion with Ben [NYGG US consultant] about it, just want to let you know what's our concerns.
>
> Best wishes,
> Jason

This e-mail makes abundantly clear that the Company was concerned that disclosure of these transactions to Staff would at the very least delay, if not jeopardize, its listing.

## Staff's Determination

        The Company's failure to inform Nasdaq of both the loan and private placement, each of which was facilitated by Mr. Wey and/or his affiliates, displays a blatant disregard for the integrity of the

Ms. Bei Lu
January 13, 2011
Page 5

listing process and Nasdaq's Listing Rules.  The Company acknowledged as much when stating that "if we close the deal before we get approval from Nasdaq listing, we have to file the 8K, and we may have new problem crop up unexpectedly for list approval [sic]."

Every company seeking to list on Nasdaq is required to disclose all material information to Staff during the listing application process and to update information previously provided.  This obligation is set forth in the Listing Application each company signs.  In that regard, in CTEK's Listing Application dated July 13, 2010, Ms. Bei Lu made the following affirmation: "I, Bei Lu, as Chief Executive Officer of CleanTech Innovations, Inc., hereby certify, to the best of my knowledge and belief that the information contained in the application is true and correct, as of [July 13, 2010], *and will notify NASDAQ promptly of any material changes*." (emphasis added)  The Listing Application specifically asks about bridge financings and private placements consummated by the Company.  Moreover, Listing Rules 5205(e) and 5250(a)(1) provide that Staff can deny initial or continued listing "if any communication to Nasdaq contains a material misrepresentation or omits material information necessary to make the communication to Nasdaq not misleading."  The Company intentionally violated these requirements by failing to provide Nasdaq with information about the material financing transactions.  It did so despite its knowledge that these transactions would be relevant to Staff, and with the clear understanding that such disclosure would likely create a "new problem" for the listing.[5]

The Company argues that its obligation to timely update Staff throughout the listing process was satisfied by its December 16th Form 8-K.  This conclusion is without merit.  It would mean that a company could, with impunity, withhold the very information necessary to make a listing decision.[6]  An 8-K disclosure obligation is quite different from a company's obligation to be forthcoming with Staff during the listing process.  In this matter, both the financial arrangement and private placement were in process prior to December 10th when Staff completed its listing review and approved the Company's listing application and were closed prior to the start of trading on Nasdaq on December 15th.  Subsequent disclosure via a Form 8-K after the Company's listing hardly cures the failure to bring these matters timely to Staff's attention.  On the facts presented above, it is clear that the Company's failure to advise Staff of these material transactions was deliberate and calls into question the Company's good faith throughout the listing process.

In prior matters, the SEC has upheld Nasdaq's discretionary authority to delist a company in order to safeguard the public interest.  In a decision entitled In the Matter of Fog Cutter Capital Group, Inc., the Commission held that "[l]isting a security on a market creates expectations among investors that listed companies meet basic standards of corporate governance and financial soundness. We have stated that 'inclusion of a security . . . entail[s] an element of judgment given the expectations of investors and the imprimatur of listing on a particular market.'  We have also held that 'the risk

---

[5]     Staff also notes that the private placement was offered at a 42% discount relative to the Company's closing stock price on December 13th, which suggests that the Company's stock price, and therefore its market capitalization, were significantly overstated.
[6]     Almost by definition, certain material information provided by an applicant to Staff will be non-public.  Staff takes care to safeguard such information.

Ms. Bei Lu
January 13, 2011
Page 6

associated with investing in [Nasdaq] is market risk rather than the risk that the promoter or other person exercising substantial influence over the issuer is acting in an illegal manner.'"[7] Here, CTEK knew that the pending transaction would raise concerns with Staff due to its nature and the individuals involved. Armed with that knowledge, the Company not only proceeded with the two transactions, but also hid them from Nasdaq. Staff believes that these actions raise the risk that the Company will continue to act in a manner inconsistent with its obligations under the Nasdaq Listing Rules and the federal securities laws, and that it is therefore appropriate to delist the Company.

Based on the discussion above, Staff believes that the Company's actions raise significant public interest concerns and that the delisting of the Company's securities from Nasdaq is warranted. Unless the Company requests an appeal of this determination as described below, trading of the Company's common stock will be suspended at the opening of business on January 22, 2011, and a Form 25-NSE will be filed with the SEC, which will remove the Company's securities from listing and registration on Nasdaq.

*          *          *

Nasdaq's Listing Rules require that the Company promptly disclose receipt of this letter by either filing a Form 8-K, where required by SEC rules, or by issuing a press release. The announcement needs to be made no later than four business days from the date of this letter and must include the continued listing criteria that the Company does not meet.[8] The Company also must submit the announcement to Nasdaq's MarketWatch Department.[9] If the announcement is publicly released during Nasdaq market hours (7:00 am – 8:00 pm Eastern Time), you must notify MarketWatch at least 10 minutes prior to its public release. If the public announcement is made outside of Nasdaq market hours, the Company must notify MarketWatch of the announcement prior to 6:50 a.m. Eastern Time. For your convenience attached is a list of news services.

Please be advised that Listing Rule 5810(b) does not relieve the Company of its disclosure obligation under the federal securities laws. In that regard, Item 3.01 of Form 8-K requires disclosure of the receipt of a delisting notification within four business days.[10] Accordingly, the Company should consult with counsel regarding its disclosure and other obligations mandated by law.

The Company may appeal Staff's determination to a Hearings Panel, pursuant to the procedures set forth in the Listing Rule 5800 Series. A hearing request will stay the suspension of the Company's securities and the filing of the Form 25-NSE pending the Panel's decision. Hearing requests should not contain arguments in support of the Company's position. The Company may request either an oral hearing or a hearing based solely on written submissions. The fee for an oral hearing is $5,000; the

---

[7]    See Exchange Act Release No. 52993 (December 21, 2005).
[8]    Listing Rule 5810(b).
[9]    The notice must be submitted to Nasdaq's MarketWatch Department through the Electronic Disclosure submission system available at www.NASDAQ.net.
[10]    See SEC Release No. 34-49424.

Ms. Bei Lu
January 13, 2011
Page 7

fee for a hearing based on written submissions is $4,000. Please send your non-refundable hearing fee by wire transfer to "The NASDAQ Stock Market LLC" in accordance with the instructions on the attached Hearing Fee Payment Form.[11] The request for a hearing must be received by the Hearings Department no later than 4:00 p.m. Eastern Time on January 20, 2011. The request and confirmation of the wire transfer[12] should be sent to the attention of Amy Horton, Associate General Counsel, Nasdaq Office of General Counsel, via email at "hearings@nasdaq.com".

Please note that the suspension and delisting will be stayed only if the Hearings Department (the Rockville, MD location) receives the Company's hearing request on or before 4:00 p.m. Eastern Time on January 20, 2011. Please use the link "Hearing Requests & Process" on the attached chart for detailed information regarding the hearings process. If you would like additional information regarding the hearings process, please call the Hearings Department at 301.978.8203. If the Company does not appeal Staff's determination to the Panel, the Company's securities will not be immediately eligible to trade on the OTC Bulletin Board or in the "Pink Sheets". The securities may become eligible if a market maker makes application to register in and quote the security in accordance with SEC Rule 15c2-11, and such application (a "Form 211") is cleared. Only a market maker, not the Company, may file a Form 211.

Listing Rule 5835 prohibits communications relevant to the merits of a proceeding under the Listing Rule 5800 Series between the Company and the Hearings Department unless Staff is provided notice and an opportunity to participate.

While the suspension announcement will be included on the "Daily List", which is posted and available to subscribers of www.Nasdaqtrader.com at approximately 2:00 p.m. on January 21, 2011, news of the suspension may not be deemed publicly disseminated until the Company makes an announcement through a Regulation FD compliant means of communication.

If you have any questions, please contact me at (301) 978-5214 or Traynham E. Mitchell, Jr., Chief Counsel, Nasdaq Listing Investigations, at (301) 978-5217.

Very truly yours,

*Gary N. Sundick*

Gary N. Sundick


cc (via email):   Jerome S. Fortinsky, Esq.
                  Jason Li, CTEK

---

[11]   The Form also includes instructions for payment by check.
[12]   The confirmation of the wire transfer should be provided in an electronic file such as a PDF document attached to the email request.

Ms. Bei Lu
January 13, 2011
Page 8

## NASDAQ REFERENCE LINKS

| Topic | Description | Link |
|---|---|---|
| NASDAQ Listing Rules | All initial and continued listing rules | NASDAQ Listing Rules |
| Corporate Governance | Independent directors, committee requirements and shareholder approval | www.nasdaq.com/about/FAQsCorpGov.stm |
| Fees | Fee schedule | www.nasdaq.com/about/FAQsFees.stm |
| Frequently Asked Questions (FAQs) | Topics related to initial and continued listing | www.nasdaq.com/about/LegalComplianceFAQs.stm |
| Hearing Requests & Process | Discussion of the Nasdaq Hearings process | www.nasdaq.com/about/FAQsHearings.stm |
| Listing of Additional Shares (LAS) | Explanation of Nasdaq's Listing of Additional Shares process | www.nasdaq.com/about/FAQsLAS.stm |
| Transfer to the Nasdaq Capital Market | Procedures and application to transfer securities to the Nasdaq Capital Market | www.nasdaq.com/about/FAQsPhaseDown.stm |

## DIRECTORY OF NEWS SERVICES*

The use of any of these services will satisfy NASDAQ's listing rules that require the disclosure of specific information in a press release or public announcement. The Company must ensure that the full text of the required announcement is disseminated publicly. The Company has not satisfied this requirement if the announcement is published as a headline only or if the news service determines not to publish the full text of the story.

| News Service | Internet Address | Telephone Number |
|---|---|---|
| Bloomberg Business News | www.bloomberg.com | Toll free: 800 444 2090 Phone: 609 750 4500 |
| Business Wire | www.businesswire.com | Toll free: 800 227 0845 Phone: 415 986 4422 |
| Dow Jones News Wire | www.djnewswires.com | Phone: 201 938 5400 |
| GlobeNewswire (A NASDAQ OMX Co.) | www.globenewswire.com | Toll free: 800 307 6627 Phone: 310 642 6930 |
| MarketWire | www.marketwire.com | Toll free: 800 774 9473 Phone: 310 765 3200 |
| PR Newswire | www.prnewswire.com | Toll free: 800 832 5522 Phone: 201 360 6700 |
| Reuters | www.thomsonreuters.com | Phone: 646 223 6000 |

* Nasdaq cannot render advice to the Company with respect to the format or content of the public announcement. The following is provided only as a guide that should be modified following consultation with securities counsel: the Company received a Nasdaq Staff Determination Letter on (DATE OF RECEIPT OF STAFF DEFICIENCY LETTER) indicating that the Company fails to comply with the (STOCKHOLDERS' EQUITY, MINIMUM BID PRICE, MARKET VALUE OF PUBLICLY HELD SHARES, etc.) requirement(s) for continued listing set forth in Listing Rule(s) _____, and that its securities are, therefore, subject to delisting from (The Nasdaq Global Select/ Global/Capital Market). The Company has requested a hearing before a Nasdaq Listing Qualifications Panel to review Staff Determination. There can be no assurance the Panel will grant the Company's request for continued listing.

**The NASDAQ Stock Market**

# Hearing Payment Form

Listing Rule 5815(a) requires the issuer to submit a fee to cover the costs of the hearing.   The fee for an oral hearing is $5,000.   The fee for a written hearing is $4,000.   NASDAQ requests that the fee be paid concurrently with your hearing request by wire transfer following the instructions below.   If you do not have access to wire transfer, you may pay by check

**Payment By Wire:** Please use the following instructions and include the specific reference information provided below when transmitting your payment.

| By Federal Reserve Wire | | By (ACH) American Clearing House | |
|---|---|---|---|
| Bank Name: | Wachovia Bank, N.A. | Bank Name: | Wachovia Bank, N.A. |
| Bank Address: | 12 E 49th St., NY, NY 10017 | Bank Address: | 12 E 49th St, NY, NY 10017 |
| SWIFT Number: | PNBPUS3NNYC | SWIFT Number: | PNBPUS3NNYC |
| ABA Number: | 031201467 | ABA Number: | 026012881 |
| Beneficiary: | The NASDAQ OMX Group, Inc | Beneficiary: | The NASDAQ OMX Group, Inc |
| Account Number: | 2000031405177 | Account Number: | 2000031405177 |
| OBI (Reference): | Company name, symbol, | OBI (Reference): | Company name, symbol, |
| and note that the fee is for a hearing. | | and note that the fee is for a hearing. | |

**Payment By Check:** The check must be made payable to The NASDAQ Stock Market LLC and sent under separate cover to the address provided below.  Please complete this form and submit it with your payment.

COMPANY NAME _____  SYMBOL _____

ADDRESS _____

ADDRESS _____

REMITTER NAME _____
(IF NOT THE SAME AS THE COMPANY)

CHECK ENCLOSED IN THE AMOUNT OF  $ _____  CHECK NO. _____

Please mail this form and your payment by courier/overnight to:

The NASDAQ Stock Market LLC
Office of General Counsel - Hearings
Lockbox 90200
c/o Wachovia Bank, N.A.
401 Market Street
Philadelphia, PA 19106

**8**

UNITED STATES OF AMERICA

NASDAQ STOCK MARKET

NASDAQ LISTING QUALIFICATIONS HEARING PANEL

CLEANTECH INNOVATIONS, INC.

Washington, D.C.

Thursday, February 24, 2011

```
 1    PARTICIPANTS:

 2    Panel Members:

 3        CRAIG V. MILLER

 4        BONNIE WACHTEL

 5    Counsel to Panel:

 6        AMY HORTON

 7    Staff:

 8        WILLIAM SLATTERY

 9        MICHAEL EMEN

10        TRAYNHAM MITCHELL

11        GARY SUNDICK

12        MICHAEL WOLF

13    For CleanTech Innovations, Inc.:

14        DAVID A. DONOHOE, JR.

15        JASON LI

16        BEI LU

17        KATHERINE ROBERSON PETTY

18        STUART P. SLOTNICK

19        DAVID STRANDBERG, III

20

21                    *   *   *   *   *

22
```

```
 1                    P R O C E E D I N G S

 2                                        (10:24 a.m.)

 3            MS. HORTON:  I think we'll go ahead and

 4     go on the record now.  We have (inaudible)

 5     formalities, so we'll start with that and hope

 6     that Katie can show up with the written

 7     presentation shortly.

 8            Welcome.  As you know, CleanTech is here

 9     for its hearing before the Hearings Panel.  The

10     Panel is made up of independent professionals,

11     independent of NASDAQ that is, who have been

12     authorized by our board to oversee this process

13     and issue final decisions, which could result in

14     the delisting of the company's shares.

15            My name is Amy Horton.  I'm here to

16     facilitate this process for you.  I serve as

17     counsel to the Panel.  And I will at this time ask

18     the Panel members to introduce themselves.

19            MR. MILLER:  My name is Craig Miller.

20     I'm an audit partner with Grant Thornton.

21            MS. WACHTEL:  My name is Bonnie Wachtel.

22     I'm a principal with Wachtel & Co., Inc., which is
```

1     a local broker- dealer.  I sit on a few corporate

2     boards.  I'm an attorney and a CFA.

3                MS. HORTON:  We have today joining us

4     members of the Listing Qualifications staff.  I

5     will ask in just a moment that they also introduce

6     themselves.

7                Typically the staff attends these

8     hearings by virtue of a written hearing

9     memorandum.  That memorandum is a part of the

10    record, but staff has decided that they will

11    attend the hearing today.  And so we will give

12    them an opportunity to speak and to make their

13    case.  But the first part of our day will be the

14    company's to make its presentation to the Panel.

15                MR. DONOHOE:  So, Amy, they fixed the

16    problem and they're printing (inaudible).

17                MS. HORTON:  Terrific.  All right.

18    Well, I'll talk a little faster then.

19                I understand that we do have some

20    simultaneous translating going on today.  I'll ask

21    everyone to be mindful of that and appreciate your

22    -- the hurdles that that takes today.

```
 1              So why don't I, at this point, turn

 2      things over to -- well, actually why don't we ask

 3      staff to introduce themselves?

 4              MR. EMEN:  Sure.  I'm Michael Emen.  I'm

 5      senior vice president in charge of the Listing

 6      Qualifications Department.

 7              MR. MITCHELL:  Hi.  I'm Tray Mitchell.

 8      I'm chief counsel for the Listing Investigations

 9      Department.

10              MR. SUNDICK:  Gary Sundick, vice

11      president, Listing Qualifications.

12              MR. SLATTERY:  Will Slattery, vice

13      president, Listing Qualifications.

14              MR. WOLF:  Michael Wolf.  I'm a

15      (inaudible).

16              MS. HORTON:  Okay.  Is the company

17      prepared to go forward?

18              MR. DONOHOE:  Yeah.  I think we can get

19      started and then we'll hand out the presentation

20      as it comes down.

21              MS. HORTON:  Okay.  Just to let you

22      know, the Panel may ask questions along the way.
```

1    If they feel that a point is being made that they

2    would like the staff to address at that point,

3    they may ask for comment.  We will make every

4    attempt to sort of, of course, allow you whatever

5    time you need to make your presentation, but do be

6    aware that this is a bit of a fluid process and so

7    we'll account for that.

8         MR. DONOHOE:  My name's Dave Donohoe and

9    I'm an advisor to the company.  And one of my

10   partners, Katherine Petty, will be joining us in

11   progress during the hearing.

12        MR. SLOTNICK:  And I'm Stuart Slotnick.

13   I'm from the law firm of Buchanan Ingersoll &

14   Rooney, and I'm counsel to CleanTech.

15        MS. LU:  My name is Bei Lu, the

16   chairman, the founder, the CEO of the company, of

17   CleanTech Innovations.

18        MR. LI:  I'm Jason Li, the corporate

19   secretary of CleanTech Innovations.

20        MR. DONOHOE:  Well, let me begin by

21   thanking the Panel for giving us the opportunity

22   to make our presentation today.  As you know,

1    we're here today because the staff has raised

2    public interest concerns related to the period in

3    time in which the company's listing application

4    was pending.  The company was listed on the market

5    back in December.  So we're going to walk you

6    through a fairly detailed presentation today to

7    address all of the facts and circumstances that

8    the staff has raised and to, in particular,

9    address all the facts and circumstances

10   surrounding the December financing that's really

11   at the heart of the issues.  And based on that

12   information, we're going to ask that the company

13   allow to be -- remain listed on the market.

14            So with that, I'm going to turn it over

15   to Bei, who's going to introduce herself and the

16   company.

17            MS. LU:  Can we start now?

18            MR. DONOHOE:  Yes.

19            MS. LU:  Thanks for giving me the

20   opportunity to make this presentation.  I'm very

21   concerned about the issue which brought us here

22   today.  The issue remaining today is not -- is

1    very upsetting and that is not how we do business.

2    We didn't intentionally withhold any information

3    from NASDAQ and we have directed our listing

4    council to answer all the questions from NASDAQ

5    and, in particular, the relationship between NYGG.

6           We are very clear about NYGG's role as a

7    placement agent, investors, advisors, and other

8    business aspects.  We believe the reason we're

9    here is as a result of a deep misunderstanding.

10   We will address all the issues today.

11          Please let me introduce the company

12   which I'm very proud of.  I'm the CEO, the

13   chairman, the founder of the company.  I have an

14   engineering degree.  I'm a certified mechanical

15   engineer and I have a master's degree of business

16   management, and I have over 20 years' experience

17   of my industry, business.  And I'm one of the few

18   female entrepreneurs in China.

19          I started my company with my bare hands,

20   with nothing.  I understand following the rules if

21   very important to us because we work with some of

22   the largest state-owned companies.  Not following

1    the rules will bring us great dishonor to our

2    company.  Then I'm going to present the company.

3              MR. DONOHOE:  And we will pass out the

4    presentation just as soon as it gets here, but we

5    can start talking about the company now.

6              MR. SLOTNICK:  Yes, go ahead.  You can

7    go ahead.  Even though we don't have the handouts,

8    you can go ahead.

9              MS. LU:  So CleanTech designs and

10   manufactures high-performance clean technology

11   products.  We have approximately 180 employees.

12   Our notable customer, including China Guodian,

13   China Huaneng, and Sinosteel, which are the top

14   Fortune 500 companies in the world.  Our company's

15   growing at a rapid pace.  As of December 21, 2010,

16   the total shareholder equity is $29 million.  The

17   market capitalization is $140 million.

18              Now we're on slide 3.  Please turn to

19   slide 3.  And in 2010, last year, we reached the

20   record revenue of $22 million.  And also we

21   reached the record net income of $4 million.  And

22   we also have a record of $50 million backlog for

```
 1    2011, which are -- most of it is wind tower

 2    business.  CleanTech anticipates winning

 3    additional wind tower supply contracts in 2011.

 4    We have a huge potential market (inaudible)

 5    approximately $5 billion.  Please turn to slide 4.

 6    Those are the three major products we have.  We

 7    own five patents and I am the inventor of two of

 8    them.  We have a very experienced management team.

 9              This is slide 5.  China is the world's

10    largest polluter.  We'll spend about $738 billion

11    in the next decade developing cleaner sources of

12    energy, which brought us a huge opportunity for

13    our products.

14              Turn to slide 6.  Our products mainly

15    provided to wind power industry and other steel

16    industry and utility industry.

17              Turn to slide 7.  Our wind towers takes

18    the revenue of 80 percent of 2010.  (inaudible) is

19    about 10 percent.

20                        (inaudible) was 10 percent.  Please

21                        turn to slide 8.  We have

22                        established our
```

1          Customer bases with China Guodian, China

2    Huaneng, China -- Sinosteel, (inaudible), which

3    are multiple revenues state- owned (inaudible)

4    company.  We're developing other top utility

5    companies are our customers.  These reputable

6    customers are the foundation to our fast growth.

7          Thank you.  Now I will pick up here from

8    slide 9.  It was the notable recent (inaudible).

9    In January and February, CleanTech just has one --

10   two wind tower contracts from China Huaneng and

11   China Guodian, which is totaling $50 million and

12   which represents 50 percent -- over 50 percent of

13   the company's current projected revenue in 2011.

14   And CleanTech anticipates additional wind tower

15   supply contracts throughout 2011.

16          For fiscal year ended December 31, 2011,

17   CleanTech reported a net income of $4 million on

18   revenue of $22 million, which represents 700 and

19   400 (inaudible) percent increase over the Fiscal

20   Year 2009.  And the total shareholder equity at

21   the year end is $29 million.  Given the Huaneng

22   contracts and additional contracts (inaudible)

1    anticipated in 2011, the company expects revenues,

2    net income, and total shareholder equity to

3    continue to increase.

4              Please turn to slide 10.  Now I'm going

5    to go through some details about our two recent

6    financing transactions.  The first one was the

7    strong growth (inaudible).  In October, CleanTech

8    consummated a $1.5 million short-term loan with

9    (inaudible) Capital, which an affiliate of NYGG

10   and the interest rate was 10 percent.  And we

11   filed the 8-K to the SEC on October 14 -- 15,

12   2010.  And the other one is in December.

13   CleanTech has made an equity (inaudible) financing

14   totaling $20 million.  The money was used to pay

15   off the short-term debt obligations and to

16   manufacture the existing wind tower contracts to

17   participate in new wind towers contracts bids and

18   to fulfill a significant amount of new wind tower

19   contracts anticipated in 2011 from China's largest

20   state-owned entities.

21             The December financing were not needed

22   and were not entered into to meet the NASDAQ's

```
1    initial or continued listing standards.  NYGG was

2    acting as a placement agent.  NYGG also provided a

3    (inaudible) loan with an interest rate of 10

4    percent.  NYGG affiliates purchased 2.5 million in

5    equity securities.  And all of this, CleanTech

6    filed the 8-K timely and properly to the SEC on

7    December 16, 2010.

8              MR. SLOTNICK:  Okay.  So if you'll turn

9    to page 11, please, I would like to start with my

10   part of the presentation.

11             MS. WACHTEL:  Mr. Slotnick, when was

12   Buchanan Ingersoll retained first to work with

13   CleanTech?

14             MR. SLOTNICK:  I believe in December.

15             MS. WACHTEL:  December 2010?

16             MR. SLOTNICK:  Yes.

17             MS. WACHTEL:  After the financing?

18             MR. SLOTNICK:  After the financing.

19             MS. WACHTEL:  Okay.

20             MR. SLOTNICK:  We were retained as a

21   result of the delisting issues.

22             MS. WACHTEL:  And is there another
```

1    outside law firm that handled the December

2    financing and --

3              MR. SLOTNICK:  Yes.  The structure, the

4    way the company proceeded prior to the financing

5    is the company had two counsels.  The company had

6    a listing counsel, separate listing counsel, which

7    was the law firm of Stevens & Lee.  The company

8    also had a separate corporate counsel, which is

9    the Law Office of Robert Newman, who handled the

10   financing and the corporate aspects.  So they were

11   separate counsel and separate law firms.

12             MS. WACHTEL:  Where are they located?

13   The same place, the same (inaudible)?

14             MR. SLOTNICK:  The Law Office of Robert

15   Newman is in New York City and the Stevens & Lee

16   law firm where the listing counsel was -- is in

17   Reading, Pennsylvania, and Philadelphia.  They're

18   basically in Reading, Pennsylvania, but listing

19   counsel is in Philadelphia.  In fact, the listing

20   counsel was at the Philadelphia Stock Exchange for

21   11 years and was the general counsel of the

22   Philadelphia Stock Exchange. And so if you hear

1     the name it's William Uchimoto, who was listing

2     counsel for the company.

3              MS. WACHTEL:  Okay.

4              MR. SLOTNICK:   Okay.   So we believe,

5     based upon our reading of the delisting letter and

6     the hearing memo that the staff has three

7     concerns.   The core concern here, we believe, is

8     that the staff feels that the company

9     intentionally failed to disclose this bridge

10    financing, this $20 million -- 10 million debt, 10

11    million equity -- and that it was deceitfully

12    disclosed, that they had lied to the staff.   And

13    that is really the core of this proceeding.

14             However, we also notice there are two

15    other concerns that although are not a basis for

16    delisting, are list -- are referenced

17    significantly.   And that is the company's

18    association with New York Global Group and an

19    individual name, Ben Wey, Mr. Wey.

20             And third, the company appears to us to

21    have objected to the terms of the December

22    financing.   Ultimately, we believe that the staff

```
 1    felt it was a bad deal.

 2            And we think that you will see when we

 3    go through this that, number one, there was a

 4    misunderstanding with regards to the company's

 5    intention to not to disclose.  The company

 6    certainly didn't mean to hide this, and you'll see

 7    it.  It sort of defies logic when you say the

 8    company meant to hide this financing; that Mr. Wey

 9    -- in response to concerns by the staff, Mr. Wey

10    went down to Maryland and sat with the staff, the

11    entire staff, everyone that's in the room today,

12    and answered questions for a half a day, almost

13    for five hours.  And ultimately, Mr. Wey was -- he

14    was approved or he was vetted because the company

15    ultimately said we will approve this company for

16    listing, notwithstanding the fact that they have a

17    relationship with Mr. Wey.  And we believe also

18    that the December financing was also a fair and

19    appropriate (inaudible) for the company to go into

20    for the reasons we'll discuss here.

21            Now, to more specifically get into it,

22    please turn to page 12.  The summary of our
```

1    responses to the staff concerns is CleanTech did

2    not intentionally withhold information.  They were

3    not deceitful.  They did not lie to the NASDAQ.

4          As a matter of fact, you'll see there is

5    one e-mail that's at the center of the staff's

6    memo and also in our memo in which Jason Li, who's

7    to my left, says we're going to file an 8-K.  So

8    if the staff meant to -- if the company meant to

9    hide this, it just doesn't make sense that within

10   days they're going to say and we're going to file

11   an 8-K.

12         Now, I would also -- I think you have to

13   assume a few things.  You have to assume that the

14   company knew when it was going to be approved,

15   which it didn't, for them to be intentionally and

16   deceitfully hiding this.  And you also have to

17   assume that they knew that the next day they would

18   be approved and that they also believed, and that

19   both the corporate counsel and the listing counsel

20   believed, that if this 8-K was just disclosed

21   outside of the listing period because the company

22   had been approved, that there was nothing that

```
 1    could be done.  And that just -- it's just not so.

 2    Everyone here was aware, the listing counsel was

 3    aware, if there were issues that anything could

 4    come up on a review even after the listing period.

 5              Now, also, to demonstrate that the

 6    company was not trying to hide anything is even

 7    before the December financing is a November 17th

 8    e-mail from listing counsel to the staff.  And

 9    you'll hear that there was a tremendous

10    back-and-forth between the staff and listing

11    counsel, a request for documents and e-mails, even

12    attorney-client privileged e-mails.  And in this

13    November 17th e-mail, way before the December

14    financing, the listing counsel in response to them

15    says that NYGG, the consultant in question here

16    that's being questioned, is going to make

17    introductions of potential institutional investors

18    and bridge lenders such as UBS Global Asset

19    Management, Dean Witter, Barclays, Apollo

20    Management, SGC -- which is Strong Growth Capital,

21    which had previously done that $1-1/2 million

22    financing with no issue from the staff -- Goldman
```

1    Sachs Asset Management through the Sonterra Fund,

2    and also notably a provision of short-term loan

3    for working capital through NYGG China, Asia

4    affiliate.   Okay?   So this is not the action --

5              MR. DONOHOE:   Let me hand this out as an

6    exhibit.

7              MR. SLOTNICK:   Okay.   This is not an

8    e-mail of a company and its listing counsel and

9    its corporate counsel all working together to be

10   deceitful and to hide potential financing in

11   December because on November 17th, they

12   specifically say in an e-mail these are some of

13   the things we're going to do.   Now, if you want to

14   look at the quote that I just read it's on page 2

15   of the November 17, 2010, e-mail from William

16   Uchimoto.   On the second page it's specifically

17   paragraph 9.

18              Of course, even prior to this e-mail New

19   York Global Group was disclosed to the staff, the

20   engagement agreement between New York Global Group

21   and the company was disclosed and it said the role

22   that they could play with the company, and we'll

1      get into more of the details of that in a moment.

2              Additionally, it's important to note

3      that in October, the October 15th financing

4      previously mentioned, that October 15th financing

5      with an affiliate of New York Global Group was not

6      previously disclosed to the staff prior to the

7      8-K.  The financing was closed, an 8-K was filed,

8      and as far as the company understood there was no

9      problem from the staff that this affiliate of New

10     York Global Group had done this $1-1/2 million

11     financing.  So when the company had done this

12     December financing they proceeded exactly as they

13     had done previously, and it did not occur to them

14     that they needed to say, listen, we're getting

15     financing ready and we'll let you know ahead of

16     time prior to the 8-K.  And they ultimately

17     disclosed the December financing through the 8-K.

18              MS. WACHTEL:  I'm sorry, I'm missing

19     something.  When was the company approved for

20     NASDAQ?

21              MR. SLOTNICK:  The company was approved

22     on December 10th.

1              MS. WACHTEL:  Why were you filing 8-Ks

2     if you weren't listed on the exchange?

3              MR. DONOHOE:  Well, they were public, so

4     they were on the Bulletin Board.

5              MS. WACHTEL:  Okay.  Got it.

6              MR. SLOTNICK:  Okay.  So I think

7     ultimately you have to make a lot of assumptions

8     to believe this company was deceitful and

9     intentional and engaging in trickery to hide

10    something that they clearly say we're filing an

11    8-K for.  And it's consistent with their past

12    behavior that had met with no issues from the

13    staff.

14              Secondly, the second concern was who is

15    Mr. Wey?  Who is New York Global Group?  In

16    response to questions from the staff, Mr. Wey

17    appeared, as I said.  He went to Maryland, he was

18    questioned for almost five hours.  Mr. Wey,

19    although he's not listed as a basis for delisting,

20    takes up tremendous content in the hearing

21    memorandum.  And they talk about how Mr. Wey is

22    someone that is controversial, that he's involved

```
 1      in the China Space.  He specializes in reverse

 2      mergers in the China Space.  And we believe that

 3      this concern that's being voiced now is a little

 4      bit misplaced.  You know, there are other

 5      companies on the NASDAQ in which Mr. Wey and New

 6      York Global Group were consultants.  For example,

 7      Deer -- the ticker's D-E-E-R -- that company is

 8      doing phenomenally well on the NASDAQ today.

 9      There's another company, SmartHeat -- the ticker

10      is H-E-A-T -- also a company that's doing well

11      today.

12              There's another company, however, that's

13      not doing as well.  It's called AgFeed, F-E-E-D.

14      Now, part of the reason why AgFeed isn't doing

15      well, AgFeed is one of the largest hog farmers in

16      China.  And you will see that -- and I'm sure

17      you'll hear that Mr. Wey has a "certain

18      notoriety," although a lot of it is built up over

19      the years through blogs about the China Space and

20      there's a Barrons article that talks about Mr. Wey

21      and New York Global Group, and specifically AgFeed

22      and how this company does so -- has done so poorly
```

1    even though New York Global Group made money.   But

2    what the article failed to mention is that AgFeed

3    suffered from not only the global economy issues,

4    but also a commodity crush on hog prices and then

5    later there were floods that decimated 14 out of

6    19 of AgFeed's farms.   So that company, it had

7    nothing to do with Mr. Wey.   Yeah, even in a

8    Barrons article they listed him.   They say, oh,

9    look at this.   He was associated with the company,

10   he made money, and now the stocks are $2.   So

11   there's certain innuendo here and a lot of it is

12   in blogs and in tabloids from my hometown called

13   The New York Post.

14        And that's -- ultimately the staff met

15   with Mr. Wey.   They asked him about his regulatory

16   past from when he was right out of college in the

17   state of Oklahoma.   They questioned him.   Every

18   single question they had we presume they asked

19   because we were there for almost five hours, and

20   every single question Mr. Wey answered.   And

21   ultimately, the company was approved for listing,

22   knowing full well the role that NYGG and Ben Wey

1    would play and the relationship and what they were

2    -- what NYGG was doing for the company.

3           And finally, we believe that the

4    company, the staff says, you know what?  This

5    December financing was a bad deal for the company.

6    They shouldn't have done it.  An affiliate of New

7    York Global Group profited.  And I'm going to turn

8    it over to my colleague Dave Donohoe in a second,

9    but they said their compensation was outrageous,

10   it was $4.8 million.  And we believe that's

11   incorrect.

12          But what you need to know about this

13   December financing is the company was in an urgent

14   situation.  The company had previously discussed

15   with the staff that they were going to do an up to

16   $50 million financing with Stifel Nicolaus in

17   December.  Stifel Nicolaus, due to market

18   conditions, told the company we're not going to do

19   the financing before the close of 2010 and we will

20   push it to the first quarter of 2011.  That left

21   the company in a very precarious situation, not

22   for listing qualifications because they met all

1    the criteria.  It wasn't a quantitative issue.

2    This financing was done so the company would have

3    cash, so they could bid for very lucrative

4    contracts.  And as a matter of fact, to date

5    they've won $15 million of contracts as a direct

6    result of this December financing.

7              So you might ask why did the company

8    need so much money to bid for contracts?  They're

9    a well-known company.  Well, in China, when they

10   are bidding to build these wind towers, they need

11   to show the vendors who they're bidding for their

12   business that they have liquidity and they need to

13   place bid deposits, sometimes 10 to 15 percent.

14   So if the company was going to bid for a $20

15   million contract, they would have to -- if it's a

16   10 percent bid -- they would have to put $2

17   million down with the company that the company

18   holds until the completion of the contract.  Not

19   only would they have to put down the bid deposits,

20   but the company also had to demonstrate to the

21   vendors that they had the ability to execute on

22   the contracts; that they had liquidity, so they

1    could buy these raw materials to (inaudible)

2    tremendously huge wind contracts.

3              Now, without this December financing the

4    company would not have been able to bid for and

5    ultimately win these contracts.  As I said, $15

6    million to date and they expect potentially to win

7    up to $10 million more in contracts in the next

8    few months of bids that are placed directly

9    relating to this financing.

10             Now, I just -- I'm going to ask Dave

11   Donohoe to just address the fact that the staff

12   objected to New York Global Group's compensation

13   directly related to this December financing

14   because the staff in its hearing memo said the

15   compensation was approximately $4.8 million.  And

16   it's interesting to note before I turn it over

17   that there's a debt portion of $10 million that

18   was done -- that was loaned by New York Global

19   Group at a 10 percent per year interest rate; same

20   exact terms that had previously been done in that

21   $1.5 million financing with an affiliate of New

22   York Global Group, which the staff did not have a

1     concern about.  And there was also a $10 million

2     equity traunch of that December financing.  And

3     out of that $10 million, only 2.5 million of those

4     dollars was invested by an affiliate New York

5     Global Group, not the entire $10 million.

6            So now, with that, and keeping in mind

7     that this financing was not done for listing

8     criteria, I'm going to turn it over to Dave.

9            MR. DONOHOE:  First, let me just add on,

10    the $2.5 million, so 2.5 out of the 10 million

11    equity financing came from Strong Growth Capital,

12    which is the NYGG affiliate.  This is the same

13    affiliate that invested 1.5 million in the company

14    in October.

15            MR. MILLER:  The debt piece, the $10

16    million debt piece, did it have warrants on it?

17            MR. DONOHOE:  Well, there were warrants

18    as part of this whole package.  It was one big

19    financing package.  And I'll address the warrants

20    and all of that as I go through this.

21            So with respect to Strong Growth

22    Capital, effectively what they did is they took

1    their $1.5 million investment that they -- which

2    was a (inaudible) they made in October, they

3    converted that to equity, and they kicked in

4    another million dollars.  So they basically added

5    a million dollars to the investment that they

6    already had.  They converted their debt investment

7    into an equity investment.

8           So I'm going to pass out two exhibits

9    right now.  Katie, you want to do that?  And the

10   first one is basically just putting down on paper

11   what I'm going to explain in the compensation

12   analysis.  So in the staff materials, they

13   attribute 4.8 million in compensation to Ben Wey,

14   NYGG, NYGG affiliates.  So let's look at what the

15   compensation actually was.

16          So NYGG received cash compensation of

17   $1.1 million in connection with the $20 million

18   financing.  So that's 5.5 percent for facilitating

19   the $20 million financing.  NYGG also received

20   300,000 warrants with an exercise price of $4 per

21   share.  So in doing their analysis the staff

22   started by using a market price of 6.75 for

1      purposes of measuring the discount in potential

2      compensation.   6.75 is the closing price on

3      December 13th, the date that they did the

4      financing.   However, you'll see in one of the

5      exhibits that under NASDAQ's own rules and

6      interpretations, the December 13th price is not

7      the right price to use.   NASDAQ is very specific

8      that if you're going to close a transaction during

9      the business day, you have to look at the prior

10     business day's closing bid price.   This

11     transaction closed around noon on December 13th,

12     so the relevant price is $6.05, which was the

13     consolidated closing bid prices on December 10th.

14     So that immediately takes 70 cents, you know, out

15     of the compensation analysis that was used by the

16     staff.

17            As a consequence of getting these

18     warrants, it's true that if the stock price didn't

19     move at all, if it didn't come down at all, NYGG

20     could have gotten another 615,000 in compensation

21     for facilitating the financing, which would take

22     it up to total available compensation to NYGG of

1    about 1,715,000 or 8-1/2 percent of the $20

2    million.  So in addition to that, which we think

3    is completely separate from the compensation,

4    Strong Growth Capital -- the NYGG affiliate --

5    invested $2.5 million out of the 10 million equity

6    piece.  And they -- so they got 625,000 shares for

7    that at $4 per share.  And they also got 421,875

8    warrants with an exercise price of $4 per share.

9            Again, in the staff's analysis they

10   assumed 100 percent warrant coverage.  It wasn't

11   100 percent warrant coverage.  It was more like 66

12   percent, so they got fewer warrants than

13   (inaudible).

14           MS. WACHTEL:  Could you slow down a

15   minute so I can make sure I've got these

16   financings in line?  So the first financing was in

17   October?  That was what total?

18           MR. DONOHOE:  That was $1.5 million by

19   Strong Growth.

20           MS. WACHTEL:  Okay.  And then the next

21   one was in December.  That was how much?

22           MR. DONOHOE:  That was $20 million.

1              MS. WACHTEL:   Okay.   And of that how

2    much was equity?   How much was debt?

3              MR. DONOHOE:   Ten million was straight

4    debt, nonconvertible debt, with a 10 percent

5    coupon and 10 million was equity with about 66

6    percent warrant coverage.

7              MS. WACHTEL:   Okay.   And who bought the

8    debt at that time?

9              MR. DONOHOE:   NYGG itself bought the

10   debt.

11             MS. WACHTEL:   Okay.   And for the equity

12   they converted their (inaudible) and threw in

13   another million.

14             MR. DONOHOE:   Right.

15             MS. WACHTEL:   So that's 2-1/2 percent of

16   the equity and the other 7-1/2 million --

17             MR. DONOHOE:   Came from independent

18   agent investors.

19             MS. WACHTEL:   Okay.   Who were introduced

20   by?

21             MR. DONOHOE:   By NYGG.

22             MS. WACHTEL:   All right.   Are they

1      affiliates of NYGG?

2            MR. DONOHOE:  They are not affiliates of

3      NYGG.  They are independent.  And, in fact -- and

4      they drove the terms on the transaction.

5            I think one other thing that's important

6      that's not evident from the record -- and it

7      wouldn't be evident -- so the company was

8      obviously fully engaged in this financing.

9            MS. WACHTEL:  One more question.  The 10

10     million in debt with the 10 percent coupon, is

11     that convertible in any way?

12           MR. DONOHOE:  No.

13           MS. WACHTEL:  Does it have liens on it?

14           MR. DONOHOE:  No, it's straight debt.

15           MS. WACHTEL:  Okay.  All right.

16           MR. DONOHOE:  Straight debt.  So, I

17     mean, one of the things that you've been hearing

18     already is that NYGG was engaged in this, you

19     know, financing effort throughout the whole period

20     of the listing process.  They -- NYGG was engaged

21     in July.  The staff received the engagement letter

22     (inaudible) as part of the listing process, which

1    fully laid out in detail what they were going to

2    be doing as far as the financing and talked about

3    NYGG also being able to take equity and debt

4    positions in the company.  So this process has

5    gone ongoing.

6         The company realized they had the

7    opportunity to make these bids and they realized

8    that the Stifel Nicolaus public offering was going

9    to be put off to the first quarter.

10        MR. MILLER:  Was that because of pricing

11   (inaudible)?  Why --

12        MR. DONOHOE:  Just the general market

13   conditions.  They felt like they couldn't get a

14   deal done within December.  They said, you know,

15   we could get it done, you know, sometime maybe

16   early in the first quarter, but the bid deadline

17   was in December, so they needed to raise the money

18   in December to meet the bid deadline.

19        So, but they had -- because they had

20   been out there talking to people, they had lots of

21   people to go to to talk about, you know, getting a

22   bridge financing.  And, in fact, in the beginning

1    of the process the company went to NYGG and said

2    why don't you -- you have money, why don't you

3    just give us the money?  And NYGG said, no, we've

4    talked to a lot of people out there.  Let's go

5    back to all of those people and let's see if we

6    can get them to give us the bridge financing.  And

7    so they went to a number of places.  They went to

8    Chinese banks.  They went to Barclays Capital.

9    They talked to Stifel about could Stifel do the

10   bridge.  They talked to Canner.  They talked to

11   Canaccord, William Blair, Bank of Montreal, Bank

12   of China, Shanghai Pudong Development Bank, Teling

13   Rural Credit Union.  And they couldn't get

14   anything that was going to work with all those

15   people.  And so finally the company went back to

16   NYGG and said, look, can't you get some of your

17   Asian investors to come in and can't you give us

18   the money?  And so they said okay, let's, you

19   know, let's put together the financing.  And so

20   that's really how all of that came together.

21            So let me go ahead and pass it back to

22   you.  I'm happy to answer any other questions

1    about this financing.

2              MR. SLOTNICK:   Okay.   So just to

3    continue on page -- and I think Dave covered some

4    of it -- is that even though the relationship with

5    Mr. Wey and New York Global Group are not grounds

6    for the delisting here, as I said, it takes a

7    prominent part in the staff's memo.   And again,

8    going back to July of 2010, the first bullet

9    point, the engagement letter with NYGG clearly

10   discloses that NYGG will "assist the company in

11   identifying, evaluating, and qualifying

12   prospective investors who will conduct one or more

13   finances for the company and counterparties for

14   possible transactions, including but not limited

15   to acquisitions, mergers, consolidations,

16   investments, joint ventures, or other business

17   combinations and transactions."   Which basically

18   they're saying New York Global Group is very

19   important in this process that the company is

20   going through.

21             And furthermore, more importantly, the

22   second bullet point, the engagement letter that

1     was disclosed to the staff says that "NYGG or its

2     affiliates may hold positions in equity, debt, or

3     other securities of the company."  And so these

4     are not productions of documents that are

5     consistent with a company that wants to hide the

6     role of NYGG and hide the fact that they're doing

7     financing.

8            In fact, this is exactly what the

9     company did with regards to holding debt in

10    October of 2010, as we said.  And I want to make

11    clear, just because I know we're talking about

12    different numbers and different financing, that

13    CleanTech filed a Form 8-K announcing this $1.5

14    million loan with a 10 percent annual interest

15    rate.  And the staff that was a New York Global

16    Group affiliate and the staff did not have an

17    issue with this.  This is not part of the

18    delisting proceeding, and this was disclosed

19    originally to the staff through the 8-K and that

20    that's how the company did it, so.

21           And to be clear, this is not subject to

22    the delisting.  They don't -- as far as I'm

1      concerned, I don't remember seeing you there

2      saying, and they did this financing and that was

3      bad and they tried to hide it from us, too.

4      Because that 8-K was filed on October 15th, and

5      then listings didn't happen until December 10th.

6      So there was a lot of time to talk about things

7      then and this wasn't really an issue.

8             MS. WACHTEL:  Let me get something

9      clear, though.  All right.  So staff has advised

10     you or the company is aware that they are

11     concerned about this outfit NYGG and Mr. Wey, and

12     even to the point of requesting attorney-client

13   - documents.  As a lawyer I realize you weren't

14     involved at that time, but you would certainly

15     have your antenna up and say NASDAQ's really

16     interested in this, right?

17            MR. SLOTNICK:  Listen, I think that's

18     clear.  I think that they knew that they were

19     interested.  As a matter of fact, Mr. Wey came

20     down and he answered the questions.

21            MR. MILLER:  When did he come down?

22            MR. SLOTNICK:  On November 5th.

1              MS. WACHTEL:  And then on the --

2              MR. SLOTNICK:  Way before any of the

3    financing.

4              MS. WACHTEL:  And then on the 12th and

5    17th they're still requesting attorney-client

6    privileged documents, which you're providing,

7    which you're also providing into early December.

8              MR. SLOTNICK:  Ultimately the -- there

9    was a significant back-and-forth with regards to

10   the attorney- client privileged documents because

11   as a lawyer, the listing counsel said this is a

12   very unusual request, asking us to waive our

13   privilege.  Even the Department of Justice in

14   their United States Attorneys Manual says we will

15   never ask someone to waive their privilege because

16   it's such a sacrosanct privilege.

17             So Stevens & Lee listing counsel brought

18   in their own general counsel, who said the staff

19   is asking us to do this very unusual thing.  We

20   think it's unusual.  And ultimately, as you'll

21   see, the staff said here's the deal:  You don't

22   disclose your -- you don't waive your privilege,

1      you don't get listed.  So that point -- because

2      there was significant back-and-forth and

3      significant conversation.

4              Listing counsel said okay, let's try and

5      protect this privilege.  How about we give them to

6      you?  You agree that you're not going to copy

7      them.  And then when you look at them and you're

8      done with them, you return them to us because

9      they're privileged materials.

10             The answer was no, no, and no.  Give it

11     to us, we want it.  And they then turned to the

12     company, they explained what attorney-client

13     privilege means, and the company said give it to

14     them.

15             MS. WACHTEL:  Okay.  And I assume they

16     also explained to them, as you said, that it's

17     very unusual, meaning NASDAQ is just really

18     concerned about this guy, Mr. Wey.  Could you

19     please ask Ms. Lu to explain to us -- or I'm sorry

20     if I got the name wrong, yeah, Ms. Lu -- to

21     explain to us what her understanding was of why

22     NASDAQ was so concerned about Mr. Wey and NYGG?

1          MS. LU:  As my knowledge we believed it

2     was the tabloid (inaudible) make the borrowings

3     article on October the 20th.  We saw that article.

4     We believe it's related.

5          MS. WACHTEL:  Okay.  I do not recall the

6     article.  What were the allegations?  What did it

7     say?

8          MR. DONOHOE:  Actually I can do that for

9     you (inaudible).  Basically in the article, this

10    is the article that (inaudible) before.  So it's a

11    whole article about the China Space in general and

12    talking about how China companies have faired.

13    And in the article with respect to Mr. Wey they

14    used the term, you know, "notoriety," and they

15    named the companies that Mr. Wey was involved in.

16          But what they did is they, for example,

17    they said, well, he's involved with Deer, but they

18    didn't say anything was wrong with Deer.  And they

19    said, you know, there's a picture of Mr. Wey on a

20    private airplane with the company after they did a

21    $75 million financing.  Didn't say the financing

22    was bad, didn't say anything bad happened.  They

1    just didn't like him flying around on the airplane

2    after they had just done a big financing.

3          And then they went on and they listed

4    several companies.  They said they used his

5    affiliation with CleanTech as an issue.  They

6    said, oh, and Mr. Wey, now he's with CleanTech.

7    CleanTech's stock's 9.25.  That's all they said.

8          And they said with AgFeed, they said,

9    oh, he was involved with AgFeed and look at

10   AgFeed.  AgFeed's stock was $15 and now it's

11   $2.50.  They didn't say that AgFeed's drop in

12   stock price came in the fall of 2008, when the

13   markets collapsed and when the hog prices went

14   down.  And they didn't say that AgFeed had lost 14

15   of their 19 farms because of a gigantic flood at

16   the beginning of 2010.

17          MS. WACHTEL:  Okay, okay, that's enough

18   because now I'd like to go back to Ms. Lu and ask

19   her again, what did -- okay, we have allegations

20   in the Barrons article.  Dave suggests these

21   allegations were unmerited on their face.  So what

22   did Ms. Lu understand to be the reason what NASDAQ

1    thought Mr. Wey was doing with her company or

2    other companies?

3            MR. LI:  Let me get this straight.  Let

4    me get clear because the English is not my first

5    language, so I might --

6            MS. WACHTEL:  Well, you're doing

7    beautifully.

8            MR. LI:  Yeah, I learned all the English

9    from China.  I'm never educated in the U.S.  I

10   just want to be clear that the question is what

11   were our thoughts about the NASDAQ people thinking

12   about, you know, the whole thing (inaudible)?

13           MS. WACHTEL:  Yes.  To lay it out again,

14   we have established that NASDAQ is extremely

15   concerned about Mr. Wey.  I'll just refer to him

16   rather than the company (inaudible).  So they're

17   very concerned about him.  You have an article

18   that doesn't really seem to prove anything.

19           MR. LI:  Okay.

20           MS. WACHTEL:  So was the understanding

21   that we have no idea why NASDAQ is interested in

22   this?  Or did you have a sense of NASDAQ is

 1    concerned that Mr. Wey is engaging in X, which we

 2    don't think he's engaging in?  What is X?  What is

 3    the bad behavior?  Did she have an understanding

 4    of that?

 5              MR. LI:  Okay.

 6              MS. LU:  The reason we chose NYGG as a

 7    financial counsel to our accountant was because

 8    NYGG has succeeded in China to put the company

 9    public in the U.S., which is (inaudible) that the

10    successful model is a company with SmartHeat and

11    Deer, and that's the reason we worked with them.

12    And we have no knowledge about the other X

13    factors.  We just -- we were a little bit confused

14    actually back then.

15              MR. DONOHOE:  So yeah, Bonnie, the

16    article did also mention that he had a regulatory

17    history that, you know, that dates past, you know,

18    10 years or so (inaudible), and we can address

19    that, also.

20              MS. WACHTEL:  Well, I think you and I

21    probably know why there was some scrutiny of this

22    person, whether justified or not.  I would now

1    like to ask Mr. Slotnick and, you know, we don't

2    get such interesting cases usually, so that's --

3    we like to play with them a little, like a cat

4    with a ball of yarn.

5              MR. SLOTNICK:  If I could just jump in

6    because I don't want to --

7              MS. WACHTEL:  What I'd -- I would like

8    to -- you talk to the listing counsel.

9              MR. SLOTNICK:  Yes.

10             MS. WACHTEL:  Who was that person again?

11             MR. SLOTNICK:  Bill Uchimoto, the former

12   general counsel of Philadelphia Stock Exchange.

13             MS. WACHTEL:  Okay.  And I'm sure he

14   told you that he was aware that the staff was

15   really interested in Mr. Wey, right, and there

16   could be -- there was potentially a problem just

17   because they were really interested in him, right?

18             MR. SLOTNICK:  I can -- let me answer

19   that with more than just a yes or a no.

20             MS. WACHTEL:  All right.  Okay, go

21   ahead.  Go ahead.

22             MR. SLOTNICK:  We obviously -- we spoke

1   with Mr. Uchimoto and interviewed him and went

2   over this.  This Barrons article, the listing

3   counsel believed, caused the concern because there

4   -- this article that came out just probably six

5   weeks after they filed their listing application,

6   this "Beware This Chinese Export."  This same

7   author, who specializes in trashing the China

8   Space and has written at least six articles,

9   negative articles, on the China Space.

10          The listing counsel said here's what

11  happened.  I don't know if he's right or if he's

12  wrong, but he said this article that mentions Ben

13  Wey, it's, you know, sort of innuendo, got the

14  staff worried because they don't want to get

15  another bad article and they don't want to be

16  associated with this.  So listing counsel said

17  that he heard from staff that they said they feel

18  uncomfortable.  Uncomfortable.  But that's what he

19  heard, uncomfortable without anything more.  And

20  that's why I said why don't you meet Mr. Wey

21  instead of relying upon these articles and blogs

22  and New York Post, why don't you meet him and ask

```
 1    him every single question you have about his

 2    regulatory history, about the companies he's

 3    involved with, who his affiliates are.   And

 4    ultimately, it proved out because the company --

 5    the staff approved.   They said he's okay.   They

 6    vetted him and he passed all their questions.

 7              MS. WACHTEL:   Well, did he tell you now

 8    they feel comfortable?

 9              MR. SLOTNICK:   Did who tell me?

10              MS. WACHTEL:   The staff.

11              MR. DONOHOE:   Well, the staff issued the

12    approval letter on December 10th.   It said nothing

13    about Mr. Wey even though they knew his full

14    (inaudible).

15              MS. WACHTEL:   But they -- did they tell

16    you they felt comfortable?

17              MR. DONOHOE:   No, they couldn't issue

18    the approval letter if they --

19              MS. WACHTEL:   Well, they -- I don't know

20    about that.

21              MR. SLOTNICK:   I don't know that they

22    specifically said we feel comfortable, but we know
```

1    that there was -- look, there was a lot of

2    back-and-forth about Ben Wey.  We'll use that

3    shorthand for New York Global Group for Ben Wey.

4    There were the articles about Ben Wey.  We see Ben

5    Wey that is attached in the hearing memo.  And

6    notwithstanding all of this, they met with Ben Wey

7    and they said this company is approved for

8    listing.

9              MS. WACHTEL:  Well, I think NASDAQ would

10   say -- I'm maybe stealing their thunder, but

11   (inaudible) I don't care -- would say, you know,

12   you could have picked up the phone and told them

13   you had this financing coming, given the fact that

14   --

15             MR. DONOHOE:  You're right.  You're

16   right.  And you'll see in here that (inaudible)

17   I'm telling you.  I mean, hindsight, they could

18   have easily picked up the phone and said this is

19   what we're doing.  It never occurred to them that

20   NASDAQ would object to the transaction or say

21   we're not going to list you for all the reasons

22   that we set forth in here.  He had already

```
 1      invested in the company during the middle of the

 2      process, you know.  And again, when I say "he," if

 3      you want to attribute, you know, Strong Growth

 4      Capital to Ben Wey, Ben Way doesn't have any

 5      beneficial ownership interests in any of the

 6      securities that we're talking about here, but he

 7      is associated with these, you know, with these

 8      entities.

 9              MS. HORTON:  I want to make sure that

10      staff has their full time and we do have some

11      limits.  So I --

12              MS. WACHTEL:  Could I ask just one more

13      question?

14              MS. HORTON:  Certainly.

15              MS. WACHTEL:  And that is did Mr.

16      Uchimoto tell you -- I'm assuming that

17      attorney-client privileges is off the table here,

18      but did he tell you that he advised whether or

19      not, shall I say, the company to inform NASDAQ of

20      this transaction before the 8-K?

21              MR. SLOTNICK:  Did Mr. Uchimoto -- no.

22      The answer is I'm not aware that he did.
```

```
1                MS. WACHTEL:  Did you ask him the

2      question?

3                MR. SLOTNICK:  Yes.

4                MS. WACHTEL:  And he said he didn't

5      advise him?

6                MR. SLOTNICK:  No.  Well, actually what

7      happened was he was not doing this transaction.

8      It was the corporate counsel that was doing it.

9      So when he found out about it, he said he didn't

10     advise the company of this transaction and this

11     went sort of just like the October financing that

12     they were going to disclose it through the 8-K,

13     which the corporate counsel was going to do.  And

14     --

15               MS. WACHTEL:  He found out about it

16     before the 8-K, I assume.

17               MR. SLOTNICK:  Yes.

18               MR. DONOHOE:  He found out right at the

19     very end, right before (inaudible).

20               MR. SLOTNICK:  Yes.

21               MS. WACHTEL:  After the listing had been

22     approved or before?
```

1              MR. DONOHOE:  Right at the same time.

2      Right at the same time.  And he had no involvement

3      at all until the --

4              MS. WACHTEL:  Because the company wasn't

5      keeping him in the loop or informing him.

6              MR. DONOHOE:  It just wasn't his role.

7      His --

8              MS. WACHTEL:  Okay.

9              MR. SLOTNICK:  Okay.  And I will say, I

10     would like to point to the November 17th e-mail

11     when Mr. Uchimoto wrote to the staff and he -- and

12     again, I read -- I believe I read this already,

13     but the New York Global Group could provide

14     short-term loan for working capital through New

15     York Global Group route China Asia affiliate.  So

16     that -- so, you know, it's not completely like

17     let's hide this because on November 17th, before

18     this financing happened, this e-mail went to the

19     staff.

20             MR. MILLER:  Let me -- I mean, I've worn

21     the most (inaudible) that the company's presented

22     thus far, but -- and I don't know the context of

```
 1      it, but in the hearing memorandum -- and it goes

 2      back to something you said about not knowing when

 3      the approval would take place, which, of course,

 4      is understandable, but there's an e-mail that I,

 5      by Mr. Li, that I don't know when it was, but it

 6      must have been around the time that the approval

 7      came out and that I find troubling, although I

 8      understand.  I don't have the context of when and

 9      the flow of the date and all that.  But it says

10      that we understand if we close the Deal before we

11      get approval from NASDAQ, we have to file the 8-K

12      and may have new problems crop up unexpectedly for

13      list approval.  And that to me shows that the

14      company, you know, knowing all the back-and-forth

15      with Mr. Wey, that they were sensitive or knew

16      that there could be something, you know, whether

17      it would stop the listing, delay it, whatever.

18      That to me lays out the sensitivity around this

19      financing.

20              MR. LI:  Okay.

21              MR. MILLER:  And I don't know, you know,

22      you couldn't say yet.  In hindsight, should have
```

1    picked up the phone, but it appeared that there

2    was a conscious effort or this could be read into

3    that there was an effort not to do that because

4    they didn't understand the impact.

5           MR. SLOTNICK:  Okay, and thank you for

6    bringing that up.  And if you turn to page --

7           MS. HORTON:  And I just want to say, I

8    want you to address that question, but as soon as

9    we can get to that, we do need to turn things over

10   to staff.  We have a hard stop at quarter of 11,

11   and we want to give them full time.

12          MR. SLOTNICK:  Okay.  If you turn to

13   page 17, we have the Li e-mail, which is on

14   December 9th in China time.  It's December 8th or

15   December 9th, depending on which country you're

16   in.  And the e-mail reads, and I think that this

17   is where the misunderstanding comes in place

18   because unless you have all of the facts here,

19   this e-mail can very easily be misread.  And I

20   agree with you 100 percent.

21          It says:  "Rob, this e-mail came from

22   Jason Li and went directly to corporate counsel

1    Robert Newman and it was an originating e-mail

2    where he started the conversation.  He said, Rob,

3    we were informed that the $20 million CleanTech

4    financing was revised to $10 million equity and

5    $10 million debt, which means it shows that the

6    terms are still changing, that even as of December

7    9th it's not -- this financing terms, they're not

8    done yet.  He wrote:  I assume we need to resign

9    the documents, right?  When I asked him, no

10   documents were previously signed.  When will we

11   receive them?"

12        Jason Li went on:  "We understand if we

13   close the $20 million deal --- the deal before we

14   get approval from NASDAQ Listings -- we may have

15   to file the 8-K and we may have new problems crop

16   up unexpectedly."  And I want to put a footnote on

17   this word problem because here's (inaudible)

18   language issue here.  We may have a new problem --

19   footnote -- crop up unexpectedly for list

20   approval.

21        But for the best interests of the

22   company, Bei -- who's sitting to my left, company

1    CEO and chairwoman -- doesn't want to wait.  If we

2    cannot get approval from NASDAQ by this Friday,

3    December 10th, which, coincidentally, was the day

4    that the company was approved for listing, Bei

5    wants to close the deal next Monday, December 13,

6    2010, and transfer the money to our U.S. account.

7    It's been a long time and a lot of effort by

8    taking all of you.  NYGG, CleanTech, Stevens &

9    Lee, which is the listing counsel, since we

10   submitted the application for the first time, July

11   16th if I remember right -- and now this is key --

12   "Bei has no interest to put NASDAQ as a prior

13   first considering the production plan we have in

14   our hand and working capitals we need for the next

15   year."  And he goes on.

16            So what is he saying?  I'm going to go

17   right to the issue you pointed out.  When I talked

18   to Jason Li I said you say the word "problem," and

19   that's what you pick up on.  I said what was the

20   new problem.  What was the problem you had before?

21            And he said we didn't have a problem.  I

22   said, well, what did you mean "new problem?"  He

1    goes this is a mistake.  I said what do you mean

2    it's a mistake?  He said the word in Chinese for

3    problem is wen ti.  Spelled phonetically it's

4    W-E-N T-I.  He said the word for question in

5    Chinese is went ay.  He said what I meant -- what

6    I really meant here is now that we're looking at

7    after the fact, and, look, I'm Chinese.  I wasn't

8    educated here.

9           You can see there's some errors in here

10   when he says we don't want to put NASDAQ as a

11   prior first considering.  He said I meant

12   question, and he said this unexpectedly.  He knew

13   that the staff had been asking a lot of questions.

14   And he's basically saying if another question

15   comes as a result of doing this financing, we

16   don't care that it will delay the listing because

17   we need to attend to the company's business.  What

18   he's saying is this e-mail was meant to go to

19   corporate counsel and it says hurry up, get this

20   financing done.  We need the money.  Stifel

21   Nicolaus pushed us to first quarter 2011.  We need

22   the money in the bank because the company's

1    business is our number one priority.

2              They had no reason to say we need this

3    listing to be done immediately.  We need this

4    listing done now.  It didn't really affect the

5    company, what the company was doing.  The core

6    business of the company is what it affected.  So

7    when I read that, we have a new problem, I said.

8    It raised a flag, the same as it did with you.

9              And after sitting down with him and

10   going over it, he goes no, it's about a question.

11   It may raise new questions.  And the company

12   didn't have problems with that.  And the proof of

13   that (inaudible) that says we're going to file the

14   8-K.  They had no idea when approval would be

15   forthcoming, if it would be forthcoming.  So for

16   all they knew, they would do this and then they

17   would be approved six weeks later.  Or if the

18   approval happened, there was no belief by all the

19   people involved that the staff wouldn't be able to

20   review this after the fact.  It just --

21              MS. HORTON:  Okay, thank you.

22              MR. SLOTNICK:  And it didn't occur to

```
 1    them.
 2            MS. HORTON:  I think that addresses the
 3    issue.  And I think at this point we're going to
 4    turn it over to the Listing Qualifications staff
 5    and ask them to make their presentations.
 6            MR. EMEN:  Okay, thank you.  This is one
 7    of the simplest matters you're going to hear in
 8    your tenure as Panel members, and I think it's one
 9    of the most important because at issue here is the
10    integrity of our listing process.
11            Simply put, this company withheld from
12    us highly material information regarding two very
13    significant transactions.  It was necessary for us
14    to make an informed decision about whether or not
15    to list the company.
16            If we had that information in hand, it
17    is likely CleanTech would not have been delisted
18    -- not have been listed.  But you don't have to
19    reach that decision today.  The issue today is
20    whether a company that withholds information like
21    that should remain listed.  And the answer to that
22    is no.
```

1           CleanTech's withholding of material

2     information was a serious violation of our rules

3     contrary to the obligations it assumed when it

4     signed out listing application.  And it was in

5     complete disregard of repeated requests by staff

6     for just that type of information.  The company

7     kept from us information we were entitled to know

8     about and that we should have considered during

9     the listing process and not afterwards.

10          Why is this case so important?  The key

11    regulatory challenge facing us today -- NASDAQ --

12    is how to effectively mitigate the regulatory and

13    reputational risks associated with the listing of

14    Chinese reverse merger companies, companies that

15    merge with U.S. shell companies.  Today, nearly 15

16    percent of our applications come from China, and

17    the majority of our 180 Chinese listings are the

18    result of reverse mergers.  When substantial

19    problems are uncovered with these companies our

20    reputation as a marketplace and investor

21    confidence in our marketplace will be irrevocably

22    damaged.  There's a cottage industry here and in

```
 1      China which is devoted to arranging these reverse

 2      merger transactions.  Benjamin Wey is part of that

 3      industry.  The people who arrange these

 4      transactions and the companies themselves have

 5      attracted an unprecedented level of media

 6      attention, and this in turn has attracted the

 7      attention of the SEC and Congress.

 8              On the one hand, concerns have been

 9      raised with the companies themselves, allegations

10      of financial fraud.  On the other hand, concerns

11      have been raised with the promoters who put the

12      deals together, allegations of undisclosed control

13      and egregious self-dealing at the expense of

14      public investors.

15              Over the past year, we've developed

16      expansive procedures to use in reviewing just this

17      type of company that go well beyond what we do

18      with other applications.  But our efforts in this

19      area will easily be frustrated if companies can

20      ignore our listing requirements and withhold key

21      information from us during the listing process.

22      Among the promoters the press is focused on are
```

1    Benjamin Wey and his close associated Ming Lee,

2    who, through their control of firms here and in

3    China, orchestrated the entire process through

4    which CleanTech went public and became listed.

5    His counsel, Mr. Slotnick, sits here today, also

6    representing the company.

7              This past summer, after CleanTech first

8    applied to list, Barrons ran a lengthy story which

9    you've heard about entitled, "Beware of This

10   Chinese Export."  The article is attached to our

11   memorandum.  The thesis of the article is that

12   many of Chinese reverse mergers are unsuccessful,

13   but that the people who promote them do

14   extraordinarily well for themselves.  Barrons

15   described Mr. Wey as one of the most controversial

16   promoters of Chinese reverse mergers.  In the view

17   of Barrons and the other columnists who have

18   written about him, Wey is controversial for a

19   variety of reasons.

20             In 1999, he was fired by his first

21   employer in the securities industry because he

22   didn't provide them with information that they

1     required.   In 2002, he was fined $5,000 and

2     suspended for 5 days by FINRA for maintaining

3     discretionary authority without providing

4     appropriate notice to his firm.   In 2005, he was

5     censured by the state of Oklahoma and agreed not

6     to register or transact securities business there.

7     In 2007, Bodison Biotech, a Chinese reverse merger

8     that Wey promoted, was delisted by the American

9     Stock Exchange for, among other things -- and I

10    quote -- "incomplete, inaccurate, and/or

11    misleading information related to its relationship

12    with and payments to a consultancy firm and its

13    affiliates, which firm and affiliates were

14    reported to have been Mr. Wey's."

15          While we had heard of Mr. Wey before

16    CleanTech applied to list in July 2010, the

17    Barrons story certainly put him front and center

18    in terms of our potential concerns.   It doesn't

19    matter whether Wey's reputation is deserved or

20    not.   What matters is that he is notorious.   We

21    knew of his reputation.   We were concerned about

22    it.   We were entitled to ask about it and we've

1      asked about it through the very end of the

2      approval process.

3              What matters to you today is that during

4      the final weeks of staff's review process the

5      company withheld from us important information

6      about two transactions it was completing with him.

7      Each of these transactions fell squarely within

8      the category of transactions we were asking about,

9      that we needed to know about.  Last October,

10     before Wey had risen to a real central role in our

11     review, we learned about the financing that you've

12     heard about that Wey and Ming Lee arranged for

13     CleanTech.  As a result of that financing, we sent

14     the company a very detailed information request,

15     which is quoted from at length in our delisting

16     determination.  That request was broad.  It called

17     for the production of any and all documents,

18     including e-mails related to Wey or Ming Lee or

19     their firms or a variety of matters, including any

20     loans or securities placements -- the very

21     transactions that were not disclosed to staff.

22              We had numerous conversations with

1    company counsel focused entirely on Wey.  As

2    you've heard, Mr. Wey, in fact, came to Rockville

3    to meet with staff.  He was accompanied by Mr.

4    Slotnick.

5              Despite all of our requests, we learned

6    in late November that the company had withheld

7    certain responsive e-mails from us.  Company

8    counsel didn't volunteer that information to us.

9    We asked whether they were withholding any e-mails

10   and that's when the contretemps about the alleged

11   privileged e-mails came about.  I'll simply tell

12   you that we disagree very strongly with the

13   assertion that those e-mails were privileged.

14             We made clear that if those e-mails were

15   not produced, the company would not be listed.

16   Securities counsel to the financings was involved

17   in those conversations as was listing counsel.

18   The company knew that was the last hurdle they had

19   us to get to address in terms of our review

20   process.  They were on the phone with us several

21   times a day asking when are we going to be

22   approved.  They knew of the imminence of our

```
 1    approval.

 2              While the company was purporting to

 3    satisfy our request for those e-mails, they were

 4    negotiating to close the two transactions that are

 5    at the heart of this case.  Our approval letter,

 6    based on incomplete information, was issued on

 7    December 10th.  Trading commenced on the 15th and

 8    the very next day, the 16th, the company filed an

 9    8-K disclosing the two Wey-related transactions,

10    which, again, are the heart of this case.  The

11    first was a private placement of $10 million worth

12    of stock and warrants, 25 percent of which went to

13    Ming Lee's firm Strong Growth Capital.  The

14    transaction was done at a deep discount, at at

15    least 33 percent to the then market price.  And

16    the shares could be sold as quickly as three

17    months later.

18              The other investors in this placement

19    all had invested in the past with Mr. Wey and Mr.

20    Lee.  For selling substantially discounted stock

21    to themselves and to other investors, Mr. Wey and

22    his associates received a fee of a million dollars
```

1    plus 300,000 warrants exercisable at the same

2    deeply discounted price.  The substantially

3    discounted price of the stock sale, quite frankly,

4    also raised doubts about the company's then

5    current trading price.

6              The second transaction was a $10 million

7    financing from Ming Lee's firm for which he

8    received yet another fee of $100,000.  The terms

9    of the loan provided that if the company's in

10   default, interest in the amount of 24 percent

11   could occur.

12             These are precisely the type of

13   self-enriching transactions for which Wey and

14   others have been criticized.  They went well

15   beyond what staff has seen before in its review of

16   this company.  When added to all the other indicia

17   of Wey's involvement, knowledge of these

18   transactions may well have tipped the balance

19   against listing CleanTech.

20             When we learned about these transactions

21   we immediately called the listing counsel.  We

22   told him that the failure to disclose these

```
 1      transactions was a serious violation of our rules.

 2      We asked for the immediate production of a

 3      chronology related to the two transactions.

 4      Hundreds of responsive e-mails were produced.

 5      They showed that the two transactions have been

 6      under discussion at least since November 30th,

 7      possibly sooner since the very first e-mail refers

 8      to a (inaudible) sheet.  Even that first e-mail is

 9      10 days before we issued our approval letter.

10              The e-mail quoted from the e-mail from

11      Jason Li, which we quote and Mr. Slotnick has

12      quoted.  It makes very clear that the company knew

13      that the disclosure of these transactions could

14      well affect our decision, but the closing of those

15      transactions were the highest priority.  It is

16      interesting that Mr. Lee's e-mail goes on to say

17      that they'll have further discussions with

18      Benjamin Wey, but not with NASDAQ, about those two

19      transactions.

20              The withholding of this information from

21      us is intolerable.  It violates our listing rules

22      and applications.  It flies in the face of
```

1    repeated oral and written requests for exactly

2    this type of information.  It defies commonsense

3    to suggest that this company had any reasonable

4    basis to believe that we would not be expected to

5    be notified in advance of these transactions

6    before we made our listing decision.

7              The company states today that our

8    listing approval meant that our concerns with Wey

9    did not rise to a serious level.  Nothing could be

10   farther from the truth.  It is ridiculous to

11   suggest that an approval letter based on

12   incomplete information is tantamount to an

13   acceptance of anything.

14              To use Mr. Slotnick's words, we did not

15   know full well what was happening with this

16   company.  Staff remained concerned about Wey

17   through the very end of the listing process.

18   While his level of involvement as presented to us

19   on December 10th may have been below the threshold

20   on which we might have denied listing, the

21   magnitude of these two transactions would have

22   clearly caused us to reassess that decision.  If

1    the company can with impunity withhold from us

2    information, necessary information, to make an

3    informed decision, we may as well just flip coins

4    when we decide to list companies.

5           After we reviewed the requested

6    materials from listing counsel, we told them that

7    the company had a choice:  They could withdraw or

8    we would proceed to delist them.  Immediately

9    afterwards, we were told that that law firm no

10   longer represented CleanTech.  Instead, Mr. Wey's

11   counsel, Mr. Slotnick, represented them.

12          After a series of discussions with Mr.

13   Slotnick's firm, we gave the company the same

14   alternative:  Withdraw or be delisted.  That very

15   night, I got an e-mail from Jason Li telling me

16   that the Slotnick firm no longer represented

17   CleanTech.  Instead, they had hired a large New

18   York law firm to represent them.

19          We met with that firm and with the

20   company, and shortly afterwards we issued our

21   delisting letter.  Interestingly, that firm no

22   longer represents the company.  Mr. Slotnick is

1    now back representing the company.

2         No matter how many times they change

3    lawyers, it is the company that is responsible for

4    getting the accurate information to the exchange.

5    This company has severely violated our rules and

6    we have no confidence that they would honor our

7    rules any more in the future than they have in the

8    past.  Consider how the company chose to disclose

9    this proceeding.

10         On January 20th, after the market

11   closed, CleanTech filed a Form 8-K with the SEC,

12   making the required disclosures about the

13   delisting proceeding.  They chose not to issue a

14   press release.  The next morning, before the

15   market opened, the company announced a new

16   contract for which they both filed an 8-K and

17   issued a press release.  As I'm sure was expected,

18   the favorable press release was picked up by the

19   wires.  That day CleanTech's stock opened at 4.45

20   and closed at 5.89.  The timing and the method of

21   these disclosures may have satisfied the letter of

22   our rules, but they certainly didn't satisfy their

1    spirit.

2           This case is terribly important.  If you

3    do not uphold our delisting determination, you

4    will be sending a clear signal not just here, but

5    around the world that it's open season to cheat on

6    NASDAQ in the listing process.  I can't imagine

7    that we want to do that.  The staff's decision to

8    delist CleanTech should be affirmed.  Thank you.

9           MS. WACHTEL:  Question for the company

10   or whoever, perhaps Mr. Slotnick.  We just heard

11   that there were a series of e-mails related to

12   these very transactions.  I think any of us in the

13   transaction world would assume, yes, you can't

14   have a transaction without e-mail traffic.  How is

15   it that those were withheld given the requests

16   that had been made by staff?

17          MR. SLOTNICK:  Thank you for asking

18   that.  That's actually in our presentation and

19   thank you for the opportunity to address that.

20          MS. HORTON:  We have a very short period

21   of time and I want to get the questions answered,

22   but I would ask you to really get to the point.

1            MR. SLOTNICK:   Okay.   So what happened

2     was that the staff had asked for corporate

3     counsel's e-mails, and those e-mails were

4     disclosed on November 24th, all the attorney-

5     client privileged e-mails.   And listing counsel

6     believed that they had complied with the staff's

7     request at that time.

8            As Mr. Emen noted, the first e-mail with

9     the company corporate counsel with regards to this

10    financing is November 30th, after that point in

11    time, and it's about a term sheet.   Here's a term

12    sheet; let us know -- to the company, let us know

13    if these terms are okay.   So the financing isn't

14    really even a place.   They're discussing a term

15    sheet on November 30th after the November 24th

16    date in which the e-mails to corporate counsel was

17    disclosed.

18            And listing counsel said, look, I

19    responded to the request, I responded on November

20    24th, and that was it.   The listing counsel said I

21    didn't believe this was an ongoing request and I

22    needed to supplement and call corporate counsel